Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION AT DAYTON

\* \* \*

JOSEPH GUGLIELMO,

             Plaintiff,

      vs.              CASE NO. 3:17-cv-6

MONTGOMERY COUNTY, OHIO,

AND THE MONTGOMERY COUNTY

BOARD OF COMMISSIONERS, et al.,

           Defendants.

\* \* \*

       Deposition of JACK E. SAUNDERS, III,

EMT-B, Witness herein, called by the Defendants

for cross-examination pursuant to the Rules of

Civil Procedure, taken before me, Caryl L.

Blevins, a Notary Public in and for the State of

Ohio, at the offices of the Montgomery County

Prosecuting Attorney, 301 W. Third Street, Dayton,

Ohio, on Tuesday, the 20th day of February, 2018,

at 1:23 p.m.

\* \* \*

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 2

1                   EXAMINATIONS CONDUCTED        PAGE

2        BY MR. MAZER:.........................      5

3        BY MR. GERHARDSTEIN:..................     54

4

5                    EXHIBITS PRESENTED

6     Deposition Exhibit 5, 1/15/15

7        incident report.......................     29

8     Deposition Exhibit 72, NaphCare

9        record for Mr. Guglielmo..............     42

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

```
 1    APPEARANCES:

 2      On behalf of the Plaintiff:

 3          Gerhardstein & Branch

 4      By:  Adam Gerhardstein
             Attorney at Law
 5           441 Vine Street
             Suite 3400
 6           Cincinnati, Ohio  45202
             (513) 246-1062
 7           agerhardstein@gbfirm.com

 8      On behalf of the Witness:

 9          Reminger Attorneys at Law

10      By:  Robert W. Hojnoski
             Attorney at Law
11           525 Vine Street
             Suite 1700
12           Cincinnati, Ohio  45202
             (513) 721-1311
13           rhojnoski@reminger.com

14

15

16

17

18

19

20

21

22

23

24

25
```

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

                                                                        Page 4

     1        On behalf of the Defendants Montgomery County,
              Ohio, and the Montgomery County Board of
     2        Commissioners, Phil Plummer, Matthew Snyder,
              Matthew Sears, David Cohn, Zachary Zink,
     3        Brandon Ort, and Benjamin Cooper:

     4              Montgomery County Prosecutor's Office

     5        By:  Benjamin A. Mazer
                   Assistant Prosecuting Attorney
     6             Fourth Floor
                   Dayton-Montgomery County Courts Building
     7             301 West Third Street
                   Dayton, Ohio  45402
     8             (937) 496-7195
                   mazerb@mcohio.org
     9
                   and
    10
                   Marshall Dennehey Warner Coleman & Goggin
    11
              By:  Jillian L. Dinehart
    12             Attorney at Law
                   127 Public Square
    13             Suite 3510
                   Cleveland, Ohio  44114
    14             (216) 912-3809
                   jldinehart@mdwcg.com
    15
                             *   *   *
    16

    17

    18

    19

    20

    21

    22

    23

    24

    25

Page 5

```
 1              JACK E. SAUNDERS, III, EMT-B
 2   of lawful age, Witness herein, having been first
 3   duly cautioned and sworn, as hereinafter
 4   certified, was examined and said as follows:
 5                   CROSS-EXAMINATION
 6   BY MR. MAZER:
 7        Q.   Good afternoon, Mr. Saunders.  We had
 8   a chance to meet off the record.  Again, my name
 9   is Benjamin Mazer and I'm an assistant prosecutor
10   in the Montgomery County Prosecutor's Office.
11             Could you please state your full name
12   and spell it for the record?
13        A.   Jack Eugene Saunders, III.  First
14   name is J A C K, middle name is E U G E N E, last
15   name is Saunders, S A U N D E R S, and I'm the
16   third.
17        Q.   Okay.  Thank you, Mr. Saunders.
18   Mr. Saunders, you are here today to have your
19   deposition taken in connection with a lawsuit
20   filed by Mr. Joseph Guglielmo against Montgomery
21   County, the Montgomery County Sheriff's Office,
22   and a number of specific Montgomery County
23   Sheriff's Office either current or former
24   employees, specifically Matthew Snyder, Zachary
25   Zink, Matthew Sears, David Cohn, Brandon Ort, and
```

Page 6

1    Benjamin Cooper.

2                    You're not a named Defendant to this

3    lawsuit.  We've asked to depose you as a fact

4    witness as it relates to this incident.

5                    Mr. Saunders, have you ever been

6    deposed before?

7         A.   No.

8         Q.   I'm going to give you a couple of

9    just really quick basic ground rules so you kind

10   of know what to expect with respect to this

11   deposition.

12                   As the court reporter's already

13   explained a little bit, she's obviously taking

14   down everything that we say.  She's transcribing

15   my questions and then she's going to go ahead and

16   transcribe the answer that you give, so as a

17   result I would ask for the sake of the record and

18   the court reporter's benefit that all the answers

19   that you give to any of the questions I ask are

20   audible answers; in other words, they should be

21   yeses or nos or an explanation as opposed to

22   nonaudible answers like shrugs or nods.  Okay?

23        A.   Right.

24        Q.   Thank you.

25        A.   Yes.

Page 7

1      Q.    Have you ever testified in court

2  before, Mr. Saunders?

3      A.    No.

4      Q.    As you already know, you were sworn

5  in today, so you are under oath, and we are

6  relying on the accuracy of the answers that you

7  give us today in this deposition.  Okay?

8      A.    Okay.

9      Q.    Lastly, if you do not understand a

10  question that I've asked, I would just ask that

11  you let me know and I will do the best I can to

12  rephrase or clarify the question.  Okay?

13      A.    Okay.

14      Q.    And lastly, if at any point you want

15  to take a break, feel free to do so.  We can go

16  off the record.  Okay?

17      A.    Okay.

18      Q.    Mr. Saunders, I'm just going to start

19  with a little bit of background on you.  What is

20  the name of your current employer, Mr. Saunders?

21      A.    I work at Med-Trans.

22      Q.    Can you spell that for us, please?

23      A.    M E D T R A N S.

24      Q.    And is that one word or two words?

25      A.    It's one word I believe.

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

                                                                          Page 8

     1            Q.   Okay.  And when did you start with

     2    Med-Trans?

     3            A.   October 31st of 2017.

     4            Q.   And where is Med-Trans located?

     5            A.   Springfield.

     6            Q.   And what does Med-Trans do?

     7            A.   I am a driver for CareFlight, for

     8    their MICU, medical ambulances, like transport

     9    ambulances.

    10            MS. DINEHART:  I'm sorry.  Did you

    11    say NICU?

    12            THE WITNESS:  MICU, like the

    13    transport helicopters.  It does the same thing,

    14    it's just on the ground.

    15    BY MR. MAZER:

    16            Q.   So you drive an ambulance?  Is that

    17    what you drive?

    18            A.   Correct.

    19            Q.   And you are, Mr. Saunders, a

    20    medic/EMT; is that correct?

    21            A.   I'm an EMT-Basic.

    22            Q.   EMT-Basic.  Is there a distinction?

    23    Are there different types of EMTs?

    24            A.   There are.

    25            Q.   Can you for our benefit -- what are

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 9

1    the distinctions?  What does an EMT do that would

2    differ from the rest?

3            A.    EMT-Basic is non -- we don't

4    administer medication like IV medications, cardiac

5    monitor, like rhythms and stuff like that.

6            Q.    So if there's an EMT-Basic, what

7    would be -- what's the name of the next -- the

8    other type of EMT?

9            A.    They have an advanced, and what they

10   do is some IV medications and some cardiac monitor

11   but no cardiac drugs.

12           Q.    Is there a licensure difference?

13           A.    It's a certification, yes.

14           Q.    Is there any difference in schooling?

15           A.    Just the period, like the amount of

16   time.

17           Q.    Okay.  Where were you most recently

18   employed prior to October the 31st, 2017?

19           A.    NaphCare at the Montgomery County

20   Jail.

21           Q.    And what year, to the best of your

22   recollection, did you start with NaphCare?

23           A.    2010.

24           Q.    And did you also work in the capacity

25   as an EMT-Basic with NaphCare?

Page 10

```
 1          A.   I did.
 2          Q.   While employed with NaphCare, did you
 3    ever work in any setting other than the Montgomery
 4    County Jail?
 5          A.   No.  Do you mean like working for
 6    NaphCare or just other like part-time jobs?
 7          Q.   Working for NaphCare specifically.
 8          A.   No, just the jail.
 9          Q.   Did you have other part-time jobs
10    that were in the capacity of an EMT during the
11    time that you worked with NaphCare?
12          A.   Yes.
13          Q.   Okay.  What were those?
14          A.   I worked at the City of Eaton.
15          Q.   And were you a medic/EMT --
16          A.   EMT-Basic/fireman.
17          Q.   When did you start working part-time
18    for them?
19          A.   At Eaton?  2010 also.
20          Q.   And you did indicate that was
21    part-time employment with the City of Eaton; is
22    that correct?
23          A.   That's correct.
24          Q.   Anywhere else part-time during that
25    period?
```

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

```
 1          A.   No.
 2          Q.   Have you ever worked in any other
 3   jail or prison setting other than the Montgomery
 4   County Jail?
 5          A.   No, sir.
 6          Q.   While working at the Montgomery
 7   County Jail for NaphCare, what shifts or watches
 8   did you work?
 9          A.   I have worked all three shifts.
10          Q.   Prior to starting with NaphCare in
11   2010 and you've testified as to your part-time
12   employment with the City of Eaton, did you have
13   any other employment as a medic -- I'm sorry --
14   EMT-Basic?
15          A.   Not that I can recall, no.
16          Q.   All right.  I'm going to skip around
17   just a little bit here to your educational
18   background.
19               Where did you go to high school?
20          A.   I went to high school at Twin Valley
21   South, West Alexandria, and that's in Ohio.
22          Q.   And what is your age, Mr. Saunders?
23          A.   I am thirty-five.
24          Q.   And when did you graduate from Twin
25   Valley South High School?
```

Page 12

```
 1            A.   2001.

 2            Q.   And walk us through, please, if you

 3    will, your post-high school education.

 4            A.   2003, 2004, firefighter, level I and

 5    level II, and then in 2005 I had went to EMT-Basic

 6    school.

 7            Q.   And did you study somewhere

 8    specifically for the firefighter level I and level

 9    II?

10            A.   Sinclair.

11            Q.   And where did you study for EMT-Basic

12    school?

13            A.   Clark State.

14            Q.   Do you hold currently any other

15    degrees or licenses?

16            A.   No.

17            Q.   Other than working as an

18    EMT-Basic/fireman for the City of Eaton, did you

19    ever work as a fireman anywhere else?

20            A.   Village of Phillipsburg.

21            Q.   Okay.  And what years was that, to

22    the best of your recollection?

23            A.   2005 to like maybe 2009 and then I'll

24    say July of last year to current.

25            Q.   So you're presently a fireman with
```

Page 13

1    the Village of Phillipsburg?

2              A.    Yes.

3              Q.    And I'm sorry, you said July of 2017

4    to present; is that correct?

5              A.    That's correct.

6              Q.    I'm going to talk a little bit about

7    your training as an EMT-Basic.  As an EMT-Basic,

8    are you required to complete any continuing

9    education training?

10             A.    Every year.  And then can I add on

11   that?

12             Q.    Yes.

13             A.    Our certification's good for three

14   years.  So we have to have so many continuing

15   education hours, but it's -- if you go to like

16   trainings or whatnot throughout the year, it adds

17   up to the amount that you need to stay current.

18             Q.    Okay.  Is there any set curriculum or

19   continuing area of focus for this continuing

20   education training?

21             A.    There are.  So many are based for

22   like trauma or heat-related injuries or whatnot.

23             Q.    When you started with NaphCare in

24   2010, did you receive any medical training

25   specifically from NaphCare when you started?

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 14

```
 1            A.   They have online training, but it's
 2    not geared toward our scope of practice or our
 3    skill set.  It's more toward nurses but not for
 4    us, no.
 5            Q.   Just to make sure I understand, do
 6    you take that training that you're referencing
 7    there, or is that something that you wouldn't,
 8    then, take?
 9            A.   For the computer training?
10            Q.   Yes, sir.
11            A.   It's mandatory.
12            Q.   So you did complete that training?
13            A.   Correct.
14            Q.   Does that training have a focus on a
15    jail setting?
16            A.   Some of it is, yes.
17            Q.   And I know you've already spoken a
18    little bit about your continuing education
19    requirements.
20                 Did you receive any continuing
21    education training specifically through NaphCare
22    while you were employed with NaphCare?
23            A.   No, not for my certification,
24    recertification, no.
25            Q.   Any continuing education with
```

Page 15

1   NaphCare just for the purposes of your employment

2   that you can recall?

3          A.   Just that online training.

4          Q.   And was that online training

5   completed just at the time that you started with

6   NaphCare or would you also complete that online

7   training on a regular basis or an annual basis?

8          A.   It was annual.  I'm trying to make it

9   easy for you.  Sorry.  We receive an e-mail that

10  we need to do such-and-such during -- for the

11  online training, so we go in there and do it, but

12  other than that, whatever it's about --

13         Q.   Okay.  And how often would you say

14  that would be?  Would that be an annual thing or

15  how frequently?

