**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

| | | |
|---|---|---|
| JOSEPH GUGLIELMO, | : | Case No. 3:17-cv-6 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| MONTGOMERY COUNTY, OHIO, and | : | |
| the MONTGOMERY COUNTY BOARD OF | : | |
| COMMISSIONERS, et al., | : | |
| | : | |
| Defendants. | : | |

_____

**ENTRY AND ORDER DENYING IN PART MOTION IN LIMINE TO EXCLUDE
MICHAEL BERG'S TESTIMONY AND EXPERT REPORT (DOC. 139), DENYING
MOTION IN LIMINE TO EXCLUDE DR. WALDMAN'S TESTIMONY AND
EXPERT REPORT (DOC. 140), AND DENYING MOTION IN LIMINE TO
EXCLUDE DR. GABRIEL'S TESTIMONY AND EXPERT REPORT (DOC. 141)**

_____

This case is before the Court on three Motions in Limine (Docs. 139-41) brought by

Defendants Montgomery County and Montgomery County Board of County Commissioners,

Sheriff Phil Plummer, Matthew Snyder, Zachary Zink, Matthew Sears, David Cohn, Brandon Ort,

and Benjamin Cooper (collectively, "Defendants").  Defendants seek to exclude from evidence the

testimony and expert reports of three of Plaintiff Joseph Guglielmo's expert witnesses:  Michael

Berg (Doc. 139), Dr. Alan Waldman (Doc. 140) and Dr. Paul Gabriel (Doc. 141).  Plaintiff filed

memoranda in opposition (Docs. 144-46) to the Motions in Limine, in response to which

Defendants filed Replies (Docs. 147-49).  This matter is ripe for review.  For the reasons below,

the Court **DENIES IN PART** the Motion in Limine (Doc. 139) as to Michael Berg and **DENIES**,

in their entirety, the Motions in Limine (Docs. 140-41) as to Dr. Waldman and Dr. Gabriel.

## I.    BACKGROUND

Plaintiff alleges that, while incarcerated at the Montgomery County Jail (the "Jail") as a pretrial detainee, Sergeant Matthew Snyder ("Sgt. Snyder") repeatedly struck him in the head and face for banging on his cell door and creating a disturbance in the Jail.  Plaintiff alleges that, as a result of the beating, he went into a coma and is now cognitively disabled, wheelchair bound, and required to submit to numerous extensive examinations, treatments and hospitalization.

Plaintiff claims that Defendants are liable for his injuries under 28 U.S.C. § 1983 for using excessive force and acting with deliberate indifference to his medical needs in violation of his constitutional rights.  Plaintiff further alleges the mistreatment he suffered is part of a pattern and practice of using excessive force against pretrial detainees at the Montgomery County Jail.

This case is set for trial on June 17, 2019.  In addition to the Motions in Limine now before the Court, Defendants have moved for summary judgment on all of Plaintiff's claims.  The Court will rule on the Motion for Summary Judgment in a separate order.

## II.    LEGAL STANDARD

Under Federal Rule of Evidence 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion" if four requirements are met:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

The Court plays a "gatekeeping" role with respect to expert testimony regarding scientific, technical or other specialized knowledge. *Kumho Tire v. Carmichael*, 526 U.S. 137, 141 (1999); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997). "As gatekeeper, the trial judge has discretion in determining whether a proposed expert's testimony is admissible based on whether the testimony is both relevant and reliable." *Palatka v. Savage Arms, Inc.*, 535 Fed.Appx. 448, 453 (6th Cir. 2013) (quotation marks and citation omitted). The Court must assess "whether the reasoning or methodology underlying the testimony is scientifically valid and … whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 592–93 (1993). The Court must make certain that the expert, "whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho*, 526 U.S. at 152.

Expert testimony should not be excluded "merely because the factual bases for an expert's opinion are weak." *Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (quotation marks and citations omitted). As other courts have observed, the rejection of expert testimony is the exception rather than the rule and the court's gatekeeping function is not "intended to serve as a replacement for the adversary system." *Rose v. Matrixx Initiatives, Inc.*, No. 07–2404–JPM/tmp, 2009 WL 902311, at *7 (W.D. Tenn. March 31, 2009) (quoting Fed. R. Evid. 702 advisory committee's note).

Under *Daubert*, "experts are permitted wide latitude in their opinions, including those not based on firsthand knowledge, so long as the expert's opinion has a reliable basis in the knowledge and experience of the discipline." *Dilts v. United Grp. Servs., LLC*, 500 Fed.Appx. 440, 445 (6th Cir. 2012) (internal quotation marks and citation omitted). "*Daubert* and Rule 702 require only

that the expert testimony be derived from inferences based on a scientific method and that those inferences be derived from the facts of the case at hand, not that they know the answer to all the questions a case presents...." *Jahn v. Equine Servs. PSC*, 233 F.3d 382, 390 (6th Cir. 2000) (internal citation omitted).