16         A.   It was completed annually, but I'm

17  not real sure if it was like every couple weeks

18  we'd get one or whatnot, but --

19         Q.   All right.  I'm going to talk a

20  little bit about your duties as an EMT-Basic

21  specifically in the Montgomery County Jail while

22  you were with NaphCare.

23              Can you tell us, please, what were

24  your general duties as an EMT-Basic in the

25  Montgomery County Jail while you were employed

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 16

1    there with NaphCare?

2            A.    Intake screening of inmates, faxing

3    for medical records and medication, basic wound

4    care, and if the police officers would bring

5    somebody in that was not suited to be inside the

6    jail, we could turn them away to receive medical

7    care at the hospital before we would accept them

8    in.

9            Q.    In general how would your duties as

10   an EMT-Basic differ from that of an RN or an LPN

11   in the Montgomery County Jail?

12           A.    Medication administration.  They do

13   all that.  They would also contact -- at the time

14   it would have been Dr. Ellis for any type of

15   advanced care for any type of inmate if needed.

16           Q.    As a medic, would it ever be -- or as

17   an EMT-Basic, would it ever be your duty or

18   responsibility to contact Dr. Ellis in a

19   particular circumstance in which it would be

20   warranted?

21           A.    No.

22           Q.    And I think you mentioned this

23   earlier but I just want to make sure I heard you

24   correctly.

25                 You would not as an EMT-Basic

Page 17

 1    administer medication; is that correct?

 2         A.   That's correct.

 3         Q.   During your time in the Montgomery

 4    County Jail as an EMT-Basic, would you have an

 5    assigned area of the jail or floor of the jail

 6    that you would cover on a particular shift or

 7    would you essentially cover the entire jail?

 8         A.   We had a first floor medic office

 9    that was located on the intake floor, first floor,

10    for our screening for the inmates coming in, but

11    we could go anywhere in the jail if there was a

12    medical emergency.

13         Q.   While you were there at the

14    Montgomery County Jail working for NaphCare, did

15    you have somebody that was a supervisor that you

16    would report to if there were any issues?

17         A.   We had -- on night shift we had two

18    LPN nurses.  They weren't really in charge of like

19    one or the other, but I would contact them if I

20    needed some type of treatment or had a question

21    about an issue.

22         Q.   You mentioned that as an EMT-Basic,

23    your responsibilities would include the intake

24    screening of inmates at their time of booking; is

25    that correct?

Page 18

```
 1            A.    That's correct.

 2            Q.    Okay.  Can you just tell us -- we're

 3     talking, you know, generalities here -- what is

 4     that process and what does that entail?

 5            A.    Vital signs, allergies, medications,

 6     medical conditions, any type of physical trauma

 7     that I can see while I'm doing the screening.

 8                  If they are going to go through any

 9     type of withdrawal from drugs or alcohol, if they

10     feel like they want to harm themselves, and then

11     we would also -- if they were taking medications,

12     we could fax their pharmacy or the hospital, if

13     they came from the hospital, for their relevant

14     information.  I'm sure I'm forgetting some other

15     stuff that I did.

16            Q.    Did you have a set list or like a

17     questionnaire that you would go off of?

18            A.    Yes, uh-hum.

19            Q.    If somebody -- and we're talking

20     generalities again here -- if somebody's coming

21     from a hospital prior to their booking in the jail

22     and they have discharge papers with them from that

23     particular hospital --

24            A.    Correct.

25            Q.    -- what is the process with respect
```

Page 19

1    **to that?**

2                    **What do you do in that case?**

3          A.    The receiving corrections officer

4    that does the pat-down, they would usually call us

5    out to check the person for their issue why they

6    went to the hospital and then they would give us

7    the paperwork, then if the paperwork had

8    prescriptions attached to them, they would go into

9    the doctor's mailbox to be started for their stay

10   while they're there.

11         **Q.    And I think you mentioned, if I heard**

12   **you correctly, that if somebody has not been**

13   **discharged from the hospital immediately prior to**

14   **their booking and you see that they have apparent**

15   **or evident injuries on their body --**

16         A.    Okay.

17         **Q.    -- you said there are circumstances**

18   **in which you would turn them away because of those**

19   **injuries; is that accurate?**

20         A.    If they were already admitted into

21   the jail, there's different steps.  Like it would

22   have to be a life-altering issue because I would

23   have to contact the nurse and then they would

24   contact Dr. Ellis to see if it's something that

25   needs to be rushed to the hospital or if it can be

Page 20

1    treated when she gets there in the morning,

2    depending on the situation.

3         Q.   This information that you're

4    collecting when you're doing this intake screening

5    during booking, how is that memorialized?

6              Is that done in a computer system?

7         A.   It is.  It's like a -- let's say it

8    has a hundred questions on there.  Then you'd go

9    step-by-step filling it out till it's completed.

10        Q.   And does that questionnaire that you

11   complete with respect to the intake screening,

12   does that become a part of that particular

13   inmate's or detainee's medical record at the jail?

14        A.   Correct.

15        Q.   Is that record, is that something

16   that specifically just the NaphCare staff or folks

17   have access to as opposed to also the corrections

18   staff?

19        A.   They would not -- the jail staff

20   would not have access to that, correct.

21        Q.   Okay.

22        A.   I think the only access that they had

23   to their medical record-type stuff was if they

24   were a -- like a lower or an upper bunk for

25   housing-type situation, but they couldn't actually

Page 21

1    see their medical issues per HIPAA.

2         **Q.   Okay.  If you have a situation**

3    **where -- and I'm just talking generalities once**

4    **again, but if you have a situation where an inmate**

5    **at the time of their booking is being**

6    **uncooperative with you and creating a challenge**

7    **with your ability to perform, you know, this**

8    **intake screening --**

9         A.   Okay.

10        **Q.   -- how do you deal with that**

11   **situation if it's causing you some difficulty in**

12   **completing their intake screening?**

13        A.   As long as they're alert and oriented

14   and they can answer some of your questions, you

15   know, they're not like highly intoxicated or

16   unable to, I don't know -- they're not going to

17   pass out or hurt themselves or be hurt by another

18   inmate, we would usually take them in.

19             Now, if they were highly intoxicated

20   or passing out, they would always -- they would

21   normally be turned away to be seen at the hospital

22   before intake.

23        **Q.   Along the same lines, I think you**

24   **were kind of referring to it here in your last**

25   **answer, but I assume you have to ask them**

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 22

1    specifically what medications they're on or what

2    medical conditions they have either currently or

3    have had in the past.

4             If they're alert but they're not

5    really responding to your questions in a

6    satisfactory way that allows you to document or

7    understand what, you know, conditions or

8    medications they have, what process do you follow

9    to still try to get that information if they're

10   not volunteering that information to you?

11            A.   Usually we wouldn't discuss any of

12   like their medical or medication in the intake

13   like while they're getting patted down, it would

14   be in our office.

15            So if they were being uncooperative

16   or combative, the jail staff deems it a safety

17   issue and they wouldn't usually have them come

18   over to the office until they're able to not be a

19   safety issue for us.

20            Q.   Okay.  And this office that you're

21   referring to, is that the first floor medic's

22   office?

23            A.   First floor medic's office.

24            Q.   In what part of the first floor of

25   the jail is that medic's office located?  Is that

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

                                                                Page 23

1    on the platform or --

2              A.   It's on the far west end.

3              Q.   Is it like the post-book area or not

4    really?

5              A.   It's in the post-book area.  It's to

6    the left of the platform.

7              Q.   Okay.  Any other duties or

8    responsibilities you would generally have as an

9    EMT-Basic in the jail that we haven't really

10   discussed here yet?

11             A.   Not that I can recall, no --

12             Q.   Okay.

13             A.   -- or that we didn't go over.

14             Q.   On a typical shift, how many other

15   EMTs or EMT-Basics or medics would be on staff at

16   that jail on a given shift with you?

17             A.   It's just one person or one EMT.

18             Q.   I think you previously mentioned

19   Dr. Ellis.  Was she the doctor on staff with

20   NaphCare the entire time that you were employed

21   with NaphCare from 2010 to -- I'm sorry, was it

22   2017?

23             A.   She had resigned or left a couple

24   months before I did.

25             Q.   Okay.  Do you recall, sir -- it would

Page 24

1    be correct to say, then, that she was the doctor

2    on staff in 2015?

3           A.   During that time, yes.

4           Q.   Do you know if she had -- and this is

5    just if you know -- do you know if she had set

6    hours where she was physically present in the

7    jail?

8           A.   I do not know.

9           Q.   Do you know under what circumstances

10   it would be appropriate or necessary for one of

11   the nurses that you mentioned to contact Dr. Ellis

12   if she was on call?

13          A.   Can you repeat the question?  I'm

14   sorry.

15          Q.   Sure.  What circumstances, if you

16   know, would arise in the jail that would be

17   necessary for somebody from the NaphCare staff to

18   reach out to Dr. Ellis?

19          A.   Like an elevated blood pressure for

20   her to be able to give them orders to start

21   medications, the same thing for elevated blood

22   sugar for insulin.  Basically, for medication and

23   treatment, stuff like that.

24          Q.   What about if it was determined that

25   there was a need to transport somebody to the

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 25

1    hospital?

2                    Would she be contacted to advise of

3    that?

4            A.   It depends on the situation.  If it's

5    a life-threatening issue, bleeding control, like

6    somebody in full arrest, we would go ahead and

7    have the control -- jail control, like the

8    dispatch, contact for a medic.

9            Q.   As you probably know, it's my

10   understanding that jail corrections staff

11   participates in a roll call at the start of each

12   of their shifts.

13                   Is that something that NaphCare or

14   you specifically would participate in that roll

15   call?

16           A.   We have access to participate, but as

17   long as I've ever been there I have never

18   participated in that.

19           Q.   Do you know if the jail has an x-ray

20   machine on site available for use by the NaphCare

21   staff?

22           A.   I don't know if it was the jail's

23   machine or if we had a outside contract company

24   come in and do it.  I believe they did both at the

25   time of my employment.

Page 26

1        Q.    How about a CT scan machine, if you
2    know?

3        A.    No.

4        Q.    Okay.  We are going to get into the
5    incident in question a little bit now.  So Joseph
6    Guglielmo, there's been some testimony and I think
7    the records reflect that he was booked into the
8    Montgomery County Jail on January the 15th, 2015,
9    at approximately 2:25 a.m. in the morning.

10            Do you happen to know whether you
11   were working I believe that would be first watch
12   that shift that Mr. Guglielmo was booked in on?

13       A.    I don't believe so, no.

14       Q.    So then is it fair to say you don't
15   have any recollection yourself of personally doing
16   his intake screening or anything to that effect?

17       A.    That's correct.

18       Q.    Additionally there's been testimony
19   and the records reflect that the incident itself
20   occurred later on that same day, January the 15th,
21   2015, at approximately 11:36 p.m., and it carried
22   over into the early morning of January the 16th,
23   2015.

24            Do you recall if you were working
25   that shift, and I believe that would also be first

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

1    watch, starting just before midnight on January

2    the 15th through January the 16th of 2015?

3            A.    I was.

4            Q.    Do you recall, were you working first

5    watch?  Is that what it would have been?

6            A.    First watch, yes.

7            Q.    And what hours would that shift have

8    been, if you know?

9            A.    It's 11:00 p.m. to 7:00 a.m.

10            Q.    And do you know, were you

11    specifically the first floor medic on that shift?

12    Is that what you were?

13            A.    Right.

14            Q.    Do you have any recollection as to

15    what other NaphCare staff were working with you on

16    that particular shift on that date?

17            A.    Greg Mills and Matt Taylor.

18            Q.    And if you know, Greg Mills, is he an

19    LPN?

20            A.    They both are, yes, or they were at

21    that time.

22            Q.    At that time.  Yes, sir.  Okay.  Was

23    Dr. Ellis present during that shift, if you know?

24            A.    No.

25            Q.    There's also been some testimony from

Page 28

1  other deponents that Mr. Guglielmo was causing

2  somewhat of a disturbance at the start of that

3  shift during roll call.  It would have been

4  approximately 11:30 p.m. or so on January the 15th

5  of 2015.

6          Do you have any recollection of

7  hearing any type of noise during that time during

8  roll call?

9          A.   I wasn't present for the roll call in

10  that area, so I don't recall any noises different

11  than normal because there's always somebody

12  banging or yelling or something like that.

13          Q.   Is it fair to say, then, that you

14  also didn't see Mr. Guglielmo himself banging on

15  his cell?

16          A.   That's correct.

17          Q.   Why don't you tell us to the best of

18  your recollection and with as much detail as you

19  can, at what point in your shift did you first

20  become aware of Mr. Guglielmo?

21          A.   Are there notes placed, or did I

22  place notes in the computer or do you have a copy

23  of that, like for times and stuff like that?

24          Q.   Yeah, I think we do, and actually

25  we're going to get into that.

Page 29

```
 1          A.    Okay.

 2          Q.    If you don't mind --

 3          A.    You want me to give you a roundabout?

 4          Q.    If you don't mind, yes.

 5                (Thereupon, Deposition Exhibit 5,

 6     1/15/15 incident report, having been previously

 7     marked, was presented for purposes of

 8     identification.)

 9     BY MR. MAZER:

10          Q.    Actually, I'll tell you what, for

11     starters I'll give you what's been marked as

12     Exhibit 5 (providing).  You can take a moment to

13     review that to help refresh your recollection and

14     then we'll go through that.

15                MR. HOJNOSKI:  By the way, this isn't

16     your note.  This is the incident report from the

17     jail.

18                THE WITNESS:  Well, this is my

19     narrative into that (indicating), so I typed it

20     up.

21                MR. HOJNOSKI:  Yeah, yeah.  You did

22     both, yeah.

23                THE WITNESS:  Okay.

24     BY MR. MAZER:

25          Q.    Okay.  What I handed you is an
```

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 30

 1    incident report regarding the incident concerning

 2    Mr. Guglielmo in the Montgomery County Jail.

 3                Did you complete an incident report

 4    or narrative with respect to your role on that

 5    particular date and time?