The party offering the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 251 (6th Cir. 2001); *Pride v. BIC Corp.*, 218 F.3d 566, 578 (6th Cir. 2000).

Under Federal Rule of Evidence 403, courts may exclude evidence where "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury…" Fed. R. Evid. 403. The district court's role in applying Rule 403 to expert testimony is significant as "[e]xpert evidence can be both powerful and quite misleading because of the affinity of the difficulty in evaluating it." *Daubert*, 509 U.S. at 595 (quoting Weinstein, Rule 702 of the Federal Rules of Evidence is Sound, 138 F.R.D. 631, 632 (1991)).

### III.     ANALYSIS

The Montgomery County Defendants argue that Plaintiff's experts' opinions are inadmissible under Rules 702 and 403. The Court addresses each of the experts in turn.

#### A.  Michael Berg

Berg is "an independent consultant in the field of corrections with over forty-four years of experience in criminal justice management, primarily in the area of corrections." (Doc. 143-1 at 1.) Defendants do not challenge Berg's qualifications to testify as an expert in this case. Rather, they argue that his opinions are not reliable under Rule 702 or should be excluded under Rule 403 because they are likely to confuse and mislead the jury.

4

Defendants first argue that all of Berg's opinions should be excluded because he testified that he is 100% certain of his opinions. (Doc. 139 at 7-8, citing Doc. 122 at 15-16.) At deposition, Defendants' counsel asked Berg if his opinions in this case are "to a reasonable degree of certainty," in response to which he said "Yes they are. Not a reasonable degree of certainty. It is certainty." *Id.* In response to follow-up questions, Berg explained, "'Certainty' is 100 percent. The opinions I provided in the report and articulated as it pertains to Joseph Guglielmo are opinions that I'm certain of and not guessing at." (Doc. 122 at 16.) Defendants do not cite any authority for the notion that an expert may testify only as to a reasonable degree of certainty. Nor is the Court aware of any such authority. The Court's research into the phrase "reasonable degree of certainty"—confined to caselaw within the Sixth Circuit—returned cases involving the standard for the determination of damages in a civil case. In sum, Berg's 100% confidence in his opinions is not disqualifying.

Defendants then suggest that their real issue is that Berg purportedly failed "to explain how and why he reached his conclusion." (Doc. 139 at 7, citing *Thomas v. Chattanooga*, 398 F.3d 426, 432 (6th Cir. 2005).) In *Thomas*, the Sixth Circuit observed:

> [B]eing an expert does not lessen the burden one has in rebutting a motion for summary judgment. In fact "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached ... and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply 'taking the expert's word for it.'"

*Thomas*, 398 F.3d at 432 (quoting Fed. R. Evid. 702 advisory committee's note).

Defendants contend that Berg provides only conclusory opinions about policy and procedures in this case. They specifically object to four of Berg's opinions, namely that:

> 1) "There was no legitimate penological reason for Sgt. Snyder, Dep. Sears, or Corrections Officers Zink and Ort to enter Mr. Guglielmo's cell as he complied with their commands to stop banging on the cell door and the

issues he was having could only be met by summoning medical staff, which the officers failed to do."

2) "Sgt. Snyder used excessive force on Joseph Guglielmo on January 15, 2015" and "Defendants Zink, Ort, Sears, and Cohn failed to intervene to protect Guglielmo from the obvious risk of harm from Sgt. Snyder."

3) "Sgt. Snyder was deliberately indifferent to Joseph Guglielmo's serious medical need for treatment for blows to his head and face on January 15, 2015."

4) "Montgomery County had a policy to use excessive force on inmates in the jail based on the pattern of excessive force used in the jail" and that "Montgomery County ratified Snyder's use of excessive force on Guglielmo."

(Doc. 143-1 at 19-20.)

### 1. Berg's Opinion Regarding Entry into Guglielmo's Cell

Defendants argue Berg failed to explain the basis for his opinion that the officers' entry into Guglielmo's cell was improper. Defendants are incorrect. Berg testified that he relied on the testimony that Snyder "said that he was going to go back there and beat the crazy fucker's ass, he grabbed a can of OC spray and he took five officers with him, indicated that he planned to do more than just talk to him." (Doc. 122 at 39.) Berg inferred from this testimony that Sgt. Snyder intended to use force, not out of necessity to protect his person, but for an improper purpose. Berg further noted that seven officers "indicated there was no need to go back there, and there was certainly no need to go inside the cell." (*Id.* at 43:1-4.) In addition, when Sgt. Snyder arrived at Guglielmo's door, Guglielmo stopped banging. Berg reasoned that, once Guglielmo complied, there was no reason to enter the cell. Berg is not relying solely on his experience in rendering this opinion. He is construing the facts in light of his experience.