 6          A.    I did.

 7          Q.    And the narrative entry that you

 8    completed, for the record, that begins at the

 9    bottom of page three and then carries over to the

10    top of page four of Exhibit 5; is that correct?

11          A.    That's correct.

12          Q.    Okay.  First of all, based upon what

13    you just read there with respect to your entry --

14          A.    Uh-hum.

15          Q.    -- does that comport with your

16    recollection of the events that occurred back on

17    January the 15th through January the 16th of 2015?

18          A.    As far as I remember, yes.

19          Q.    So I want to go back to the question

20    now that you've had a chance to kind of refresh

21    your recollection.

22          A.    Uh-hum.

23          Q.    First, what is documented in this

24    incident report and narrative, to the best of your

25    recollection and knowledge, did you have any

Page 31

 1   contact with Mr. Guglielmo in the timeline prior

 2   to what you put here in this narrative?

 3        A.   No.

 4        Q.   Okay.  Why don't you tell us, then,

 5   what you recall about the first time that you

 6   became aware of Mr. Guglielmo.

 7        A.   Greg Mills had Mr. Guglielmo moved to

 8   cell 139 so he could be observed more often due

 9   to -- I don't know why he was moved because he

10   didn't tell me, but usually they're moved to the

11   139 or the front cell part to be observed more

12   frequently, I guess, and he just -- or Greg Mills

13   told me to just keep an eye on him and of his

14   condition and make sure he's acting appropriate

15   and stuff like that.

16        Q.   At that point, once Mr. Guglielmo was

17   moved to cell 139 and Greg Mills asked you to keep

18   an eye on him, did you have any knowledge as to

19   what area of the jail he was being moved from?

20        A.   No.

21        Q.   And at that point did you have any

22   knowledge as to any altercation or use of force on

23   Mr. Guglielmo at that point?

24        A.   I believe in -- maybe in short

25   speaking, Greg might have told me that he was hit

Page 32

1    in the head or had -- was struck in the head,

2    something along those lines.

3         **Q.   Do you have any recollection if you**

4    **were told by Greg how many times he was struck in**

5    **the head?**

6         A.   No.

7         **Q.   At that point in time did you have**

8    **any communication with any corrections staff**

9    **concerning Mr. Guglielmo or his status?**

10        A.   Just as it's documented on my

11   narrative, just Sergeant Snyder asked me to check

12   him -- or check Inmate Guglielmo for a possible

13   seizure.

14        **Q.   Okay.  I'm just going to back up one**

15   **second.  So you indicated that Greg Mills moved**

16   **him to cell 139 for closer observation.**

17             **Did Mr. Mills indicate to you how**

18   **frequently he wanted you to check on him or keep**

19   **an eye on Mr. Guglielmo, if you recall?**

20        A.   No.

21        **Q.   And why would those cells, cell**

22   **139 -- and is cell 139 in post-book?  Is that**

23   **where that would be?**

24        A.   That's correct.

25        **Q.   Why do those allow potentially for**

Page 33

1    **better observation?**

2           A.   Where he was brought from, the

3    transport area, you have to have a key to get back

4    there, and if there's inmates out, like because

5    it's just extra holding, like they'll be out

6    freely, so for safety for us, we can't go back

7    there and physically look in the locked cells for

8    inmate condition and stuff like that, we'd have to

9    be escorted by jail staff, but like the cell 139,

10   I can actually walk up and physically look inside

11   and communicate through the cell door with

12   whoever's in there.

13          **Q.   Cell 139, that's considered a male**

14   **holding cell; is that correct?**

15          A.   That's correct.

16          **Q.   And is that distinguishable**

17   **specifically from a medical observation cell that**

18   **you guys have at the Montgomery County Jail?**

19          A.   I'm not real clear of what you're

20   calling a medical observation cell.  I know that

21   there are like suicide housing cells that have

22   like the clear glass or Plexiglas, no metal

23   blocking the view from them, but the only medical

24   cells that they have are for actual housed inmates

25   for medical conditions.

Page 34

1          Q.    Okay.   This medical holding cell 139

2    is not the medical housing cells themselves; is

3    that correct?

4          A.    That's correct.

5          Q.    And is that cell 139 the suicide

6    housing cell that's full glass?

7          A.    No.

8          Q.    Before we went back a little bit, you

9    had mentioned, referring to your entry here, that

10   Sergeant Snyder contacted you at a certain point

11   that morning.

12         A.    Uh-hum.

13         Q.    Walk us through in some detail what

14   that was about.

15         A.    Greg Mills first asked me to watch or

16   check on Mr. Guglielmo.  I walked over when he was

17   placed in the cell, had a conversation with him.

18              He was alert and oriented, seemed to

19   be with it to the best of his ability to be able

20   to answer questions and stuff, and then I went

21   back to my office, the first floor medical office,

22   and I was requested back to cell 139 shortly after

23   to find Mr. Guglielmo on his side and unresponsive

24   but breathing.

25         Q.    Prior to finding Mr. Guglielmo

Page 35

1    unresponsive and breathing, you did one prior

2    check based upon Sergeant Snyder's request; is

3    that correct, based upon your entry there?

4           A.   Yes.

5           Q.   And is that the check that you

6    indicated you talked to him, he was alert, and he

7    was answering your questions?

8           A.   That's correct.

9           Q.   Okay.  I see in your note here that

10   you said, I was requested by Sergeant Snyder to

11   check Inmate Guglielmo for a possible seizure.

12          A.   Uh-hum.

13          Q.   Did you have any indication at that

14   time when you went to check on him that he was

15   actually having any type of seizure, if you

16   recall, or any type of medical emergency, I guess,

17   at that point in time?

18          A.   Not at that time.  Due to the notes,

19   it says that he responded with cussing me out.

20          Q.   Okay.

21          A.   So usually people in a seizure aren't

22   able to pull that off.

23          Q.   Okay.  Your note states here, Inmate

24   Guglielmo stated, leave me the fuck alone as he

25   looked at me.

Page 36

```
 1                  Is that what you're referring to
 2      there?
 3           A.    That's correct.
 4           Q.    Also just, I think, about two
 5      sentences immediately prior to the sentence I just
 6      read you, it says, Guglielmo was laying on his
 7      left side shaking his legs.
 8           A.    Uh-hum.
 9           Q.    Do you have any recollection as to
10      the shaking of his legs part, what that was about?
11           A.    I do not.
12           Q.    Okay.  So the second time, right
13      after that, you went to check on Guglielmo -- I'm
14      sorry.
15                  After that, according to your entry
16      here, you were approached by Corrections Officer
17      Cohn to check Inmate Guglielmo's medical
18      condition.
19                  So that is the time that you found
20      Mr. Guglielmo unresponsive; is that correct?
21           A.    That's correct.
22           Q.    Okay.  Do you have any recollection
23      as to how much time had passed in between your
24      first check and that second check?
25           A.    I would say within ten minutes-ish.
```

Page 37

1    It was a short amount of time, or less I'd say.

2         **Q.   Walk us through.  I know you have**

3    **your entry here, but walk us through what you**

4    **observed and what was happening when you did that**

5    **second check that you found Mr. Guglielmo**

6    **unresponsive.**

7         A.   From this entry, it states I found

8    him in the same position, on his left side, as

9    stated earlier, and Mr. Guglielmo was bleeding

10   from his left nostril but he was breathing on his

11   own.  He was nonresponsive to verbal or painful

12   stimuli.

13        **Q.   Let me ask you about that.**

14        A.   Yes.

15        **Q.   For our benefit as being nonmedical**

16   **folks, what would you be referring to**

17   **specifically, if you recall, as to the various**

18   **stimuli that you tried to use on Mr. Guglielmo,**

19   **the verbal and I think you said -- was it painful**

20   **stimuli?**

21        A.   Correct.  Verbal is just

22   communication, sir, calling somebody by their

23   name.  If they look at you or respond to you, then

24   they're alert to that.  Painful stimuli is any

25   type of touch if you get a reaction.

Page 38

1          **Q.    Okay.  And neither one were**

2     **successful in getting him to respond; is that**

3     **correct?**

4          A.    That's correct.

5          **Q.    Do you recall at that time seeing any**

6     **visible injuries to Mr. Guglielmo's head?**

7          A.    I know that he was bleeding from the

8     nose area of his face.  I don't -- I can't recall

9     any type of bruising or swelling or anything like

10    that.

11         **Q.    Do you recall what either corrections**

12    **staff or other NaphCare staff were also with you**

13    **when you responded to Mr. Guglielmo's cell that**

14    **second time?**

15         A.    It was Officer Cohn and I believe it

16    was just myself, and I had Officer Cohn radio for

17    Nurse Mills and Taylor to assist.

18         **Q.    And I think this is probably a pretty**

19    **obvious question, but why did you think you needed**

20    **their assistance?**

21              **Why did you have them do that?**

22         A.    Any type of advanced care or

23    treatment they would have to perform, or if his

24    condition is questionable about going to the

25    hospital or not, they can make that determination

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 39

1    or call Dr. Ellis.

2          **Q.    And did Nurses Mills and Taylor, in**

3    **fact, respond to that cell once they were radioed?**

4          A.    They did.

5          **Q.    Okay.  If you can recall, what did**

6    **you, Nurse Mills, and Nurse Taylor do further at**

7    **that point to try to evaluate Mr. Guglielmo?**

8          A.    I did not document it in my report,

9    but I do recall checking his pupils, and his

10   pupils were not -- they were different shapes.

11   Most signs of that are some type of head trauma,

12   or possible head trauma.

13         **Q.    Did you specifically evaluate his**

14   **pupils or were you there when either Mills or**

15   **Taylor did?**

16         A.    I was there while it happened.  I

17   can't recall if I did or if one of them did.

18         **Q.    Were you provided any information as**

19   **to -- and I'm backing up here a minute.**

20         A.    Uh-hum.

21         **Q.    Were you provided any information as**

22   **to what medical care or treatment Mr. Guglielmo**

23   **received, if any, prior to him being moved to cell**

24   **139 in the jail?**

25         A.    Just an ice pack from Nurse Mills.

Page 40

1          Q.   How did you become aware that he was

2     given an ice pack from Nurse Mills?

3          A.   I can't remember if he was carrying

4     it or if Nurse Mills was carrying it, but they

5     passed right by my door.

6          Q.   So you observed this when he was

7     being rehoused to 139?

8          A.   Right, correct.

9          Q.   Do you have any knowledge or any

10    memory if anything other than the ice pack was

11    done to evaluate Mr. Guglielmo in transport

12    staging?

13         A.   No.

14         Q.   Did Nurse Mills or anybody from

15    NaphCare, the NaphCare staff that were on duty

16    that morning, indicate to you whether there was

17    any intention to have Mr. Guglielmo receive x-rays

18    in the jail?

19         A.   In the jail, no, because right after

20    I called them to respond to 139, Dayton Fire was

21    also called for a transport to the hospital, so he

22    was removed from the jail to the hospital at that

23    time.

24         Q.   Okay.  Who made that decision, or was

25    it a joint decision between you and Mills and

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

                                                                    Page 41

1    **Taylor, to call Dayton Fire/EMS to transport him?**

2           A.   It was pretty much a joint decision

3    due to his extent of injuries.

4           **Q.   Were you present still at his cell**

5    **when Dayton Fire/EMS arrived?**

6           A.   I believe so, yes.  Yes.  I put in my

7    report yes.  It states I was there.

8           **Q.   Did you personally -- scratch that.**

9    **Strike that, please.**

10          **Do you have any knowledge as to**

11   **whether Dr. Ellis was contacted specific to this**

12   **incident and the need to transport Mr. Guglielmo**

13   **to the hospital?**

14          A.   No, I'm not aware of that.

15          **Q.   In your entry that you have here,**

16   **it's the third -- or I guess the second-to-last**

17   **complete sentence at the bottom, you indicate**

18   **here, I did obtain vital signs awaiting medical to**

19   **arrive.**

20          A.   Correct.

21          **Q.   Do you have any recollection -- and I**

22   **know those aren't specifically enumerated here,**

23   **but do you have any recollection as to what vital**

24   **signs you obtained and whether any of those were**

25   **normal other than the pupils that you already**

Page 42

1    identified?

2            A.    Not that I can recall.

3            Q.    Okay.

4                  (Thereupon, Deposition Exhibit 72,

5    NaphCare record for Mr. Guglielmo, having been

6    previously marked, was presented for purposes of

7    identification.)

8    BY MR. MAZER:

9            Q.    I'm going to hand you what has been

10   marked as Exhibit 72 previously (providing).

11           A.    Okay.

12           Q.    I'm going to pass that to you right

13   there.  Take a moment if you will, please, to

14   review that exhibit and specifically I believe an

15   entry that's the third down there.

16           A.    Uh-hum.

17           Q.    Take your time and let me know when

18   you're done there.