Defendants point out that Berg conceded there "probably are numerous reasons why in the operation, in the security management of a jail that an individual could enter a cell." (Doc. 139 at 9, quoting Doc. 122 at 52.) This concession does not undermine Berg's opinion or render it

6

conclusory. The Court understood this testimony as meaning that Berg believes Sgt. Snyder did not enter the cell with a legitimate penological purpose because, based on his experience, entry into the cell was not consistent with any of the "numerous reasons" why an officer might enter a cell for security purposes.

In *Thomas*, the case relied upon by Defendants, the Sixth Circuit held that an expert's conclusory opinions based on his experience were properly excluded from evidence. 398 F.3d at 432. The Sixth Circuit explained that the expert provided "no rationale for his conclusions" and "offered no qualitative analysis" of the alleged excessive use of force by the defendant police department. *Id.* As a result, the plaintiffs were simply asking the court to "take their expert's 'word for it'." *Id.* In contrast, Berg is not asking anyone to take his word that Sgt. Snyder acted inappropriately. Berg has identified specific facts in the record and explained how those facts led him to his opinion based on his training and experience.

### 2. Berg's Opinion that Sgt. Snyder Used Excessive Force

Defendants argue that Berg's opinion that Sgt. Snyder used excessive force should be excluded because it is conclusory and impinges on the Court's instructions to the jury. (Doc. 139 at 9, citing, *inter alia*, *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir. 1994) and *Apponi v. Sunshine Biscuits Inc.*, 809 F.3d 1210, 1218 (6th Cir. 1987).)

Berg's opinion on Sgt. Snyder's use of force is not conclusory. Berg identifies the factors that he considered in reaching this opinion in his expert report: (1) the relationship between the need for the use of force and the amount of force used, (2) the extent of Guglielmo's injuries as a result of the use of force, (3) any effort made to temper or limit the amount of force used, (4) the severity of the security problem at issue, (5) the threat reasonably perceived by the officer, (6) whether Guglielmo was actively resisting, and (7) other circumstances that make up the totality of

7

circumstances surrounding the use of force. (Doc. 143-1 at 25-26.) Berg explains his findings as to these factors and how they inform his opinion.

Defendants' objection that Berg's opinion is a legal conclusion implicates Rule 704 of the Federal Rules of Evidence. Under Rule 704, expert opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." The Sixth Circuit has recognized that "Rule 704 abolishes a long recognized 'ultimate issue' objection to opinion testimony and shifts the focus of the inquiry to 'whether the testimony is otherwise admissible'" under Rule 702. *Heflin v. Stewart Cty., Tenn.*, 958 F.2d 709, 715 (6th Cir. 1992). Consequently, "[t]he decision to admit or exclude such evidence ultimately turns on whether it is helpful to the trier of fact." *Id.* (citing *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir.1985)).

The question of whether Sgt. Snyder used excessive force is a mixed question of law and fact. *See Ornelas v. United States*, 517 U.S. 690, 696–97 (1996) (determination of reasonable suspicion or reasonable cause for stop is two-part inquiry; first part is determination of historical facts; second part is mixed question of law and fact); *see also Mazloum v. D.C. Metro. Police Dep't*, 576 F. Supp. 2d 25, 38 n. 10 (D.D.C. 2008) ("[A]lthough the jury's use of the term 'excessive force' may appear, at first glance, to be a legal conclusion, it is clear that the jury necessarily made the factual determinations that [defendant] used some force against [plaintiff] and that the circumstances did not warrant that use of force.").

In this case, Berg's opinion on the use of force will be helpful to the trier of fact. *See Gaddis ex rel. Gaddis v. Redford Twp.*, 364 F.3d 763, 775 (6th Cir. 2004); *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 908 (6th Cir. 2004); *Russo v. City of Cincinnati*, 953 F.2d 1036, 1047 (6th Cir. 1992). Berg's experience will provide a valuable perspective on the facts and circumstances before the jury, a perspective that cannot be provided by someone without his

8

qualifications and expertise.  Additionally, Berg does not purport to define the legal term "excessive force" for the jury.  Berg's understanding of what constitutes excessive force is based on his understanding of certain Supreme Court precedent, but that is logical given that, as a jail administrator, he was responsible for ensuring that his jail operated within constitutional requirements. (Doc. 122 at 108-09.)  Although framed by his understanding of those requirements, Berg's opinion is very much rooted in the facts of this case and his professional experience addressing the use of force in similar contexts.  For example, Berg opines that Sgt. Snyder's use of force was excessive because, among other reasons, Guglielmo was not a threat and banging on a cell door did not present a security issue.