19                 (Pause in proceedings.)

20                 THE WITNESS:  Okay.

21   BY MR. MAZER:

22           Q.    Okay.  The third entry down from the

23   top of that first page, Exhibit 72, it says Jack

24   Saunders, EMT above it.

25                 Is that an entry that you drafted and

Page 43

1    submitted?

2         A.   I did.

3         Q.   Okay.  And above the body of the

4    narrative of that entry it indicates an asterisk

5    and late note.

6              I think I know, but what does that

7    mean?

8         A.   If there is something going on as

9    much as what -- or like transporting, taking care

10   of medical problems or whatever, I can go back and

11   document what I had done prior to the time that I

12   put the note in.

13        Q.   Okay.  There's a timestamp and a date

14   stamp next to your name of January the 15th, 2016,

15   and then it says 2:15:48 a.m.

16             Would that have been the time that

17   you actually made the entry and submitted it?

18        A.   That's correct.

19        Q.   And I'm just going to read this entry

20   here and then we're going to go through it just a

21   little bit.

22        A.   Okay.

23        Q.   The entry says, at 00:08 requested to

24   check inmate in cell 138 (sic) with jail staff.

25   And for the record, I think we've determined

Page 44

1   that's actually cell 139.  Is that correct?

2          A.   Correct.

3          Q.   Inmate was laying on the floor, left

4   side.  Inmate was alert and oriented to painful

5   stimuli, ABC intact, no signs of distress.  Inmate

6   stated name.  Inmate was left on left side, and

7   then in parentheses it says, recovery position.

8               That's obviously -- is that the first

9   check that you did on Mr. Guglielmo that we

10  previously discussed?

11         A.   That's correct.

12         Q.   And we talked a little bit about the

13  stimuli that you did.  ABC intact, what does that

14  mean?

15         A.   Airway, breathing, circulation.

16         Q.   And what do you do in order to

17  determine that the airway, breathing, circulation

18  is proper?

19         A.   Breathing on his own, normal rate and

20  rhythm.  He's talking, not gasping or working or

21  fighting to get breath.

22         Q.   Okay.  And then where it says inmate

23  was left on left side, in parentheses, it says

24  recovery position.

25         A.   Correct.

Page 45

```
 1           Q.   By recovery position, you just mean
 2      that was the same position you found him in the
 3      second time?
 4           A.   Recovery position as like to medical
 5      staff or whatever, it's just laying on his left
 6      side, one leg tucked back a little bit so he can't
 7      roll over on his back or over on his stomach.  It
 8      sort of keeps him propped up using his own body
 9      parts.
10           Q.   Is that a position that he placed
11      himself in or did you help ease him into that
12      position, if you recall?
13           A.   I do not recall.
14           Q.   The next sentence says, 00:18,
15      corrections checked inmate, noticed medical issues
16      with inmate.  Corrections had me check on inmate
17      again.
18                Is this the second time that we're
19      referring to, the second check that you --
20           A.   I believe so, yes.
21           Q.   Okay.  And based upon your entry in
22      the incident report, corrections, specifically
23      would that be David Cohn, if you recall?
24           A.   Correct.
25           Q.   Okay.  It goes on to say, this inmate
```

Page 46

1   was still laying on his left side.  Inmate was now

2   bleeding from his left nostril.  Inmate was

3   unresponsive to verbal and painful stimuli but

4   breathing under own power.

5           First set of vitals were obtained and

6   recorded.  I had corrections officers radio for

7   medical to assist with medical treatment.

8           A.   Correct.

9           Q.   Medical arrived and I retrieved O2

10  with nasal -- is that cannula?

11          A.   Cannula.

12          Q.   Cannula, thank you -- and cervical

13  collar from medic office.  I want to ask you just

14  about that last sentence.

15          Why did you retrieve what you

16  indicated you retrieved here, the O2 with the

17  nasal cannula and the cervical collar, if you

18  recall?

19          A.   The O2 is for -- I don't know if his

20  oxygen saturation was low and that's why it was

21  applied or just to help him out since he was

22  slightly -- or he was unresponsive, like it

23  states, and then the cervical collar is to prevent

24  any other type of neck injuries that might not

25  have already been created.

Page 47

```
 1          Q.   Okay.  The last sentence states,
 2   medical requested, then an ambulance was called
 3   for transport.
 4               Reading that today, does that all
 5   comport with your best recollection of that
 6   incident?
 7          A.   It does.
 8          Q.   Okay.  Going back to the incident
 9   report narrative that you completed, Exhibit 5,
10   previously marked as Exhibit 5, do you recall if
11   anyone specifically asked you to submit an
12   incident report narrative for that incident?
13          A.   I believe the jail sergeant
14   requests -- if we're involved in an incident, they
15   just automatically require us to put in a
16   narrative.
17          Q.   Okay.  Do you recall if you reviewed
18   anyone else's narrative that completed a narrative
19   in this incident report prior to submitting your
20   narrative?
21          A.   No.  I usually don't, other than to
22   like copy names and spelling and that type of
23   stuff, but I don't read them, no.
24          Q.   Did anyone specifically tell you what
25   to put in your narrative, the substance of your
```

Page 48

1   narrative?

2            A.   No.

3            Q.   Once Mr. Guglielmo was transported to

4   the hospital, did you learn anything further

5   concerning Mr. Guglielmo's condition after he left

6   the jail?

7            A.   I did not.  Usually the nurses will

8   call and ask for like an update or condition-type

9   thing, but I don't have access or I can't call the

10  hospital to get information.

11           Q.   Were you ever contacted by anybody

12  from the Montgomery County Sheriff's Office

13  concerning any internal affairs investigations

14  with respect to anything regarding this particular

15  incident?

16           A.   No.

17           Q.   Did you ever personally see

18  Mr. Guglielmo ever again after he left the jail

19  that morning?

20           A.   No.

21           MR. MAZER:  I'm going to take a quick

22  break, if that's okay.  I just need a couple

23  minutes and then I don't think I have a great deal

24  more for you.

25                THE WITNESS:  Okay.

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 49

1              (Recess taken.)

2    BY MR. MAZER:

3         Q.   We took a very brief break, and I

4    don't have much more for you, sir, just a few

5    questions and then Plaintiff's counsel will

6    probably have some questions for you as well.

7         A.   Okay.

8         Q.   When you receive discharge paperwork

9    at the time of booking an inmate in and doing

10   their screening, do you make a separate note

11   anywhere in that inmate's medical files concerning

12   the fact that they have discharge paperwork and

13   what that paperwork says or do you just put that

14   paperwork with their medical file?

15        A.   It might -- their medical screening

16   might have like a note added, came over with

17   hospital paperwork from so-and-so hospital.

18             If not, the paperwork is always put

19   in the doctor's box back in the medical department

20   so whenever the doctor or the nurse practitioner

21   come in in the morning or the next day or whenever

22   it is, they can get that paperwork and go through

23   it and provide whatever care and treatment they

24   need to do.

25        Q.   If you receive discharge paperwork

Page 50

1    from a hospital concerning an inmate that is being

2    booked and that discharge paperwork states

3    something to the effect of the patient is

4    discharged and told to follow up with primary-care

5    physician, return to the emergency department if

6    worsening headache, nausea, vomiting, numbness,

7    tingling, weakness, change of vision, decreased

8    level of consciousness, confusion, or any other

9    concern and complaints -- if you received

10   discharge paperwork that said something to that

11   effect, would that in and of itself be any reason

12   to deny booking that inmate?

13          A.    No.

14          Q.    I want to go back a little bit.  When

15   you're doing a neuro check, and we're talking, you

16   know, in general here, what would a neuro check

17   that you would do on an inmate consist of?

18          A.    Their vitals, blood pressure, pulse,

19   oxygen saturation, talk to them, make sure that

20   they're alert and oriented, know where they're at,

21   ask them some questions, check their eyes, make

22   sure their pupils are equal, round, reactive to

23   light and all that, and just it's mainly for their

24   mental state, to make sure that they're alert and

25   oriented.

Page 51

1          Q.   And when would you do a neuro check?

2    Under what circumstances would you want to perform

3    a neuro check?

4          A.   They have different -- at the jail

5    they have sometimes three times a shift, some just

6    once daily, it all depends on what type of injury,

7    I guess, they have, and the doctor or somebody

8    higher than us depict when we check them.

9          Q.   Okay.  Did you do a neuro check on

10   Mr. Guglielmo, a full neuro check on

11   Mr. Guglielmo, with respect to all the things you

12   identified when you checked on Mr. Guglielmo the

13   first time?

14         A.   I did not input it into the computer

15   as a neuro check, so technically no, but I checked

16   him for all the same things, I just didn't input

17   it into the computer as a neuro check.

18         Q.   Okay.  When you checked on

19   Mr. Guglielmo the first time, there's been some

20   testimony as to what's been called, I guess, an

21   emergency medical bag.

22              Do you know what that would be?

23         A.   Yeah.

24         Q.   Okay.  Let me back up a second, then.

25   What does that emergency medical bag consist of?

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

```
 1            A.    It has bandages.  It's mainly for

 2    like lacerations, cuts, and it's like some saline

 3    to clean wounds, bandages, ice packs, blood

 4    pressure cuff, stuff like that.

 5            Q.    Okay.  Is there like a penlight as a

 6    part of that emergency medical bag?

 7            A.    I'm sure there's one in there, yes.

 8            Q.    Did you bring that emergency medical

 9    bag with you to check on Mr. Guglielmo the first

10    time?

11            A.    I cannot recall.

12            Q.    Do you know if you had a penlight

13    that you utilized to check Mr. Guglielmo the first

14    time you checked on him?

15            A.    I cannot recall.

16            Q.    Can an inmate refuse a neuro check?

17    Do they have the ability to do that if you want to

18    perform one?

19            A.    Technically, yes.  They can refuse

20    any type of medical care if they're alert and

21    oriented and know what's going on.

22            Q.    If they refuse medical care, is

23    that --

24            A.    It's documented as such, and they

25    have a release of responsibility sheet that
```

Page 53

1    they're supposed to sign, but if they're

2    uncooperative or something like that, then they

3    may not sign it.  You would usually have like a

4    corrections officer or somebody present sign it as

5    a witness.

6              Q.   That first time that you saw

7    Mr. Guglielmo to check on him, was there anything

8    during that particular check that you can recall

9    that gave you any reason for concern during that

10   first check?

11             A.   No.

12             Q.   Just to make sure I understand, did

13   you have knowledge, I guess, based upon whatever

14   Greg Mills told you that Mr. Guglielmo had had

15   some injuries to his head at the time that he was

16   relocated to medical holding?

17             A.   I don't really recall.  He may have,

18   but I'm not real sure.

19             Q.   Is there any policy, either NaphCare

20   policy or just general, you know, EMT-Basic

21   guidelines that you follow through your, you know,

22   education and training with respect to how you

23   would try to evaluate a head injury or a potential

24   head injury other than the neuro check that we

25   just discussed?

Page 54

```
 1          A.   No, that's basically it.
 2          Q.   Okay.  Do you recall if at any point
 3   you reviewed Mr. Guglielmo's medical records on
 4   file prior to him being transported out of the
 5   jail to the hospital, so at any point during
 6   either your first or your second checks?
 7          A.   No.
 8          Q.   As a part of the first check, do you
 9   recall specifically whether you examined his
10   pupils during the first check?
11          A.   I cannot recall.
12          Q.   Can you recall if you were able to
13   examine or check his eyes in any way during the
14   first check?
15          A.   I believe I documented that he looked
16   up at me, and usually if there was something
17   totally obvious, like one's constricted, one's
18   fully dilated, that's cause for concern, but other
19   than that, no.
20          MR. MAZER:  Okay.  I have no further
21   questions.  Thank you.
22                      CROSS-EXAMINATION
23   BY MR. GERHARDSTEIN:
24          Q.   Mr. Saunders, my name is Adam
25   Gerhardstein.  I represent Joe Guglielmo.  When
```

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 55

1    **Sergeant Snyder first asked you to check on**

2    **Mr. Guglielmo, did he tell you that he had struck**

3    **Mr. Guglielmo in the head multiple times?**

4           A.   No.

5                MR. MAZER:  Objection.

6    BY MR. GERHARDSTEIN:

7           **Q.   Did he tell you that there had been a**

8    **use of force on Mr. Guglielmo?**

9           A.   Not to my knowledge, no.

10          **Q.   He did say that he thought**

11   **Mr. Guglielmo was having a seizure?**

12          A.   That's what it states.  I'm not

13   really sure with it being so far back.  I don't

14   know.

15          **Q.   Do you recall him saying why he**

16   **thought that?**

17          A.   Not to my knowledge, no.

18          **Q.   Is a seizure treated differently than**

19   **a brain injury?**

20          A.   From my skill set at the jail, no,

21   not until there are further supporting facts or

22   whatever or medical --

23          **Q.   Okay.  So from an EMT perspective,**

24   **you provide the same degree of care, right?**

25          A.   Correct.

Page 56

1          Q.   But if you were to pass on

2    information about the patient, would it be

3    important to a nurse or a doctor if the patient

4    was having a seizure versus a traumatic brain

5    injury?

6                MS. DINEHART:  Objection.

7    BY MR. GERHARDSTEIN:

8          Q.   You can answer.

9          A.   Oh, okay.  Usually the only way you

10   can tell that type of stuff is with advanced

11   medical or hospital care, like machines and stuff.