Defendants note that, in his expert report, Berg references how legal standards were applied in certain caselaw and, at deposition, compared the facts in certain cases to the facts in this case. Such testimony would be inappropriate in front of a jury, but the record does not suggest that Plaintiff intends to solicit such testimony.  To eliminate any doubt, Berg is not permitted to testify regarding legal standards or the import of any caselaw at trial.  He may testify regarding what constitutes excessive force based on his experience, education and training and whether Defendants' use of force was excessive in this case.

### 3.    Berg's Opinion that Sgt. Snyder was Deliberately Indifferent

Defendants argue Berg's opinion that Sgt. Snyder was deliberately indifferent to Guglielmo's serious medical needs is objectionable because what constitutes "deliberate indifference" is a legal conclusion.  They cite *Woods v. LeCureux*, 110 F.3d 1215, 1221 (6th Cir. 1997), in which the Sixth Circuit held that a district court did not abuse its discretion by excluding expert testimony on "deliberate indifference."  The Sixth Circuit contrasted its prior decisions in *Heflin* and *Berry* as follows:

9

> [T]wo Sixth Circuit cases have confronted the ultimate issue problem as it relates to the term "deliberate indifference."  In *Heflin v. Stewart County*, 958 F.2d 709 (6th Cir.), cert. denied, 506 U.S. 998, 113 S.Ct. 598, 121 L.Ed.2d 535 (1992), an expert witness in a § 1983/Eighth Amendment case testified that, in his opinion, the prison officials were "deliberately indifferent" to the medical needs of a pretrial detainee.  The court concluded that the district court did not commit "reversible error" by admitting this evidence.  *Id*. at 715.  Central to the court's conclusion was the fact that the witness "used 'deliberately indifferent' in the way an ordinary layman would to describe such conduct—to state his opinion on the ultimate fact, not to state a legal conclusion."  *Id*.  In *Berry v. City of Detroit*, 25 F.3d 1342 (6th Cir.1994), cert. denied, 513 U.S. 1111, 115 S.Ct. 902, 130 L.Ed.2d 786 (1995), a § 1983/municipal liability case, the plaintiff's expert witness testified that the Detroit Police Department was "gross[ly] negligent" in its training of its officers and that this gross negligence was comparable to "deliberate indifference."  *Id*. at 1353.  The witness then defined deliberate indifference as "[c]onscious knowledge of something and not doing anything about it."  *Id*. at n. 12.  Overturning a jury verdict for the plaintiff, this court held that the district court erred by admitting this testimony. We stated that "'deliberate indifference' is a legal term" and that "[i]t is the responsibility of the court, not testifying witnesses, to define legal terms."  *Id*.
>
> *Berry* and *Heflin* shed light on the difficulty district courts face when determining whether to admit testimony that arguably amounts to a legal conclusion. Although *Heflin* indicates that district courts can exercise some discretion in determining whether the proffered testimony is helpful to the jury, *Berry* teaches that a district court abuses its discretion when it allows a witness to define legal terms, especially terms that carry a considerable amount of legal baggage.

*Woods*, 110 F.3d at 1220.

As the Sixth Circuit acknowledged, the term "deliberate indifference" carries a "considerable amount of legal baggage." *Id.*  Its precise meaning also may not be readily apparent to a layperson.  Consequently, allowing Berg to testify that Sgt. Snyder was "deliberately indifferent" is likely to require further explanation—namely, an explanation of what he means by "deliberately indifferent."  The risk that Berg will impinge on the Court's jury instructions arises out of that explanation.  Rather than run that risk, Berg must be precluded from using the term "deliberate indifference."[1]

---

[1] In contrast, the Court does not see the same risk in Berg's use of the term "excessive force", which an ordinary juror would certainly understand as too much force.  A juror should also be able to listen to

10

That Berg cannot use the term "deliberate indifference" does not mean that he cannot testify regarding Sgt. Snyder's handling of Guglielmo's medical needs. Berg may testify, for example, that "[i]t was unreasonable for Sgt. Snyder to delay necessary medical care, conceal the extent and cause of Guglielmo's injuries, and fail to provide reasonable medical care promptly." (Doc. 143-1 at 28.) Berg may explain the facts supporting this opinion and his underlying reasoning. He simply may not, when describing his conclusions, state that Sgt. Snyder acted with "deliberate indifference" because of the risk of interfering with the jury's understanding of the Court's instructions.[2]

### 4. Berg's Opinion regarding Montgomery County's Policy

Defendants argue Berg's opinion that Montgomery County has a policy of using excessive force on inmates is conclusory. They cite deposition testimony in which Berg was unable to recall the details of his findings after reviewing 120 use-of-force incidents in the jail involving the named Defendants in this case. In the testimony, Berg tells Defendants' counsel that he needed to review the incident report to refresh his memory as to the particular details of one incident—an eminently reasonable request. Defendants never provided him the requested incident report.