12         Q.   As an emergency medical technician,

13   Sergeant Snyder first informed you to check on

14   Mr. Guglielmo around 12:05 -- or 12:08 a.m.; is

15   that right?

16               MR. HOJNOSKI:  It's in the other one

17   right there (indicating).

18               THE WITNESS:  12:08, yes.

19   BY MR. GERHARDSTEIN:

20         Q.   And if there had been a use of force

21   on him about thirty minutes prior to that, is that

22   something you would have liked to have known?

23         A.   Due to the type of injuries that he

24   had, I'd say yes.

25         Q.   And in the correctional setting, do

Page 57

1  you rely on corrections officers as a source of

2  information about inmate injuries?

3          A.   They're not medically trained, so

4  they can tell me what they physically see.

5          Q.   Okay.  But you expect that when they

6  do tell you about inmates, that their information

7  is going to be accurate, right?

8          A.   I believe so, yes.

9          Q.   Now, the second time you went to

10 check on Mr. Guglielmo, you were summoned by David

11 Cohn; is that right?

12         A.   That's correct.

13         Q.   Did he tell you there had been a use

14 of force on Mr. Guglielmo?

15         A.   No.

16         Q.   Did he tell you that Mr. Guglielmo

17 had been struck in the head by Sergeant Snyder?

18         A.   No.

19         Q.   You were there when Dayton Fire/EMS

20 arrived?

21         A.   Correct.

22         Q.   Do you know who spoke with the EMS

23 staff?

24         A.   I would say Matt Taylor or Greg

25 Mills.

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 58

1          Q.   Okay.  Did Sergeant Snyder speak with

2     the EMS staff?

3          A.   I'm not -- I don't know.

4          Q.   Okay.  Did you hear anybody tell EMS

5     staff that Mr. Guglielmo had banged his head on

6     the wall?

7          A.   Not to my knowledge.

8          Q.   Okay.  You were looking at your

9     incident report earlier, right?

10         A.   Okay.  Yes.

11         Q.   Have you ever seen that document

12    before?

13         A.   Before now?

14         Q.   Yeah.

15         A.   No.  I mean, other than typing it in,

16    no, I haven't seen a copy of it or anything.

17         Q.   Okay.  So the first time you've seen

18    that since you typed it was today in this

19    deposition?

20         A.   Correct.

21         Q.   Okay.  At any point prior to when

22    Sergeant Snyder -- let me back up.

23              Did you wear a radio in the jail?

24         A.   Yes.

25         Q.   Okay.  At any point prior to Sergeant

Page 59

1    Snyder asking you to check Mr. Guglielmo, had

2    there been a radio transmission that Mr. Guglielmo

3    needed medical help?

4          A.   Not that I can recall, no.

5          Q.   And just so I'm crystal clear on

6    this, from the time you checked him the first time

7    to when you checked him the second time, was he in

8    the same position during both checks on the floor?

9          A.   He was.

10         Q.   So as the EMT, you were stationed on

11   the first floor, right?

12         A.   Correct.

13         Q.   And Sergeant Snyder worked as the

14   booking sergeant for about a year and a half also

15   on the first floor; is that right?

16         A.   That's correct.

17         Q.   What was his reputation as a sergeant

18   in the jail?

19              MR. MAZER:  Objection.

20              THE WITNESS:  I usually -- I don't

21   really conversate with like the jail sergeants.

22   They usually are in charge of like the corrections

23   staff and they sit in their office unless they

24   need to deal with some type of jail issue, but

25   they usually -- other than in passing, hey, how

Page 60

1   you doing type of deal, we usually don't.

2   BY MR. GERHARDSTEIN:

3          **Q.   Did you respond to any other**

4   **incidents where he had used force?**

5          A.   Not that I can recall.

6          **Q.   Okay.  And you testified that you**

7   **weren't contacted by internal affairs about this**

8   **incident.**

9          **Have you talked to anybody at the**

10  **Montgomery County Sheriff's Office about**

11  **Mr. Guglielmo since it happened?**

12         A.   No.

13         **Q.   No?**

14         A.   (Shaking head from side to side.)

15         MR. GERHARDSTEIN:  All right.  That's

16  all I have.

17         MR. MAZER:  Nothing further.

18  Appreciate it.

19         MR. HOJNOSKI:  Okay.

20         (Thereupon, the deposition was

21  concluded at 2:49 o'clock p.m.)

22                *   *   *

23

24

25

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

```
                                                              Page 61

  1              I, JACK E. SAUNDERS, III, EMT-B, do hereby

  2   certify that the foregoing is a true and accurate

  3   transcription of my testimony.

  4

  5

  6                    _ _ _ _ _ _ _ _ _ _ _ _ _

  7

  8              Dated _ _ _ _ _ _ _ _ _ _ _ _ _

  9

 10

 11

 12

 13

 14

 15

 16

 17

 18

 19

 20

 21

 22

 23

 24

 25   Job: 180220CLB
```

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 62

1   STATE OF OHIO          )

2   COUNTY OF MONTGOMERY )  SS: CERTIFICATE

3               I, Caryl L. Blevins, a Notary

4   Public within and for the State of Ohio, duly

5   commissioned and qualified,

6               DO HEREBY CERTIFY that the

7   above-named JACK E. SAUNDERS, III, EMT-B, was by

8   me first duly sworn to testify the truth, the

9   whole truth and nothing but the truth.

10              Said testimony was reduced to

11  writing by me stenographically in the presence

12  of the witness and thereafter reduced to

13  typewriting.

14              I FURTHER CERTIFY that I am not a

15  relative or Attorney of either party, in any

16  manner interested in the event of this action,

17  nor am I, or the court reporting firm with which

18  I am affiliated, under a contract as defined in

19  Civil Rule 28(D).

20

21

22

23

24

25

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 63

1          IN WITNESS WHEREOF, I have hereunto set

2    my hand and seal of office at Dayton, Ohio, on

3    this 3rd day of March, 2018.

4

5

6

7    _____
     CARYL L. BLEVINS, RPR, CRR
8    NOTARY PUBLIC, STATE OF OHIO
     My commission expires 7-16-2018

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case: 3:17-cv-00006-TMR-SLO Doc #: 108 Filed: 06/12/18 Page: 64 of 70 PAGEID #: 2384

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 1

**A**

**a.m** 26:9 27:9 43:15 56:14
**ABC** 44:5,13
**ability** 21:7 34:19 52:17
**able** 22:18 24:20 34:19 35:22 54:12
**above-named** 62:7
**accept** 16:7
**access** 20:17,20,22 25:16 48:9
**accuracy** 7:6
**accurate** 19:19 57:7 61:2
**acting** 31:14
**action** 62:16
**actual** 33:24
**Adam** 3:4 54:24
**add** 13:10
**added** 49:16
**Additionally** 26:18
**adds** 13:16
**administer** 9:4 17:1
**administration** 16:12
**admitted** 19:20
**advanced** 9:9 16:15 38:22 56:10
**advise** 25:2
**affairs** 48:13 60:7
**affiliated** 62:18
**afternoon** 5:7
**age** 5:2 11:22
**agerhardstein@g...** 3:7
**ahead** 6:15 25:6
**airway** 44:15,17
**al** 1:10
**alcohol** 18:9
**alert** 21:13 22:4 34:18 35:6 37:24 44:4 50:20,24 52:20
**Alexandria** 11:21
**allergies** 18:5
**allow** 32:25
**allows** 22:6
**altercation** 31:22
**ambulance** 8:16 47:2
**ambulances** 8:8,9
**amount** 9:15 13:17 37:1
**annual** 15:7,8,14
**annually** 15:16

**B**

**back** 30:16,19 32:14 33:3,6 34:8,21,22 43:10 45:6,7 47:8 49:19 50:14 51:24 55:13 58:22
**background** 7:19 11:18
**backing** 39:19
**bag** 51:21,25 52:6,9
**bandages** 52:1,3
**banged** 58:5
**banging** 28:12,14
**based** 13:21 30:12 35:2,3 45:21 53:13
**basic** 6:9 16:3
**basically** 24:22 54:1
**basis** 15:7,7
**begins** 30:8
**behalf** 3:2,8 4:1
**believe** 7:25 25:24 26:11,13,25 31:24 38:15 41:6 42:14 45:20 47:13 54:15 57:8
**benefit** 6:18 8:25 37:15
**Benjamin** 4:3,5 5:9 6:1
**best** 7:11 9:21 12:22 28:17 30:24 34:19 47:5
**better** 33:1
**bit** 6:13 7:19 11:17 13:6 14:18 15:20 26:5 34:8 43:21 44:12 45:6 50:14
**bleeding** 25:5 37:9 38:7 46:2
**Blevins** 1:17 62:3 63:7
**blocking** 33:23
**blood** 24:19,21 50:18 52:3
**Board** 1:10 4:1
**body** 19:15 43:3 45:8
**booked** 26:7,12 50:2
**booking** 17:24 18:21 19:14 20:5 21:5 49:9 50:12 59:14
**bottom** 30:9 41:17
**box** 49:19
**brain** 55:19 56:4
**Branch** 3:3
**Brandon** 4:3 5:25
**break** 7:15 48:22 49:3
**breath** 44:21
**breathing** 34:24 35:1 37:10 44:15 44:17,19 46:4
**brief** 49:3
**bring** 16:4 52:8
**brought** 33:2
**bruising** 38:9
**Building** 4:6

**bunk** 20:24

**C**

**C** 5:14
**call** 19:4 24:12 25:11,15 28:3,8,9 39:1 41:1 48:8,9
**called** 1:14 40:20,21 47:2 51:20
**calling** 33:20 37:22
**cannula** 46:10,11,12 46:17
**capacity** 9:24 10:10
**cardiac** 9:4,10,11
**care** 16:4,7,15 38:22 39:22 43:9 49:23 52:20,22 55:24 56:11
**CareFlight** 8:7
**carried** 26:21
**carries** 30:9
**carrying** 40:3,4
**Caryl** 1:16 62:3 63:7
**case** 1:7 19:2
**cause** 54:18
**causing** 21:11 28:1
**cautioned** 5:3
**cell** 28:15 31:8,11 31:17 32:16,21,22 33:9,11,13,14,17 33:20 34:1,5,6,17 34:22 38:13 39:3 39:23 41:4 43:24 44:1
**cells** 32:21 33:7,21 33:24 34:2
**certain** 34:10
**CERTIFICATE** 62:2
**certification** 9:13 14:23
**certification's** 13:13
**certified** 5:4
**certify** 61:2 62:6,14
**cervical** 46:12,17,23
**challenge** 21:6
**chance** 5:8 30:20
**change** 50:7
**charge** 17:18 59:22
**check** 19:5 32:11,12 32:18 34:16 35:2 35:5,11,14 36:13 36:17,24,24 37:5 43:24 44:9 45:16 45:19 50:15,16,21 51:1,3,8,9,10,15

**51:17 52:9,13,16 53:7,8,10,24 54:8 54:10,13,14 55:1 56:13 57:10 59:1**
**checked** 45:15 51:12,15,18 52:14 59:6,7
**checking** 39:9
**checks** 54:6 59:8
**Cincinnati** 3:6,12
**circulation** 44:15,17
**circumstance** 16:19
**circumstances** 19:17 24:9,15 51:2
**City** 10:14,21 11:12 12:18
**Civil** 1:16 62:19
**clarify** 7:12
**Clark** 12:13
**clean** 52:3
**clear** 33:19,22 59:5
**Cleveland** 4:13
**closer** 32:16
**Cohn** 4:2 5:25 36:17 38:15,16 45:23 57:11
**Coleman** 4:10
**collar** 46:13,17,23
**collecting** 20:4
**combative** 22:16
**come** 22:17 25:24 49:21
**coming** 17:10 18:20
**commission** 63:8
**commissioned** 62:5
**Commissioners** 1:10 4:2
**communicate** 33:11
**communication** 32:8 37:22
**company** 25:23
**complaints** 50:9
**complete** 13:8 14:12 15:6 20:11 30:3 41:17
**completed** 15:5,16 20:9 30:8 47:9,18
**completing** 21:12
**comport** 30:15 47:5
**computer** 14:9 20:6 28:22 51:14,17
**concern** 50:9 53:9 54:18
**concerning** 30:1 32:9 48:5,13 49:11 50:1

Case: 3:17-cv-00006-TMR-SLO Doc #: 108 Filed: 06/12/18 Page: 65 of 70 PAGEID #: 2385

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page  2

concluded 60:21
condition 31:14
  33:8 36:18 38:24
  48:5
condition-type 48:8
conditions 18:6 22:2
  22:7 33:25
CONDUCTED 2:1
confusion 50:8
connection 5:19
consciousness 50:8
considered 33:13
consist 50:17 51:25
constricted 54:17
contact 16:13,18
  17:19 19:23,24
  24:11 25:8 31:1
contacted 25:2
  34:10 41:11 48:11
  60:7
continuing 13:8,14
  13:19,19 14:18,20
  14:25
contract 25:23
  62:18
control 25:5,7,7
conversate 59:21
conversation 34:17
Cooper 4:3 6:1
copy 28:22 47:22
  58:16
correct 8:18,20
  10:22,23 13:4,5
  14:13 17:1,2,25
  18:1,24 20:14,20
  24:1 26:17 28:16
  30:10,11 32:24
  33:14,15 34:3,4
  35:3,8 36:3,20,21
  37:21 38:3,4 40:8
  41:20 43:18 44:1
  44:2,11,25 45:24
  46:8 55:25 57:12
  57:21 58:20 59:12
  59:16
correctional 56:25
corrections 19:3
  20:17 25:10 32:8
  36:16 38:11 45:15
  45:16,22 46:6
  53:4 57:1 59:22
correctly 16:24
  19:12
counsel 49:5
County 1:8,9,18 4:1
  4:1,4,6 5:10,21,21
  5:22 9:19 10:4