---

testimony regarding what an expert witness opines was too much force (and why) and weigh that testimony against the Court's instructions as to the legal standards applicable to Plaintiff's claims.

[2] This case is set for trial on June 17, 2019. The Court has not held its Final Pretrial Conference and the parties have not submitted their proposed jury instructions. The Sixth Circuit does not provide pattern civil jury instructions. In the Seventh Circuit, however, the pattern civil jury instruction for failure to provide medical attention under the Eighth and Fourteenth Amendments does not use the term "deliberate indifference." Instead, it describes the factual findings required to meet that standard in ordinary language. The Committee Comment explains that the term "deliberate indifference" was not included in the instructions "because most jurors will not be familiar with it and it can be described using ordinary language." Seventh Cir. Pattern Civil Jury Instruction 7.17 (2017 rev.) and Committee Comment c at p. 172. If, in this case, the jury instructions ultimately do not contain the term "deliberate indifference," the conflict between Berg's testimony and the Court's instructions would be considerably diminished. If that situation arises, the parties may ask the Court to revisit this ruling, notwithstanding that the Seventh Circuit Committee Comment suggests any use of the term might be ill-advised—including by the parties' experts.

Berg was able to elaborate on six exemplar use-of-force incidents—which were exhibits at his depositions—but Defendants did not ask Berg about them.  Berg's lack of instant recall does not establish that his opinions are unsupported.  It is evident from his expert report that Berg reviewed the facts from each particular incident and determined whether the use of force was reasonable or unreasonable in each case.

Defendants also argue Berg should have interviewed the witnesses involved in the use-of-force incidents and compared his quantitative findings—for example, that 71 of the 120 incidents involved excessive force—with other jails in Ohio.  This criticism is fodder for cross-examination, but it does not demonstrate Berg's methodology is unreliable.  The reliability of Berg's methodology is demonstrated by his reasoned application of well-known standards within the industry and reliance on relevant policies and procedures, including The Montgomery County Sheriff's Office General Orders Manual.  (*See, e.g.,* Doc. 143-1 at 35-36.)

### 5.  Defendants' General Objection under Rule 403

Defendants argue that Berg's opinions, even if admissible under Rule 702, should be excluded under Rule 403 because they are not relevant and/or their probative value is outweighed by the risk of unfair prejudice.  Defendants specifically identify a statement during Berg's deposition regarding Sgt. Snyder's lack of regret and a statement in his expert report that "Sgt. Snyder's attitude and demeanor can only be described as arrogant, disrespectful, callous, sadistic, barbaric, inhumane and just plain mean."  (Doc. 122 at 128; Doc. 143-1 at 31.)  Berg made the first statement in response to questions about Montgomery County's investigation.  The second statement appears in the section of his expert report regarding the Jail's alleged policy of using excessive force.

12

It would not be appropriate to rule on the admissibility of these statements—or others like them—under Rule 403 without placing them in context.  Neither statement is one of the six opinions designated in Berg's expert report.  (Doc. 143-1 at 19-20.)  There is no indication that Guglielmo will solicit these statements at trial.  Guglielmo expressly states he will not seek Berg's opinion on any witness's credibility at trial.  (Doc. 144 at 15.)  Ultimately, the admissibility of such statements will depend greatly on the purpose for which they are offered at trial.  The Court therefore declines to exclude them from evidence at this time.

### B.  Dr. Alan Waldman

Dr. Waldman became a licensed physician in 1987 and has practiced in neuropsychiatry for over 30 years.  (Doc. 146-1 at 1; Doc. 129 at 6:6-7.)  He is board certified in psychiatry, neurology, and as a forensic examiner.  (Doc. 146-1 at 1.)  He served as the neuropsychiatric provider at a head injury center for three years.  (*Id.* at 3.)  Guglielmo's counsel retained Dr. Waldman to perform a neuropsychiatric evaluation to determine the extent of Guglielmo's injuries resulting from Sgt. Snyder's use of force.  (Doc. 146 at 1.)