11:4,7 15:21,25
  16:11 17:4,14
  26:8 30:2 33:18
  48:12 60:10 62:2
couple 6:8 15:17
  23:23 48:22
court 1:1 6:12,18
  7:1 62:17
Courts 4:6
cover 17:6,7
created 46:25
creating 21:6
cross-examination
  1:15 5:5 54:22
CRR 63:7
crystal 59:5
CT 26:1
cuff 52:4
current 5:23 7:20
  12:24 13:17
currently 12:14
  22:2
curriculum 13:18
cussing 35:19
cuts 52:2

        D

D 5:15 7:23
daily 51:6
date 27:16 30:5
  43:13
Dated 61:8
David 4:2 5:25
  45:23 57:10
day 1:20 26:20
  49:21 63:3
Dayton 1:3,19 4:7
  40:20 41:1,5
  57:19 63:2
Dayton-Montgom...
  4:6
deal 21:10 48:23
  59:24 60:1
decision 40:24,25
  41:2
decreased 50:7
deems 22:16
Defendant 6:2
Defendants 1:11,14
  4:1
defined 62:18
degree 55:24
degrees 12:15
Dennehey 4:10
deny 50:12
department 49:19
  50:5

depending 20:2
depends 25:4 51:6
depict 51:8
deponents 28:1
depose 6:3
deposed 6:6
deposition 1:13 2:6
  2:8 5:19 6:11 7:7
  29:5 42:4 58:19
  60:20
detail 28:18 34:13
detainee's 20:13
determination
  38:25
determine 44:17
determined 24:24
  43:25
differ 9:2 16:10
difference 9:12,14
different 8:23 19:21
  28:10 39:10 51:4
differently 55:18
difficulty 21:11
dilated 54:18
Dinehart 4:11 8:10
  56:6
discharge 18:22
  49:8,12,25 50:2
  50:10
discharged 19:13
  50:4
discuss 22:11
discussed 23:10
  44:10 53:25
dispatch 25:8
distinction 8:22
distinctions 9:1
distinguishable
  33:16
distress 44:5
DISTRICT 1:1,2
disturbance 28:2
DIVISION 1:3
doctor 23:19 24:1
  49:20 51:7 56:3
doctor's 19:9 49:19
document 22:6 39:8
  43:11 58:11
documented 30:23
  32:10 52:24 54:15
doing 18:7 20:4
  26:15 49:9 50:15
  60:1
door 33:11 40:5
Dr 16:14,18 19:24
  23:19 24:11,18
  27:23 39:1 41:11

drafted 42:25
drive 8:16,17
driver 8:7
drugs 9:11 18:9
due 31:8 35:18 41:3
  56:23
duly 5:3 62:4,8
duties 15:20,24 16:9
  23:7
duty 16:17 40:15

        E

E 1:13 5:1,14,14,14
  5:15 7:23 61:1
  62:7
e-mail 15:9
earlier 16:23 37:9
  58:9
early 26:22
ease 45:11
easy 15:9
Eaton 10:14,19,21
  11:12 12:18
education 12:3 13:9
  13:15,20 14:18,21
  14:25 53:22
educational 11:17
effect 26:16 50:3,11
either 5:23 22:2
  38:11 39:14 53:19
  54:6 62:15
elevated 24:19,21
Ellis 16:14,18 19:24
  23:19 24:11,18
  27:23 39:1 41:11
else's 47:18
emergency 17:12
  35:16 50:5 51:21
  51:25 52:6,8
  56:12
employed 9:18 10:2
  14:22 15:25 23:20
employees 5:24
employer 7:20
employment 10:21
  11:12,13 15:1
  25:25
EMS 57:22 58:2,4
EMT 9:1,8 10:10
  23:17 42:24 55:23
  59:10
EMT-B 1:14 5:1
  61:1 62:7
EMT-Basic 8:21,22
  9:3,6,25 11:14
  12:5,11 13:7,7
  15:20,24 16:10,17

16:25 17:4,22
  23:9 53:20
EMT-Basic/firem...
  10:16 12:18
EMT-Basics 23:15
EMTs 8:23 23:15
entail 18:4
entire 17:7 23:20
entry 30:7,13 34:9
  35:3 36:15 37:3,7
  41:15 42:15,22,25
  43:4,17,19,23
  45:21
enumerated 41:22
equal 50:22
escorted 33:9
essentially 17:7
et 1:10
Eugene 5:13
evaluate 39:7,13
  40:11 53:23
event 62:16
events 30:16
evident 19:15
EXAMINATIONS
  2:1
examine 54:13
examined 5:4 54:9
exhibit 2:6,8 29:5,12
  30:10 42:4,10,14
  42:23 47:9,10
EXHIBITS 2:5
expect 6:10 57:5
expires 63:8
explained 6:13
explanation 6:21
extent 41:3
extra 33:5
eye 31:13,18 32:19
eyes 50:21 54:13

        F

face 38:8
fact 6:3 39:3 49:12
facts 55:21
fair 26:14 28:13
far 23:2 30:18 55:13
fax 18:12
faxing 16:2
February 1:20
feel 7:15 18:10
fighting 44:21
file 49:14 54:4
filed 5:20
files 49:11
filling 20:9
find 34:23

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

finding 34:25
Fire 40:20
Fire/EMS 41:1,5
  57:19
firefighter 12:4,8
fireman 12:19,25
firm 62:17
first 5:2,13 17:8,9
  22:21,23,24 26:11
  26:25 27:4,6,11
  28:19 30:12,23
  31:5 34:15,21
  36:24 42:23 44:8
  46:5 51:13,19
  52:9,13 53:6,10
  54:6,8,10,14 55:1
  56:13 58:17 59:6
  59:11,15 62:8
floor 4:6 17:5,8,9,9
  22:21,23,24 27:11
  34:21 44:3 59:8
  59:11,15
focus 13:19 14:14
folks 20:16 37:16
follow 22:8 50:4
  53:21
follows 5:4
force 31:22 55:8
  56:20 57:14 60:4
foregoing 61:2
forgetting 18:14
former 5:23
found 36:19 37:5,7
  45:2
four 30:10
Fourth 4:6
free 7:15
freely 33:6
frequently 15:15
  31:12 32:18
front 31:11
fuck 35:24
full 5:11 25:6 34:6
  51:10
fully 54:18
further 39:6 48:4
  54:20 55:21 60:17
  62:14

**G**
G 5:14
gasping 44:20
geared 14:2
general 15:24 16:9
  50:16 53:20
generalities 18:3,20
  21:3

generally 23:8
Gerhardstein 2:3
  3:3,4 54:23,25
  55:6 56:7,19 60:2
  60:15
getting 22:13 38:2
give 6:8,16,19 7:7
  19:6 24:20 29:3
  29:11
given 23:16 40:2
glass 33:22 34:6
go 6:15 7:15 11:19
  13:15 15:11 17:11
  18:8,17 19:8 20:8
  23:13 25:6 29:14
  30:19 33:6 43:10
  43:20 49:22 50:14
goes 45:25
Goggin 4:10
going 6:8,15 7:18
  11:16 13:6 15:19
  18:8 21:16 26:4
  28:25 32:14 38:24
  42:9,12 43:8,19
  43:20 47:8 48:21
  52:21 57:7
good 5:7 13:13
graduate 11:24
great 48:23
Greg 27:17,18 31:7
  31:12,17,25 32:4
  32:15 34:15 53:14
  57:24
ground 6:9 8:14
guess 31:12 35:16
  41:16 51:7,20
  53:13
Guglielmo 1:5 2:9
  5:20 26:6,12 28:1
  28:14,20 30:2
  31:1,6,7,16,23
  32:9,12,19 34:16
  34:23,25 35:11,24
  36:6,13,20 37:5,9
  37:18 39:7,22
  40:11,17 41:12
  42:5 44:9 48:3,18
  51:10,11,12,19
  52:9,13 53:7,14
  54:25 55:2,3,8,11
  56:14 57:10,14,16
  58:5 59:1,2 60:11
Guglielmo's 36:17
  38:6,13 48:5 54:3
guidelines 53:21
guys 33:18

**H**
half 59:14
hand 42:9 63:2
handed 29:25
happen 26:10
happened 39:16
  60:11
happening 37:4
harm 18:10
head 32:1,1,5 38:6
  39:11,12 53:15,23
  53:24 55:3 57:17
  58:5 60:14
headache 50:6
hear 58:4
heard 16:23 19:11
hearing 28:7
heat-related 13:22
helicopters 8:13
help 29:13 45:11
  46:21 59:3
hereinafter 5:3
hereunto 63:1
hey 59:25
high 11:19,20,25
higher 51:8
highly 21:15,19
HIPAA 21:1
hit 31:25
Hojnoski 3:10 29:15
  29:21 56:16 60:19
hold 12:14
holding 33:5,14
  34:1 53:16
hospital 16:7 18:12
  18:13,21,23 19:6
  19:13,25 21:21
  25:1 38:25 40:21
  40:22 41:13 48:4
  48:10 49:17,17
  50:1 54:5 56:11
hours 13:15 24:6
  27:7
housed 33:24
housing 33:21 34:2
  34:6
housing-type 20:25
hundred 20:8
hurt 21:17,17

**I**
ice 39:25 40:2,10
  52:3
identification 29:8
  42:7
identified 42:1

51:12
II 12:5,9
III 1:13 5:1,13 61:1
  62:7
immediately 19:13
  36:5
important 56:3
incident 2:7 6:4
  26:5,19 29:6,16
  30:1,1,3,24 41:12
  45:22 47:6,8,12
  47:12,14,19 48:15
  58:9 60:8
incidents 60:4
include 17:23
indicate 10:20 32:17
  40:16 41:17
indicated 32:15
  35:6 46:16
indicates 43:4
indicating 29:19
  56:17
indication 35:13
information 18:14
  20:3 22:9,10
  39:18,21 48:10
  56:2 57:2,6
informed 56:13
injuries 13:22 19:15
  19:19 38:6 41:3
  46:24 53:15 56:23
  57:2
injury 51:6 53:23
  53:24 55:19 56:5
inmate 16:15 21:4
  21:18 32:12 33:8
  35:11,23 36:17
  43:24 44:3,4,5,6
  44:22 45:15,16,16
  45:25 46:1,2 49:9
  50:1,12,17 52:16
  57:2
inmate's 20:13
  49:11
inmates 16:2 17:10
  17:24 33:4,24
  57:6
input 51:14,16
inside 16:5 33:10
insulin 24:22
intact 44:5,13
intake 16:2 17:9,23
  20:4,11 21:8,12
  21:22 22:12 26:16
intention 40:17
interested 62:16
internal 48:13 60:7

intoxicated 21:15,19
investigations 48:13
involved 47:14
issue 17:21 19:5,22
  22:17,19 25:5
  59:24
issues 17:16 21:1
  45:15
IV 9:4,10

**J**
J 5:14
Jack 1:13 5:1,13
  42:23 61:1 62:7
jail 9:20 10:4,8 11:3
  11:4,7 14:15
  15:21,25 16:6,11
  17:4,5,5,7,11,14
  18:21 19:21 20:13
  20:19 22:16,25
  23:9,16 24:7,16
  25:7,10,19 26:8
  29:17 30:2 31:19
  33:9,18 39:24
  40:18,19,22 43:24
  47:13 48:6,18
  51:4 54:5 55:20
  58:23 59:18,21,24
jail's 25:22
January 26:8,20,22
  27:1,2 28:4 30:17
  30:17 43:14
Jillian 4:11
jldinehart@mdwc...
  4:14
Job 61:25
jobs 10:6,9
Joe 54:25
joint 40:25 41:2
Joseph 1:5 5:20
  26:5
July 12:24 13:3

**K**
K 5:14
keep 31:13,17 32:18
keeps 45:8
key 33:3
kind 6:9 21:24
  30:20
know 6:10 7:4,11
  14:17 18:3 21:7
  21:15,16 22:7
  24:4,5,5,8,9,16
  25:9,19,22 26:2
  26:10 27:8,10,18
  27:23 31:9 33:20

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.