At the conclusion of Dr. Waldman's expert report, he states:

> [I]t is my opinion within a reasonable degree of medical probability that Mr. Guglielmo's injuries are permanent and debilitating.  It is also my opinion within a reasonable degree of medical probability that Joseph Guglielmo was severely beaten at the Montgomery County jail.  He sustained neurologic injuries that could have, likely should have killed him, but has left him in a state of permanent debility [sic], mental anguish, and the need for continual attendant care of medically and custodial needs to maintain his well being and essentially his life.  Any inference that Mr. Guglielmo's injuries and current condition was caused by the injuries that were seen at Grandview Hospital is beyond absurd, beyond fanciful and beyond ridiculous.  Mr. Guglielmo received his life-threatening injuries at the Montgomery County jail.

(Doc. 129-1 at 22-23.)

Defendants contend Dr. Waldman's conclusions are unreliable and irrelevant.  They specifically argue that Dr. Waldman's opinion regarding the cause of Guglielmo's injuries is

unreliable because he is not a radiologist and, at deposition, did not know the number of strikes it would take to cause Guglielmo's injuries.

Defendants do not cite any authority for the proposition that only a radiologist is qualified to evaluate Guglielmo's injuries.  Dr. Waldman has an extensive background treating head injuries, including serving at a head injury center for three years.  He has treated many patients with post-traumatic amnesia, one of Guglielmo's symptoms.  (Doc. 129 at 32.)  Dr. Waldman's opinions are not speculative merely because he was unable to estimate how many strikes would be necessary to cause Guglielmo's injuries.  When asked this question at deposition, Dr. Waldman explained that it was within the scope of his expertise to opine that "significant blunt force trauma with multiple impacts" caused the damage to Guglielmo's skull and brain.  (*Id.* at 50:18-21.)  He did not, however, believe he had the expertise to estimate the precise number of strikes that would be necessary.  (*Id.* at 50:13-18.)  This testimony shows that Dr. Waldman placed limitations on his opinions to stay within the scope of his expertise, not that he was speculating as Defendants suggest.  Dr. Waldman is qualified to offer his opinions in this case.

Defendants also argue two opinions should be excluded because they are contradictory. The first opinion is that "Mr. Guglielmo was beaten to a much greater degree by Sergeant Snyder, possibly others, than what the statements and investigation would reflect" and the second opinion is "that Sergeant Snyder striking Mr. Guglielmo those three times coupled with him falling and hitting his head could certainly have caused the injuries that nearly killed Joseph Guglielmo." (*Id*. at 51:10-13, 69:24-70:3.)  Upon review of the transcript, these opinions are consistent.  Essentially, Dr. Waldman testified that, while it is *possible* that three strikes and a hit to the head caused Guglielmo's injuries, he found it more likely that Guglielmo was beaten much more severely than

14

Sgt. Snyder claims. (*Id.*) This testimony is not inherently contradictory. To the extent Defendants believe that it is, they may explore it on cross-examination.

Defendants also challenge Dr. Waldman's assessment of Sgt. Snyder's credibility. Dr. Waldman testified that, in reaching his conclusions, he determined Sgt. Snyder was not telling the truth. (*Id.* at 61-63.) He explained that Sgt. Snyder's assertion that he "hardly used any force" against Guglielmo was "absurd" in light of Guglielmo's "horrible injuries." (*Id.*) Defendants claim that this determination is "speculative, remote and uncertain." (Doc. 140 at 8.) It is not speculative because it is based on Dr. Waldman's medical evaluation of Guglielmo and his review of the Jail's records. Nor is it uncertain, as Dr. Waldman expressed no doubt in his conclusion that Sgt. Snyder was not telling the truth. Defendants never explain what they mean by the objection that Dr. Waldman's assessment is "remote." Perhaps it is a synonym for "speculative," in which case it is redundant, or it may be rhetorical, in which case it has failed to persuade. In any event, it is rejected as unsupported.

Dr. Waldman did not set out to assess Sgt. Snyder's credibility, but the results of his medical evaluation were inconsistent with Sgt. Snyder's statements. Thus, by necessity, Dr. Waldman could not find those statements credible. Guglielmo asserts that Dr. Waldman will not testify about his determination of Sgt. Snyder's credibility at trial, unless Defendants solicit such testimony. There is no reason to exclude Dr. Waldman's assessment of Sgt. Snyder's credibility at this time.

Defendants also object to Dr. Waldman's opinion that the person interviewing Sgt. Snyder as part of the Jail's investigation asked questions "in a fashion where he is suggesting what the answer should be." (Doc. 129 at 61:11-16.) Defendants argue that such opinions are subject to exclusion under Rule 403 because they have little probative value but are highly prejudicial. Dr.