Jack E. Saunders, III, EMT-B

Page 4

**M**

**M** 7:23
**machine** 25:20,23 26:1
**machines** 56:11
**mailbox** 19:9
**male** 33:13
**mandatory** 14:11
**manner** 62:16
**March** 63:3
**marked** 29:7,11 42:6,10 47:10
**Marshall** 4:10
**Matt** 27:17 57:24
**Matthew** 4:2,2 5:24 5:25
**Mazer** 2:2 4:5 5:6,9 8:15 29:9,24 42:8 42:21 48:21 49:2 54:20 55:5 59:19 60:17
**mazerb@mcohio.....** 4:8
**mean** 10:5 43:7 44:14 45:1 58:15
**Med-Trans** 7:21 8:2 8:4,6
**medic** 11:13 16:16 17:8 25:8 27:11 46:13
**medic's** 22:21,23,25
**medic/EMT** 8:20 10:15
**medical** 8:8 13:24 16:3,6 17:12 18:6 20:13,23 21:1 22:2,12 33:17,20 33:23,25 34:1,2 34:21 35:16 36:17 39:22 41:18 43:10 45:4,15 46:7,7,9 47:2 49:11,14,15 49:19 51:21,25 52:6,8,20,22 53:16 54:3 55:22 56:11,12 59:3
**medically** 57:3
**medication** 9:4 16:3 16:12 17:1 22:12 24:22
**medications** 9:4,10 18:5,11 22:1,8 24:21
**medics** 23:15
**meet** 5:8
**memorialized** 20:5

37:2 38:7 41:22 42:17 43:6 46:19 50:16,20 51:22 52:12,21 53:20,21 55:14 57:22 58:3
**knowledge** 30:25 31:18,22 40:9 41:10 53:13 55:9 55:17 58:7
**known** 56:22

**L**

**L** 1:16 4:11 62:3 63:7
**lacerations** 52:2
**lastly** 7:9,14
**late** 43:5
**Law** 3:4,9,10 4:12
**lawful** 5:2
**lawsuit** 5:19 6:3
**laying** 36:6 44:3 45:5 46:1
**learn** 48:4
**leave** 35:24
**left** 23:6,23 36:7 37:8,10 44:3,6,6 44:23,23 45:5 46:1,2 48:5,18
**leg** 45:6
**legs** 36:7,10
**let's** 20:7
**level** 12:4,5,8,8 50:8
**licenses** 12:15
**licensure** 9:12
**life-altering** 19:22
**life-threatening** 25:5
**light** 50:23
**liked** 56:22
**lines** 21:23 32:2
**list** 18:16
**little** 6:13 7:19 11:17 13:6 14:18 15:20 26:5 34:8 43:21 44:12 45:6 50:14
**located** 8:4 17:9 22:25
**locked** 33:7
**long** 21:13 25:17
**look** 33:7,10 37:23
**looked** 35:25 54:15
**looking** 58:8
**low** 46:20
**lower** 20:24
**LPN** 16:10 17:18 27:19

**memory** 40:10
**mental** 50:24
**mentioned** 16:22 17:22 19:11 23:18 24:11 34:9
**metal** 33:22
**MICU** 8:8,12
**middle** 5:14
**midnight** 27:1
**Mills** 27:17,18 31:7 31:12,17 32:15,17 34:15 38:17 39:2 39:6,14,25 40:2,4 40:14,25 53:14 57:25
**mind** 29:2,4
**minute** 39:19
**minutes** 48:23 56:21
**minutes-ish** 36:25
**moment** 29:12 42:13
**monitor** 9:5,10
**Montgomery** 1:8,9 1:18 4:1,1,4 5:10 5:20,21,22 9:19 10:3 11:3,6 15:21 15:25 16:11 17:3 17:14 26:8 30:2 33:18 48:12 60:10 62:2
**months** 23:24
**morning** 20:1 26:9 26:22 34:11 40:16 48:19 49:21
**moved** 31:7,9,10,17 31:19 32:15 39:23
**multiple** 55:3

**N**

**N** 5:14,15 7:23
**name** 5:8,11,14,14 5:15 7:20 9:7 37:23 43:14 44:6 54:24
**named** 6:2
**names** 47:22
**NaphCare** 2:8 9:19 9:22,25 10:2,6,7 10:11 11:7,10 13:23,25 14:21,22 15:1,6,22 16:1 17:14 20:16 23:20 23:21 24:17 25:13 25:20 27:15 38:12 40:15,15 42:5 53:19
**narrative** 29:19

30:4,7,24 31:2 32:11 43:4 47:9 47:12,16,18,18,20 47:25 48:1
**nasal** 46:10,17
**nausea** 50:6
**necessary** 24:10,17
**neck** 46:24
**need** 13:17 15:10 24:25 41:12 48:22 49:24 59:24
**needed** 16:15 17:20 38:19 59:3
**needs** 19:25
**neither** 38:1
**neuro** 50:15,16 51:1 51:3,9,10,15,17 52:16 53:24
**never** 25:17
**NICU** 8:11
**night** 17:17
**nods** 6:22
**noise** 28:7
**noises** 28:10
**non** 9:3
**nonaudible** 6:22
**nonmedical** 37:15
**nonresponsive** 37:11
**normal** 28:11 41:25 44:19
**normally** 21:21
**nos** 6:21
**nose** 38:8
**nostril** 37:10 46:2
**Notary** 1:17 62:3 63:8
**note** 29:16 35:9,23 43:5,12 49:10,16
**notes** 28:21,22 35:18
**noticed** 45:15
**number** 5:22
**numbness** 50:6
**nurse** 19:23 38:17 39:6,6,25 40:2,4 40:14 49:20 56:3
**nurses** 14:3 17:18 24:11 39:2 48:7

**O**

**o'clock** 60:21
**O2** 46:9,16,19
**oath** 7:5
**Objection** 55:5 56:6 59:19
**observation** 32:16

33:1,17,20
**observed** 31:8,11 37:4 40:6
**obtain** 41:18
**obtained** 41:24 46:5
**obvious** 38:19 54:17
**obviously** 6:13 44:8
**occurred** 26:20 30:16
**October** 8:3 9:18
**office** 4:4 5:10,21,23 17:8 22:14,18,20 22:22,23,25 34:21 34:21 46:13 48:12 59:23 60:10 63:2
**officer** 19:3 36:16 38:15,16 53:4
**officers** 16:4 46:6 57:1
**offices** 1:18
**Oh** 56:9
**Ohio** 1:2,8,18,20 3:6 3:12 4:1,7,13 11:21 62:1,4 63:2 63:8
**okay** 5:17 6:22 7:7,8 7:12,13,16,17 8:1 9:17 10:13 12:21 17:18 15:13 18:2 19:16 20:21 21:2 21:9 22:20 23:7 23:12,25 26:4 27:22 29:1,23,25 30:12 31:4 32:14 34:1 35:9,20,23 36:12,22 38:1 39:5 40:24 42:3 42:11,20,22 43:3 43:13,22 44:22 45:21,25 47:1,8 47:17 48:22,25 49:7 51:9,18,24 52:5 54:2,20 55:23 56:9 57:5 58:1,4,8,10,17,21 58:25 60:6,19
**once** 21:3 31:16 39:3 48:3 51:6
**one's** 54:17,17
**online** 14:1 15:3,4,6 15:11
**opposed** 6:21 20:17
**order** 44:16
**orders** 24:20
**oriented** 21:13 34:18 44:4 50:20 50:25 52:21

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

**Ort** 4:3 5:25
**outside** 25:23
**oxygen** 46:20 50:19

_____

**P**

**p.m** 1:21 26:21 27:9 28:4 60:21
**pack** 39:25 40:2,10
**packs** 52:3
**page** 2:1 30:9,10 42:23
**painful** 37:11,19,24 44:4 46:3
**papers** 18:22
**paperwork** 19:7,7 49:8,12,13,14,17 49:18,22,25 50:2 50:10
**parentheses** 44:7,23
**part** 20:12 22:24 31:11 36:10 52:6 54:8
**part-time** 10:6,9,17 10:21,24 11:11
**participate** 25:14,16
**participated** 25:18
**participates** 25:11
**particular** 16:19 17:6 18:23 20:12 27:16 30:5 48:14 53:8
**parts** 45:9
**party** 62:15
**pass** 21:17 42:12 56:1
**passed** 36:23 40:5
**passing** 21:20 59:25
**pat-down** 19:4
**patient** 50:3 56:2,3
**patted** 22:13
**Pause** 42:19
**penlight** 52:5,12
**people** 35:21
**perform** 21:7 38:23 51:2 52:18
**period** 9:15 10:25
**person** 19:5 23:17
**personally** 26:15 41:8 48:17
**perspective** 55:23
**pharmacy** 18:12
**Phil** 4:2
**Phillipsburg** 12:20 13:1
**physical** 18:6
**physically** 24:6 33:7 33:10 57:4

**physician** 50:5
**place** 28:22
**placed** 28:21 34:17 45:10
**Plaintiff** 1:6 3:2
**Plaintiff's** 49:5
**platform** 23:1,6
**please** 5:11 7:22 12:2 15:23 41:9 42:13
**Plexiglas** 33:22
**Plummer** 4:2
**point** 7:14 28:19 31:16,21,23 32:7 34:10 35:17 39:7 54:2,5 58:21,25
**police** 16:4
**policy** 53:19,20
**position** 37:8 44:7 44:24 45:1,2,4,10 45:12 59:8
**possible** 32:12 35:11 39:12
**post-book** 23:3,5 32:22
**post-high** 12:3
**potential** 53:23
**potentially** 32:25
**power** 46:4
**practice** 14:2
**practitioner** 49:20
**prescriptions** 19:8
**presence** 62:11
**present** 13:4 24:6 27:23 28:9 41:4 53:4
**presented** 2:5 29:7 42:6
**presently** 12:25
**pressure** 24:19 50:18 52:4
**pretty** 38:18 41:2
**prevent** 46:23
**previously** 23:18 29:6 42:6,10 44:10 47:10
**primary-care** 50:4
**prior** 9:18 11:10 18:21 19:13 31:1 34:25 35:1 36:5 39:23 43:11 47:19 54:4 56:21 58:21 58:25
**prison** 11:3
**probably** 25:9 38:18 49:6
**problems** 43:10

**Procedure** 1:16
**proceedings** 42:19
**process** 18:4,25 22:8
**proper** 44:18
**propped** 45:8
**Prosecuting** 1:19 4:5
**prosecutor** 5:9
**Prosecutor's** 4:4 5:10
**provide** 49:23 55:24
**provided** 39:18,21
**providing** 29:12 42:10
**Public** 1:17 4:12 62:4 63:8
**pull** 35:22
**pulse** 50:18
**pupils** 39:9,10,14 41:25 50:22 54:10
**purposes** 15:1 29:7 42:6
**pursuant** 1:15
**put** 31:2 41:6 43:12 47:15,25 49:13,18

_____

**Q**

**qualified** 62:5
**question** 7:10,12 17:20 24:13 26:5 30:19 38:19
**questionable** 38:24
**questionnaire** 18:17 20:10
**questions** 6:15,19 20:8 21:14 22:5 34:20 35:7 49:5,6 50:21 54:21
**quick** 6:9 48:21

_____

**R**

**R** 5:15 7:23
**radio** 38:16 46:6 58:23 59:2
**radioed** 39:3
**rate** 44:19
**reach** 24:18
**reaction** 37:25
**reactive** 50:22
**read** 30:13 36:6 43:19 47:23
**Reading** 47:4
**real** 15:17 33:19 53:18
**really** 6:9 17:18 22:5 23:4,9 53:17 55:13 59:21

**reason** 50:11 53:9
**recall** 11:15 15:2 23:11,25 26:24 27:4 28:10 31:5 32:19 35:16 37:17 38:5,8,11 39:5,9 39:17 42:2 45:12 45:13,23 46:18 47:10,17 52:11,15 53:8,17 54:2,9,11 54:12 55:15 59:4 60:5
**receive** 13:24 14:20 15:9 16:6 40:17 49:8,25
**received** 39:23 50:9
**receiving** 19:3
**recertification** 14:24
**Recess** 49:1
**recollection** 9:22 12:22 26:15 27:14 28:6,18 29:13 30:16,21,25 32:3 36:9,22 41:21,23 47:5
**record** 2:9 5:8,12 6:17 7:16 20:13 20:15 30:8 42:5 43:25
**record-type** 20:23
**recorded** 46:6
**records** 16:3 26:7 26:19 54:3
**recovery** 44:7,24 45:1,4
**reduced** 62:10,12
**referencing** 14:6
**referring** 21:24 22:21 34:9 36:1 37:16 45:19
**reflect** 26:7,19
**refresh** 29:13 30:20
**refuse** 52:16,19,22
**regarding** 30:1 48:14
**regular** 15:7
**rehoused** 40:7
**relates** 6:4
**relative** 62:15
**release** 52:25
**relevant** 18:13
**relocated** 53:16
**rely** 57:1
**relying** 7:6
**remember** 30:18 40:3

**Reminger** 3:9
**removed** 40:22
**repeat** 24:13
**rephrase** 7:12
**report** 2:7 17:16 29:6,16 30:1,3,24 39:8 41:7 45:22 47:9,12,19 58:9
**reporter's** 6:12,18
**reporting** 62:17
**represent** 54:25
**reputation** 59:17
**request** 35:2
**requested** 34:22 35:10 43:23 47:2
**requests** 47:14
**require** 47:15
**required** 13:8
**requirements** 14:19
**resigned** 23:23
**respect** 6:10 18:25 20:11 30:4,13 48:14 51:11 53:22
**respond** 37:23 38:2 39:3 40:20 60:3
**responded** 35:19 38:13
**responding** 22:5
**responsibilities** 17:23 23:8
**responsibility** 16:18 52:25
**rest** 9:2
**result** 6:17
**retrieve** 46:15
**retrieved** 46:9,16
**return** 50:5
**review** 29:13 42:14
**reviewed** 47:17 54:3
**rhojnoski@remin...** 3:13
**rhythm** 44:20
**rhythms** 9:5
**right** 6:23 11:16 15:19 27:13 36:12 40:5,8,19 42:12 55:24 56:15,17 57:7,11 58:9 59:11,15 60:15
**RN** 16:10
**Robert** 3:10
**role** 30:4
**roll** 25:11,14 28:3,8 28:9 45:7
**round** 50:22
**roundabout** 29:3
**RPR** 63:7