15

Waldman explained that he included this assessment in his report because it was germane to Sgt. Snyder's credibility. (*Id.* at 61.)  Again, Dr. Waldman was in a position where his findings were at odds with Sgt. Snyder's statements. Dr. Waldman therefore had reason to scrutinize the investigation as it related to those statements.  As mentioned, Guglielmo does not intend to solicit Dr. Waldman's assessment of Sgt Snyder's credibility, which would include his assessment of the interviewer's questions.  The Court again sees no reason to exclude testimony that will not be offered into evidence, unless the Defendants solicit it.

Defendants generally argue that all of Dr. Waldman's opinions are inadmissible under Federal Rule of Evidence 403, without identifying why any specific opinions should be excluded on this basis.  The Court declines the invitation to audit Dr. Waldman's report for compliance with Rule 403.  In any event, the Court finds Dr. Waldman's opinions both relevant and of probative value in this case.  The only prejudice to Defendants is that his opinions support Guglielmo's claims, which is a normal part of an adversarial legal system.

### C.  Dr. Paul Gabriel

Dr. Gabriel is a board-certified specialist in emergency medicine.  (Doc. 128 at 6.)  He earned his medical degree from Emory University School of Medicine, practiced in orthopedic surgery, then radiology, and began his practice in emergency medicine in 1988.  (*Id.* at 69-70.) For the last 17 years Dr. Gabriel has been the Chairman of Emergency Medicine at Grant Medical Center in Columbus, Ohio. (Doc. 128-1 at 2.)  Grant Medical is the busiest Level I Trauma Center in Ohio, the twelfth busiest in the country.  (Doc. 128 at 76-77.)  Dr. Gabriel is also the chair of the peer review process, where he reviews all cases that have a bad outcome.  (*Id.* at 63, 72.)  He lectures for EMS groups and professional journal clubs; occasionally serves as an expert witness; and serves as the EMS medical director for Washington Township and the cities of Dublin and

Delaware.  (*Id.* at 73,-74, 99-100.)  In these roles he reviews their emergency runs quarterly, maintains their protocols, and meets with their EMS supervisors.  (*Id.*)  He is on the faculty teaching clinical emergency medicine at Ohio State University and the Ohio University Heritage College.  (*Id.* at 56.)

Dr. Gabriel provides two basic opinions regarding Guglielmo's injuries. First, he opines that Guglielmo's injuries were caused in the Montgomery County Jail, not during his arrest 23 hours earlier.  (Doc. 128 at 66.)  Second, he opines that the force described by Defendants (the three blows) could not possibly have caused the degree of the injuries Guglielmo suffered.  (*Id.*)

Defendants contend that Dr. Gabriel's opinions as to what caused Mr. Guglielmo's head injuries do not satisfy the reliability standards of Fed. R. Evid. 702.   They assert that Dr. Gabriel does not have expertise in neurology, neuroradiology, neurosurgery, orthopedics, plastic surgery, or ENT and has never rendered an expert opinion about trauma, traumatic head injury, or neurological deficits as a result of a traumatic brain injury.  (Doc. 141 at 8 (citing Doc. 128 at 112).)

The contention that Dr. Gabriel is not qualified to render an opinion on head injuries is not well founded.  The above description of Dr. Gabriel's qualifications and accomplishments as an emergency room physician demonstrates that he has the necessary expertise.  If there were any doubt, Guglielmo directs the Court to the following additional facts:  Dr. Gabriel treats subdural hematoma patients every week.  (Doc. 128 at 85).  Just during the week of his deposition, he had treated at least three subdural hematoma patients.  (*Id*. at 138.)  He has seen many patients who suffered facial fractures similar to Guglielmo's, including one the same month as his deposition. (*Id*. at 92.)  Grant Medical serves an area with a large gang population, so Dr. Gabriel frequently treats head injuries caused by fistfights.  (*Id*. at 150-152.)  Whenever he treats a patient who was

assaulted, he asks about the cause of the injuries, including the degree of force, whether any instruments were used, and whether the person fell from any height.  (*Id*. at 153.)  In sum, Dr. Gabriel is qualified to render a medical opinion regarding the nature and extent of Guglielmo's head injuries.

Defendants also cite Dr. Gabriel's statement that, when presented with two injuries in an emergency room, he could determine which injury caused a neurological deficit based on the amount of force used.  Dr. Gabriel testified that he could provide such an opinion based on "[t]hirty years of experience, seventeen years working at the busiest trauma center in the country and seeing a large number of these cases."  (Doc. 128 at 112.)  Based on this testimony, Defendants argue that Dr. Gabriel does not rely upon any "seasoned methodology" in reaching his opinions, only his medical experience.