_____

Case: 3:17-cv-00006-TMR-SLO Doc #: 108 Filed: 06/12/18 Page: 69 of 70 PAGEID #: 2389

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 6

**Rule** 62:19
**rules** 1:15 6:9
**rushed** 19:25

_____

**S**

**S** 5:15,15 7:23
**safety** 22:16,19 33:6
**sake** 6:17
**saline** 52:2
**satisfactory** 22:6
**saturation** 46:20
50:19
**Saunders** 1:13 5:1,7
5:13,15,17,18 6:5
7:2,18,20 8:19
11:22 42:24 54:24
61:1 62:7
**saw** 53:6
**saying** 55:15
**says** 35:19 36:6
42:23 43:1;23
44:7,22,23 45:14
49:13
**scan** 26:1
**school** 11:19,20,25
12:3,6,12
**schooling** 9:14
**scope** 14:2
**scratch** 41:8
**screening** 16:2
17:10,24 18:7
20:4,11 21:8,12
26:16 49:10,15
**seal** 63:2
**Sears** 4:2 5:25
**second** 32:15 36:12
36:24 37:5 38:14
45:3,18,19 51:24
54:6 57:9 59:7
**second-to-last** 41:16
**see** 18:7 19:14,24
21:1 28:14 35:9
48:17 57:4
**seeing** 38:5
**seen** 21:21 58:11,16
58:17
**seizure** 32:13 35:11
35:15,21 55:11,18
56:4
**sentence** 36:5 41:17
45:14 46:14 47:1
**sentences** 36:5
**separate** 49:10
**sergeant** 32:11
34:10 35:2,10
47:13 55:1 56:13
57:17 58:1,22,25

59:13,14,17
**sergeants** 59:21
**set** 13:18 14:3 18:16
24:5 46:5 55:20
63:1
**setting** 10:3 11:3
14:15 56:25
**shaking** 36:7,10
60:14
**shapes** 39:10
**sheet** 52:25
**Sheriff's** 5:21,23
48:12 60:10
**shift** 17:6,17 23:14
23:16 26:12,25
27:7,11,16,23
28:3,19 51:5
**shifts** 11:7,9 25:12
**short** 31:24 37:1
**shortly** 34:22
**shrugs** 6:22
**sic** 43:24
**side** 34:23 36:7 37:8
44:4,6,23 45:6
46:1 60:14,14
**sign** 53:1,3,4
**signs** 18:5 39:11
41:18,24 44:5
**Sinclair** 12:10
**sir** 11:5 14:10 23:25
27:22 37:22 49:4
**sit** 59:23
**site** 25:20
**situation** 20:2,25
21:2,4,11 25:4
**skill** 14:3 55:20
**skip** 11:16
**slightly** 46:22
**Snyder** 4:2 5:24
32:11 34:10 35:10
55:1 56:13 57:17
58:1,22 59:1,13
**Snyder's** 35:2
**so-and-so** 49:17
**somebody** 16:5
17:15 18:19 19:12
24:17,25 25:6
28:11 37:22 51:7
53:4
**somebody's** 18:20
**somewhat** 28:2
**sorry** 8:10 11:13
13:3 15:9 23:21
24:14 36:14
**sort** 45:8
**source** 57:1
**South** 11:21,25

**SOUTHERN** 1:2
**speak** 58:1
**speaking** 31:25
**specific** 5:22 41:11
**specifically** 5:24
10:7 12:8 13:25
14:21 15:21 20:16
22:1 25:14 27:11
33:17 37:17 39:13
41:22 42:14 45:22
47:11,24 54:9
**spell** 5:12 7:22
**spelling** 47:22
**spoke** 57:22
**spoken** 14:17
**Springfield** 8:5
**Square** 4:12
**SS** 62:2
**staff** 20:16,18,19
22:16 23:15,19
24:2,17 25:10,21
27:15 32:8 33:9
38:12,12 40:15
43:24 45:5 57:23
58:2,5 59:23
**staging** 40:12
**stamp** 43:14
**start** 7:18 8:1 9:22
10:17 24:20 25:11
28:2
**started** 13:23,25
15:5 19:9
**starters** 29:11
**starting** 11:10 27:1
**state** 1:17 5:11
12:13 50:24 62:1
62:4 63:8
**stated** 35:24 37:9
44:6
**states** 1:1 35:23
37:7 41:7 46:23
47:1 50:2 55:12
**stationed** 59:10
**status** 32:9
**stay** 13:17 19:9
**stenographically**
62:11
**step-by-step** 20:9
**steps** 19:21
**stimuli** 37:12,18,20
37:24 44:5,13
46:3
**stomach** 45:7
**Street** 1:19 3:5,11
4:7
**Strike** 41:9
**struck** 32:1,4 55:2

57:17
**study** 12:7,11
**stuff** 9:5 18:15
20:23 24:23 28:23
31:15 33:8 34:20
47:23 52:4 56:10
56:11
**submit** 47:11
**submitted** 43:1,17
**submitting** 47:19
**substance** 47:25
**successful** 38:2
**such-and-such**
15:10
**sugar** 24:22
**suicide** 32:31 34:5
**Suite** 3:5,11 4:13
**suited** 16:5
**summoned** 57:10
**supervisor** 17:15
**supporting** 55:21
**supposed** 53:1
**sure** 14:5 15:17
16:23 18:14 24:15
31:14 50:19,22,24
52:7 53:12,18
55:13
**swelling** 38:9
**sworn** 5:3 7:4 62:8
**system** 20:6

_____

**T**

**T** 7:23
**take** 7:15 14:6,8
21:18 29:12 42:13
42:17 48:21
**taken** 1:16 5:19
49:1
**talk** 13:6 15:19
50:19
**talked** 35:6 44:12
60:9
**talking** 18:3,19 21:3
44:20 50:15
**Taylor** 27:17 38:17
39:2,6,15 41:1
57:24
**technically** 51:15
52:19
**technician** 56:12
**tell** 15:23 18:2 28:17
29:10 31:4,10
47:24 55:2,7
56:10 57:4,6,13
57:16 58:4
**ten** 36:25
**testified** 7:1 11:11

60:6
**testify** 62:8
**testimony** 26:6,18
27:25 51:20 61:3
62:10
**thank** 5:17 6:24
46:12 54:21
**thing** 8:13 15:14
24:21 48:9
**things** 51:11,16
**think** 16:22 19:11
20:22 21:23 23:18
26:6 28:24 36:4
37:19 38:18,19
43:6,25 48:23
**third** 1:19 4:7 5:16
41:16 42:15,22
**thirty** 56:21
**thirty-five** 11:23
**thought** 55:10,16
**three** 11:9 13:13
30:9 51:5
**till** 20:9
**time** 9:16 10:11 15:5
16:13 17:3,24
21:5 23:20 24:3
25:25 27:21,22
28:7 30:5 31:5
32:7 35:14,17,18
36:12,19,23 37:1
38:5,14 40:23
42:17 43:11,16
45:3,18 49:9
51:13,19 52:10,14
53:6,15 57:9
58:17 59:6,6,7
**timeline** 31:1
**times** 28:23 32:4
51:5 55:3
**timestamp** 43:13
**tingling** 50:7
**today** 5:18 7:5,7
47:4 58:18
**told** 31:13,25 32:4
50:4 53:14
**top** 30:10 42:23
**totally** 54:17
**touch** 37:25
**trained** 57:3
**training** 13:7,9,20
13:24 14:1,6,9,12
14:14,21 15:3,4,7
15:11 53:22
**trainings** 13:16
**transcribe** 6:16
**transcribing** 6:14
**transcription** 61:3

Case: 3:17-cv-00006-TMR-SLO Doc #: 108 Filed: 06/12/18 Page: 70 of 70 PAGEID #: 2390

Guglielmo, Joseph v. Montgomery Co., Ohio, etc., et al.                    Jack E. Saunders, III, EMT-B

Page 7

transmission 59:2
transport 8:8,13
    24:25 33:3 40:11
    40:21 41:1,12
    47:3
transported 48:3
    54:4
transporting 43:9
trauma 13:22 18:6
    39:11,12
traumatic 56:4
treated 20:1 55:18
treatment 17:20
    24:23 38:23 39:22
    46:7 49:23
tried 37:18
true 61:2
truth 62:8,9,9
try 22:9 39:7 53:23
trying 15:8
tucked 45:6
Tuesday 1:20
turn 16:6 19:18
turned 21:21
Twin 11:20,24
two 7:24 17:17 36:4
type 9:8 16:14,15
    17:20 18:6,9 28:7
    35:15,16 37:25
    38:9,22 39:11
    46:24 47:22 51:6
    52:20 56:10,23
    59:24 60:1
typed 29:19 58:18
types 8:23
typewriting 62:13
typical 23:14
typing 58:15

——————— U ———————
U 5:14,15
uh-hum 18:18 30:14
    30:22 34:12 35:12
    36:8 39:20 42:16
unable 21:16
uncooperative 21:6
    22:15 53:2
understand 7:9 14:5
    22:7 53:12
understanding
    25:10
UNITED 1:1
unresponsive 34:23
    35:1 36:20 37:6
    46:3,22
update 48:8
upper 20:24

use 25:20 31:22
    37:18 55:8 56:20
    57:13
usually 19:4 21:18
    22:11,17 31:10
    35:21 47:21 48:7
    53:3 54:16 56:9
    59:20,22,25 60:1
utilized 52:13

——————— V ———————
Valley 11:20,25
various 37:17
verbal 37:11,19,21
    46:3
versus 56:4
view 33:23
Village 12:20 13:1
Vine 3:5,11
visible 38:6
vision 50:7
vital 18:5 41:18,23
vitals 46:5 50:18
volunteering 22:10
vomiting 50:6
vs 1:7

——————— W ———————
W 1:19 3:10
walk 12:2 33:10
    34:13 37:2,3
walked 34:16
wall 58:6
want 7:14 16:23
    18:10 29:3 30:19
    46:13 50:14 51:2
    52:17
wanted 32:18
Warner 4:10
warranted 16:20
wasn't 28:9
watch 26:11 27:1,5
    27:6 34:15
watches 11:7
way 22:6 29:15
    54:13 56:9
we'll 29:14
we're 18:2,19 28:25
    43:20 45:18 47:14
    50:15
we've 6:3 43:25
weakness 50:7
wear 58:23
weeks 15:17
went 11:20 12:5
    19:6 34:8,20
    35:14 36:13 57:9

weren't 17:18 60:7
west 4:7 11:21 23:2
WESTERN 1:3
whatnot 13:16,22
    15:18
WHEREOF 63:1
whoever's 33:12
withdrawal 18:9
witness 1:14 3:8 5:2
    6:4 8:12 29:18,23
    42:20 48:25 53:5
    56:18 59:20 62:12
    63:1
word 7:24,25
words 6:20 7:24
work 7:21 9:24 10:3
    11:8 12:19
worked 10:11,14
    11:2,9 59:13
working 10:5,7,17
    11:6 12:17 17:14
    26:11,24 27:4,15
    44:20
worsening 50:6
wouldn't 14:7 22:11
    22:17
wound 16:3
wounds 52:3
writing 62:11

——————— X ———————
x-ray 25:19
x-rays 40:17

——————— Y ———————
yeah 28:24 29:21,21
    29:22 51:23 58:14
year 9:21 12:24
    13:10,16 59:14
years 12:21 13:14
yelling 28:12
yeses 6:21

——————— Z ———————
Zachary 4:2 5:24
Zink 4:2 5:25

——————— 0 ———————
00:08 43:23
00:18 45:14

——————— 1 ———————
1/15/15 2:6 29:6
1:23 1:21
11:00 27:9
11:30 28:4
11:36 26:21

12:05 56:14
12:08 56:14,18
127 4:12
138 43:24
139 31:8,11,17
    32:16,22,22 33:9
    33:13 34:1,5,22
    39:24 40:7,20
    44:1
15th 26:8,20 27:2
    28:4 30:17 43:14
16th 26:22 27:2
    30:17
1700 3:11
180220CLB 61:25

——————— 2 ———————
2:15:48 43:15
2:25 26:9
2:49 60:21
2001 12:1
2003 12:4
2004 12:4
2005 12:5,23
2009 12:23
2010 9:23 10:19
    11:11 13:24 23:21
2015 24:2 26:8,21
    26:23 27:2 28:5
    30:17
2016 43:14
2017 8:3 9:18 13:3
    23:22
2018 1:20 63:3
20th 1:20
216 4:14
246-1062 3:6
28(D) 62:19
29 2:7

——————— 3 ———————
3:17-cv-6 1:7
301 1:19 4:7
31st 8:3 9:18
3400 3:5
3510 4:13
3rd 63:3

——————— 4 ———————
42 2:9
441 3:5
44114 4:13
45202 3:6,12
45402 4:7
496-7195 4:8

——————— 5 ———————

5 2:2,6 29:5,12
    30:10 47:9,10
513 3:6,12
525 3:11
54 2:3

——————— 6 ———————

——————— 7 ———————
7-16-2018 63:8
7:00 27:9
72 2:8 42:4,10,23
721-1311 3:12

——————— 8 ———————

——————— 9 ———————
912-3809 4:14
937 4:8