This argument also has no merit.  In the cited testimony, Dr. Gabriel stated that he was relying on thirty years of experience *as an emergency room physician*.  He sheds light on what this means in his expert report:

> As an Emergency Medicine physician, I rely on medical records to form an opinion of diagnosis, cause, and treatment of injuries, including traumatic brain injuries. I have prepared this report based upon my education, training, skill, specialized knowledge, and 30 years of experience in the field of Emergency Medicine. I have applied the principles and methods used by an Emergency Medicine specialist to the facts of the case to render my opinions.

(Doc. 128-1 at 4.)  This is a clear statement that Dr. Gabriel applied standard medical diagnostic methods to determine the cause of Mr. Guglielmo's injuries.  Defendants have not come forward with any evidence that the steps taken by Dr. Gabriel in reaching his opinions in this case do not meet the accepted standards of his profession.

Defendants also argue that Dr. Gabriel does not cite to any evidence or research to support his claim regarding the force necessary to cause Guglielmo's injuries.  Dr. Gabriel testified,

however, that he consulted multiple journal articles concerning traumatic brain injury, professional treatment guidelines, trusted internet resources, and two chapters from "Tintinalli's Emergency Medicine" textbook on head and face trauma.  (Doc. 128 at 42-59.)  This argument therefore also fails.

Defendants argue that Dr. Gabriel did not have sufficient facts about the incident to opine that Sgt. Snyder caused Guglielmo's injuries.  (Doc. 128 at 165.)  They refer to Dr. Gabriel's testimony regarding the number of blows and the amount of time it would take to cause those injuries.  When asked how many blows it would take, Dr. Gabriel responded:

> I don't know how many blows.  Two, three blows, no.  This is – Again, I see gang violence every single day of my life.  I see guys with their faces blown out by being struck multiple times by baseball bats.  That's the degree of trauma we're talking about.  You know, two punches is not being beaten by a baseball bat, making your face look like pulp and fracturing every single bone in the left side of your face.  That the degree of trauma we're talking about here.

(Doc. 128 at 169-70.)  This line of questioning continued:

> Q.     But you can't say with any kind of probability how many blows it would take?
>
> A.     No.  I would say repeated blows and probably over a period of time, it would probably be greater than 30 seconds, about 40, 45 seconds.  I'm estimating that.  It – Two distinct blows could not cause this degree of injury.
>
> Q.     And to even start to presume about the amount of time that it would have taken, you would need to know about the force of each blow, the location of each blow, how the blow was delivered, as in what bone of the body, et cetera, correct?
>
> A.     Absolutely.
>
> Q.     And you don't have any experience in determining to a certainty how much force is used to deliver injuries like this?
>
> A.     No.  I'm not a forensics expert.

(*Id.* at 170.)

19

Dr. Gabriel's responses demonstrate the limitations on the scope of his opinion in light of his experience, expertise and the information available to him.  They do not show that Dr. Gabriel did not have sufficient information to render any opinion on the issue of whether Sgt. Snyder caused Guglielmo's injuries.  The limitations of his opinion, of course, may be exploited on cross-examination at trial.  *Daubert*, 509 U.S. at 595–96.

Finally, Defendants argue that Dr. Gabriel's opinions are inadmissible under Fed. R. Evid. 403.  Similar to their Rule 403 argument regarding Dr. Waldman, Defendants do not explain why any particular opinion should be excluded on this basis.  Nevertheless, Guglielmo argues, and the Court agrees, that Dr. Gabriel's testimony will assist the jury in considering whether Sgt. Snyder's use of force was reasonable and the extent of Guglielmo's injuries.  The case will involve medical terminology, such as the term "subdural hematoma," that is within Dr. Gabriel's expertise.  Dr. Gabriel's experience treating similar injuries will assist the jury in assessing the credibility of the testimony about what happened to Guglielmo at Montgomery County Jail.  Dr. Gabriel's testimony will not be unfairly prejudicial.  It will assist Guglielmo in proving his claims, but that is the sort of prejudice contemplated by the Rules of Evidence and is typical in every case.

## IV.    CONCLUSION

For the reasons above, the Court **DENIES IN PART** the Motions in Limine (Doc. 139) as to Michael Berg, the sole exception being that Berg shall not be permitted to use the term "deliberate indifference" at trial.  The Motions in Limine (Docs. 140-41) as to Dr. Waldman and Dr. Gabriel are **DENIED** in their entirety.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, May 14, 2019.

s/Thomas M. Rose

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

20