# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | | |
|---|---|---|
| JOSEPH GUGLIELMO, | : | Case No. 3:17-cv-6 |
| | : | |
| Plaintiff, | : | Judge Thomas M. Rose |
| | : | |
| v. | : | |
| | : | |
| MONTGOMERY COUNTY, OHIO, and the MONTGOMERY COUNTY BOARD OF COMMISSIONERS, et al., | : | |
| | : | |
| | : | |
| Defendants. | : | |

_____

## ENTRY AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (DOC. 123)

_____

This case is before the Court on the Motion for Summary Judgment (Doc. 123) filed by Defendants Montgomery County, Ohio and the Montgomery County Board of Commissioners, Sheriff Phil Plummer, and Officers Matthew Snyder, Zachary Zink, Matthew Sears, David Cohn, Brandon Ort, and Benjamin Cooper. Plaintiff Joseph Guglielmo alleges that, while incarcerated at Montgomery County Jail as a pretrial detainee, Defendant Matthew Snyder repeatedly struck him in the head for banging on his cell door and creating a disturbance. Guglielmo claims Defendants are liable for his resulting injuries under 42 U.S.C. § 1983 for using excessive force and acting with deliberate indifference to his medical needs in violation of his constitutional rights. Guglielmo further alleges the mistreatment he suffered is part of a custom or policy of permitting the use of excessive force against pretrial detainees at Montgomery County Jail.

Defendants move for summary judgment on the basis of qualified immunity and on the basis that there is no genuine issue of material fact and they are entitled to judgment as a matter of

law. This matter is fully briefed (Docs. 123, 134, 142) and ripe for review. For the reasons below, the Motion for Summary Judgment (Doc. 123) is **GRANTED IN PART** and **DENIED IN PART**.

## FACTS

The following recitation of facts includes the evidence, including witness testimony, espoused by both Guglielmo and Defendants. The parties dispute key facts regarding what happened inside Guglielmo's cell on January 15, 2015. Depending on the jury's assessment of the credibility of the parties' witnesses, the narrative may change significantly. The Court discusses how a reasonable juror could construe the facts in the light most favorable to Guglielmo, the non-movant, in the analysis portion of this Order.

### A.    Guglielmo's Arrest

Prior to the events giving rise to this case, Guglielmo was a fifty-seven-year-old homeless veteran of the United States Air Force residing at Gettysburg Gateway Homeless Shelter for Men ("Gateway") in Dayton, Ohio. At approximately 12:41 a.m. on January 15, 2015, Dayton police officers arrested Guglielmo for assaulting a staff member at Gateway. While placing Guglielmo in handcuffs and escorting him to their police cruiser, the officers noticed an abrasion to Guglielmo's forehead. In accordance with policy, they transported Guglielmo directly to Grandview Hospital for medical clearance.

An attending physician at Grandview Hospital saw Guglielmo. The physician's notes state, "Joseph Guglielmo is a fifty-seven year old male who presents with assault […] abrasion to his forehead. Patient is complaining of pain over the abrasion site. Patient did not lose consciousness. Patient does complain of a mild headache but denies any neck or back pain." Guglielmo was discharged from the hospital with a diagnosis of a forehead abrasion and taken to Montgomery County Jail (the "Jail") for booking.

**B.    Guglielmo is Booked into the Montgomery County Jail**

The Dayton police officers booked Guglielmo into the Jail at approximately 2:25 a.m. on January 15, 2015.  Guglielmo recalls that the "Sheriff" was very nice and cordial when he was booked.  Guglielmo has no recollection of anything that happened at the Jail after his booking.

Defendant Sergeant Matthew Snyder ("Sgt. Snyder") met Guglielmo during the booking process.  Sgt. Snyder recalled that Guglielmo was upset.  According to Sgt. Snyder, they talked about the circumstances leading up to Guglielmo's arrest, Guglielmo's injury to his face, and that they had both served in the military.  Sgt. Snyder testified that normally a sergeant would not be involved in the booking process.  In this case, however, Guglielmo arrived at the jail uncooperative, and therefore additional officers were needed.

Once booked into the Jail, NaphCare medical staff saw Guglielmo for his medical intake screening.[1]  A NaphCare EMT is responsible for the intake screening of detainees at the Jail.  The intake screening includes taking vital signs, making a history of allergies, medications, medical conditions, noting any type of physical trauma that the medic can see while the EMT is doing the screening, symptoms of withdrawal from drugs or alcohol, and any indications of self-harm.  The EMT also initiates prescription verification by outside healthcare providers.

The medical records from Guglielmo's medical intake screening indicate that NaphCare staff placed orders for certain prescription medication for Guglielmo.  The EMT's notes state, "ABCs intact no distress.  Inmate alert and oriented in cell MHD 133, refused to get up to come answer medical questions, refuses to provide information in cell, abrasion noted to forehead, hospital discharge paperwork in NP/MD box.  Treated at Grandview Medical Center."  At approximately 11:27 a.m. that same day, another entry states, "Now reports anxiety and sleep

---

[1] Montgomery County contracts with NaphCare, Inc., to provide medical care, treatment and services, including distribution and ordering of medicine for detainees in the Jail.

issues, states he gets meds from the VA. Added to reconciliation." NaphCare staff made additional entries within the same hour regarding "drug reconciliation" for various prescription medications.

### C. Guglielmo is Relocated from Delta Pod to Transport Staging

Guglielmo was initially housed in Delta Pod Cell 429, a general population area of the Jail. Defendant Officer Matthew Sears ("Officer Sears") testified that Guglielmo became highly agitated and disruptive, however, and had to be moved. According to Officer Sears, Guglielmo was upset about not getting his medication—he did not have it yet—and was taking physically threatening stances in his cell. Officer Sears testified that Guglielmo also verbally threatened to assault his cellmate.

Sergeant Richard Whalen ("Sgt. Whalen") also addressed Guglielmo's disturbance in Delta Pod and participated in the decision to relocate him to an unoccupied area of the Jail called Transport Staging. Sgt. Whalen first interacted with Guglielmo in Delta Pod at roughly 10:00 p.m. on January 15, 2015. Sgt. Whalen testified that Guglielmo was agitated and his "main issue seemed to be about medical, either they were not giving him his meds or he was not getting the appropriate meds." Sgt. Whalen and Sergeant Vitali decided to relocate Guglielmo because he kept yelling and it was 10:00 p.m. They had an obligation to the rest of the inmate population to remove Guglielmo from the area so the other inmates could sleep. Sgt. Whalen testified that removing an inmate to Transport Staging is "a technique that we have used many, many times, and in general, it is successful. It causes people to settle down because they no longer have an audience, and it's worked before and it was my hope that it would work that night." Guglielmo was placed in Transport Staging Cell 114 at approximately 10:00 p.m.

### D.    Guglielmo Creates a Disturbance in Transport Staging

Once in Transport Staging, Guglielmo requested and received a medical review at approximately 10:44 p.m. on January 15, 2015.  The Samaritan Behavioral Health employee who saw Guglielmo noted that Guglielmo was depressed, tearful, and having hopeless thoughts.  Her notes further state that Guglielmo was agitated and irritable and she was referring him to a NaphCare doctor.

Defendant Officer Benjamin Cooper ("Officer Cooper") was working in the Jail's security control room that night.  He wrote an incident report for that evening, even though he was not with Guglielmo when he suffered his injuries, "to demonstrate that while in security control, I heard a loud noise within the area that is responsible for access control as well as the safety of the jail, among other things."  Officer Cooper stated in his report:

> On January 15, 2015, I was assigned as the Security Control Officer on first watch. At approximately 2330 hours, while attending my post, I could hear a loud banging noise coming from the wall behind my workstation. The banging was apparently coming from Transport Staging, which is located directly behind Security Control. While checking cameras in Transport Staging, I was able to determine the loud sound was coming from the inmate in the cell directly attached to the rear wall of Security Control. I was able to see an inmate throwing himself into and striking the door. The sound caused by the inmate in the cell were loud enough that it began to hinder my ability to hear my jail radio.

Sgt. Snyder began roll call (the pre-shift meeting when officers report and receive information pertinent to their shift) shortly after arriving at the Jail at 11:15 p.m. on January 15, 2015.  He was the booking sergeant and in charge of the first floor of the Jail.  His incident report states that, at about 11:30 p.m., he "was conducting a roll call on the jail platform with the first watch corrections staff.  Inmate Guglielmo began banging and punching the cell door and glass in TRS #114.  Once roll call was complete at 2334 hours, I gathered several officers and a large can of O.C. pepper spray and responded to TRS #114 to address the disturbance."

Sgt. Snyder described the disturbance as the sound of metal banging, as if Guglielmo might have been banging on the metal toilet and connected plumbing. Sgt. Snyder testified that potential concerns over an inmate banging in a cell are that "if they're banging to the point where they're going to hurt themselves, damage the property which they'll hurt themselves before they damage the property usually or they're affecting the operation of the jail, the cell he was in was close to security control and he was affecting the operation." The Transport Staging area is separated from the booking sergeant's office by a window.

Officer Sears, who was present during roll call, testified that it sounded like Guglielmo was banging with a closed fist on the glass window of the cell door and screaming. The Jail security footage of the Transport Staging area captures Mr. Guglielmo banging non-stop on his cell door for over five minutes with only intermittent pauses. The banging on video becomes increasingly aggressive over time. The banging ceases with the arrival of Sgt. Snyder and other officers at his cell door starting at approximately 11:33:30 p.m.

Sergeant Eric Banks ("Sgt. Banks") was at the Jail that night. He testified that, during roll call, Sgt. Snyder became visibly upset after being interrupted a few times by Guglielmo. According to Sgt. Banks, Sgt. Snyder was red in the face, biting his lip, and then "[Snyder] made a comment to the effect of after roll call, we're going to go back there and beat that crazy fucker's ass." (This testimony is not consistent with Sgt. Snyder's testimony that he went to Transport Staging due to concerns about Guglielmo's safety and Jail security.) Another officer present that night, Sergeant Feehan ("Sgt. Feehan"), also testified that Sgt. Snyder said "we're going to go back there and beat that crazy fucker's ass."

Sgt. Snyder did not recall making these statements and further testified he did not know who was making the disturbance, much less that it was an old man. Officer Sears also did not

recall hearing Sgt. Snyder say anything about beating Guglielmo after roll call. Officer Sears qualified that testimony, however, by adding that he also was not paying attention at that time. In addition, Officers David Cohn and Brandon Ort, who are also Defendants, also did not recall hearing Sgt. Snyder say he was going to beat the person making the disturbance. Finally, Officer Kyle Chmiel, who is not a Defendant, also did not hear Sgt. Snyder say anything to that effect.

### E.    Sgt. Snyder Addresses the Disturbance Caused by Guglielmo

Before leaving for Guglielmo's cell, Sgt. Snyder went to the booking sergeant's office to get a large can of pepper spray (which Sgt. Baker provided), told Sgt. Feehan to get a handheld camera, and gathered five other officers to accompany him. Sgt. Snyder testified that he asked for a handheld camera because he thought the situation could end in a use of force. Policy required a sergeant to use a handheld camera to record incidents that could lead to uses of force.

Before going to the cell, Officer Sears told Sgt. Snyder that Guglielmo was causing a disturbance because he wanted his medication and had already been told that "med pass" would happen in the morning. Sgt. Snyder said he still wanted to go to Guglielmo's cell. In response, Officer Sears said, "I don't know if you're going to be able to talk to him. He's already been explained it two or three times, I don't know if you're going to get anything through to him." Sgt. Whalen, who had also dealt with Mr. Guglielmo on the prior shift, intercepted the group on their way to the cell, and told them "he'll settle down, just give him time, he'll settle down."

Officers Cohn, Sears, Ort, and Zachary Zink (all Defendants) and Officer Kyle Chmiel (not a Defendant) accompanied Sgt. Snyder to Guglielmo's cell. Sgt. Banks and Sgt. Feehan did not join the group, although Sgt. Snyder had asked Sgt. Feehan to get a handheld camera. Sgt. Banks said to Sgt. Feehan, "I'm not going back there and getting involved in that." Sgt. Feehan responded, "No, I don't want anything to do with it." Sgt. Banks testified that, in his opinion, Sgt.

Snyder "was very confrontational," operated "in the gray" and "[did]n't follow policies and procedures." Sgt. Banks testified that Sgt. Snyder "liked to show people who was in charge."

When asked why he brought other officers with him to Guglielmo's cell, Sgt. Snyder testified, "Well, he had been brought down for a discipline problem. He was being very turbulent and loud and profane and it may have taken three or four people to deal with him." Sgt. Snyder testified his plan was to "see why [Guglielmo] was banging and see if we could make him stop." Upon reaching the cell, Sgt. Snyder recognized Guglielmo from his booking and Guglielmo stopped banging.

Sgt. Snyder testified Guglielmo told him that he did not want to be in the Jail and wanted to go to the VA. Sgt. Snyder responded that he could not go to the VA. At this point, Officer Sears suggested that Sgt. Snyder not enter the cell, but instead talk to Guglielmo through the door or open the food port so he could hear better. Sgt. Snyder ordered Guglielmo to step back from the door. Guglielmo complied. Sgt. Snyder then asked Officer Zink to open the cell door.

Officers Zink, Ort, and ultimately Sears followed Sgt. Snyder into the cell, but all three officers testified that there was no reason to enter the cell because Guglielmo was calm. Sgt. Snyder testified that he decided to enter the cell so that he "could speak to [Guglielmo] clearer, more personal." Sgt. Snyder testified that he believed he had established a rapport with Guglielmo the night before: "We had a brief but productive conversation and I didn't have any more problems out of him the rest of my shift the night before, so I thought I could do the same that night."

There is no video footage of what happened inside of Guglielmo's cell because Sgt. Snyder entered the cell before he was brought the handheld camera that he had requested. In addition, the Jail's security cameras could not record the interior portion of the cell where Guglielmo was seated. Officers Zink and Ort entered the cell behind Sgt. Snyder. Officer Sears stood just outside the

door with Officers Cohn and Chmiel. Sgt. Snyder testified the following occurred upon entering the cell:

Q. What happened after Zink opened the door?

A. I said sit down and he sat down.

Q. Then what?

A. We started—I said what's going on, what do you need, why are you so upset and he said—he said he wanted to go to the V.A. Medical Center.

Q. Okay.

A. I think he told me he had PTSD. I said I remember that from the night before when we had the conversation. And he said—I don't think he recognized me initially and I reiterated—reiterated, we discussed—I repeated the same conversation we had the night before.

Q. Okay. And did he respond?

A. I think he remembered. He—the conversation was he went in the Air Force— the night before I said where are you from, you're not from Dayton. He said I'm from the Bronx. I said why didn't you go—I said were you in the Navy. He said, no, I didn't go in the Navy, all Navy guys are faggots; and I started laughing. And I said they are and he's like, yeah. I said, that's funny. I said I was in the Army. I didn't like the uniforms in the Navy, and he said I went in the Air Force. He said my grandpa was in the Air Force, and we talked about that again and that's how it went.

I mean, we just—we started discussing our military careers again and then he said I need to go to the V.A. And I said you can't go to the V.A., Joe, you're in jail. He said I want—I need my medication. And I went through the whole process of how you get medications from the jail—from the V.A. [...].

Q. And then what?

A. At some point he—it was just kind of an impasse. He—he didn't like—he wasn't going to the V.A., that was the bottom line. You can't go, you're not going. I mean, the goal was to get him housed into another location out of transport cell and you could just tell his whole demeanor changed from a casual conversation to—to antagonized [...].

Q. And then you said his demeanor changed?

A. Yes, sir.

Q. And what prompted that?

A. That the answer was, no, he wasn't going anywhere besides jail.

Sgt. Snyder explained what he meant by his statement that Guglielmo's "whole demeanor changed," testifying "He set his jaw, his shoulders started to roll, he clenched his fists, he started— I believe he started talking through his teeth like so (indicating). His demeanor changed. He went from listening and carrying a conversation to aggressive and having that fight response, appearance of fight response."

Relevant to this change in demeanor, Officer Zink testified, "I don't recall if [Sgt. Snyder] said, you know, you are a faggot or if he said the – I know the word faggot was used" and "it was shortly after that [Guglielmo's] demeanor changed." Officer Sears, standing just outside the cell, "heard Mr. Guglielmo state I'm not a faggot" and "that's when [Guglielmo] stood up and then started yelling at [Sgt. Snyder]." Soon after the incident was over, Officer Sears told Sgt. Banks "that Snyder called the guy a faggot. And the guy said, I ain't no faggot, and maybe mentions something about being in the Army or something. And then Snyder called him a faggot again. And the guy stood up because he was mad that Snyder called him a faggot again."

Sgt. Snyder testified that, to the extent he said the word "faggot," he was merely repeating the same use of the word by Guglielmo during booking the night before. Per Sgt. Snyder's testimony:

Q. Deputy Zink testified that you said the word faggot.

A. I did.

Q. And at the time you were only speaking with Mr. Guglielmo, right?

A. When I used the word—the term faggot?

Q. Yes.

A. Yes. He—he said he did not join the Navy the night before because all sailor[s] are faggots because he grew up in the Bronx, Navy town. I said why didn't you join the Navy? He said all sailors are faggots. I said, okay, I've got it, the Navy guys are faggots.

Q. That's what he said the night before?

A. That's the night before. When I came into the cell, we went back over it. Like I said, I don't think he recognized me. I said you remember last night we were talking about you were in the Air Force, my grandfather was in the Air Force, I went in the Army, you didn't go in the Navy because sailors are faggots and he goes, yes, or he said something—repeated the word faggot.

[...]

Q. Did you say all you Air Force guys are faggots?

A. Absolutely not.

Q. Did you call him a faggot?

A. I did not.

Q. So I don't understand if you didn't call him a faggot, what triggered the change in his demeanor?

A. Because I told him, no, he couldn't go to [the] V.A.

Sgt. Snyder was standing when he spoke to Guglielmo, who was seated in the cell. When Guglielmo's demeanor changed, however, he stood up. According to Officer Ort, Officer Zink and Sgt. Snyder, Guglielmo then grasped and pulled Sgt. Snyder's left forearm. Officer Sears estimated that, for about four or five seconds, Sgt. Snyder ordered Guglielmo to let go. After those four or five seconds passed, Sgt. Snyder struck Guglielmo. Sgt. Snyder testified that he struck Guglielmo in the right side of his head, punched him in the gut, and then struck him in the left side of the head. After those three blows, Guglielmo let go of Sgt. Snyder. Sgt. Snyder admitted that he punched Guglielmo one more time in the left side of his head when Guglielmo was no longer touching him.

Officer Sears testified the use of force lasted approximately five seconds. Guglielmo's counsel argues that the use of force against Guglielmo lasted up to forty-nine seconds based on their analysis of the witness testimony against the security video footage from outside the cell. Defendants dispute this estimate and reference the officers' testimony that the entire incident took seconds to escalate and resolve.

Sgt. Snyder testified that he was required to use force against Guglielmo based on the following actions:

Q. Okay. So he started to stand up. Then what happened?

A. I moved a step or so closer and put my arms out like this and said don't stand up (indicating).

Q. So you put both arms out in front of you.

A. Yes, sir.

Q. With your palms facing him?

A. Yes.

Q. Okay. And then what happened?

A. He grabbed my arms.

Q. How did he grab your arms?

A. Like this (indicating).

Q. So he—what part of your arms did he grab?

A. Like right here (indicating).

Q. Did he grab—[...] your forearms?

A. My forearms, yes.

Q. And were his hands on top of your forearms or was he grabbing from beneath?

A. I believe it was underneath like this (indicating).

Q. His thumbs were on top?

A. Correct.

Q. And his fingers were below?

A. As best I recall, yes.

Q. All right. Then what happened?

A. He started pulling me towards him.

Q. Then what?

A. I hit him.

Q. How did you hit him?

A. With my left arm, I believe this one and if I'm accurate, the recollection of my report, I either hit him with this part of my forearm or my elbow (indicating).

Q. So either the outside part or your forearm or elbow?

A. Yeah.

Q. On your left arm?

A. My left arm, yes.

Q. Was he still holding your left arm at the time?

A. I would have to look at the report. I don't recall the exact series of how it went, sir. May I do that?

Q. No, we're just going to talk through it and then just tell me to the best of your recollection.

A. Okay.

Q. So you don't know—you can't remember if he was grabbing your arm or not at that time?

[...]

A. He had my—I know he still had my right arm.

Q. Okay.

A. There's a point where he let go of my left arm.

Q. How did you get your left arm free?

A. That's why I would have to look at the use of force report, sir. I struck him—there's two forearm strikes during this event and one he still had hold and one he did not have hold at the time. I would have to look to get the actual breakdown correctly.

Q. Did you say anything to him before you hit him?

A. I said let go of me.

Q. Did you say that prior to hitting him or as you were hitting him?

A. Prior and as. It was pretty rapidly evolving. I mean, he's pulling—I'm standing. I have my arms out. He's sitting grabbing and starts to pull as he's attempting to stand using me to pull up. I thought—I started to go off—I was still standing flat footed. Like I said, I think it was—I didn't think there was going to be any use of force because I was talking to him and everything was fine. And he just went from the communicating, to upset, to trying to stand, to grabbing, to pulling and I thought I was going to smash my face on that concrete wall behind him.

[...]

Q. –were you able to push him back into the seat?

[...]

A. I didn't have any contact with him when I put my hands out.

Q. Okay. So when you struck him with your left forearm and elbow, how did he respond?

A. He grabbed my right arm with both his arms or he added his right arm to my right arm at that time.

Q. So at that point how was he holding your right arm?

A. Like a golf club, hand over—I don't know if he tucked his thumb but hand over hand (indicating).

Q. And was he—where—was he seated at that point?

A. Yes.

Q. And then what happened?

A. He's still pulling on my arm, has hold of my arm and I hit him in the abdomen with a closed fist with my left hand.

Q. How did he respond?

A. He doubled over and went all of the way down on his bottom but he still had hold of my right wrist.

Q. So he—what do you mean by doubled over.

A. He was up pulling, I hit in the stomach and it knocked the air out of him a little and he went—sat all of the way down.

[...]

Q. All right. So he doubled over and then was fully on his bottom and what happened next?

A. I was trying to pull—I'm telling him to let go repeatedly. I'm trying to pull my right arm out of his grasp, pull backwards.

Q. Okay. Then what?

A. He was still latched onto my right arm and pulling me forward towards the wall. So I—going backward didn't work, so I went forward and hit him with my right forearm or elbow (indicating).

[...]

Q. So you were pulling him towards you and then—

A. He's pulling me towards him and I'm trying to pull backwards away from him which is not working.

Q. Okay. He's still got a grasp?

A. He's still this way.

Q. So you throw your—

A. I just go—I just go with his pull and I just leaned in and go like that (indicating).

Q. And did that break his grip?

A. Yes.

Q. Where did you strike him?

A. I'm looking at your face. I'm sorry. Left side of the face. Left cheek area, I believe.

Q. That could have been with your elbow or your forearm?

A. Yes.

Q. And then what happened?

A. I started to regain my balance and back pedal a little bit or stand up straight and he—like I said, he was—he had his arms out and he started to lunge forward like he was going to hug my waist.

Q. Okay. What happened?

A. I struck him one last time.

Q. How did you strike him?

A. With a closed fist.

Q. So what part of him?

A. The side of his head or top. One or the other. [...]

Q. And then what happened after that punch?

A. He went on to the bench, pulled his legs up and said I'm done, I'm done and said I'm sorry, I'm sorry—or I'm done, I'm sorry, something to that extent.

[...]

Q. And what did you do?

A. Backed out of the cell, shut the door.

While Sgt. Snyder was striking Guglielmo, Officers Zink, Ort, and Sears were inside the cell but did not intervene. They all testified that they did not believe Sgt. Snyder was at risk of harm. Officer Sears testified:

Q. ... Did you try to assist Snyder at any point?

A. No.

Q. Why not?

A. I didn't feel like there was a threat that I needed to get involved in.

Q. Tell me more about that.

A. One, I had already had contact with [Guglielmo], so, like I said, I wasn't intimidated by him or threatened by anything that – that he was going to do towards me. Second off, I figured Snyder could handle himself if something did happen in there.

Q. Okay.

A. There was no need for me to cause use of force on top of Snyder's.

Q. Okay. But your -- in your training if there's an officer that's at risk of harm, you are trained to intervene and help that officer, right?

A. If there is harm going towards that officer, yes.

Q. So this wasn't a case where you felt there was --

A. No.

Q. -- harm coming to Snyder?

A. No.

Q. He wasn't at risk of harm?

A. Myself, no, I didn't feel like he was in threat of harm.

Officers Cohn and Chmiel stood outside the cell door. Cohn testified, "I stood out there and – I mean, if I saw other officers go towards, I would have gone towards, but no one did. You know, no one did anything, so I waited."

According to Sgt. Banks' testimony, after the use of force, Sgt. Snyder told Sgt. Banks and Sgt. Feehan that he "shoved Guglielmo back and that he had hit his head on the wall and then he got on top of Guglielmo and struck him." Officer Sears told Sgt. Banks that Sgt. "Snyder shoved him back, and that's when he hit his head and he got on top of him."

### F. Post-Incident Treatment of Guglielmo's Injuries

Immediately after the incident, Sgt. Snyder observed Guglielmo "standing in the window banging" on the window of the cell door again. The left side of Guglielmo's face was redder and swelling more than it had been and he had a drop of blood coming from one of his nostrils. Sgt. Snyder further testified, "I walked out of the—out of the transport staging and there was a nurse standing there and I told him we had a use of force and he needed to see Mr. Guglielmo." The nurse was Gregg Mills, a NaphCare employee. Contrary to Sgt. Snyder's recollection, Nurse Mills

testified that Sgt. Snyder did not tell him that there had been a use of force or that Guglielmo had a head injury. Nurse Mills testified as follows about running into Sgt. Snyder after the incident:

Q. So it's my understanding the first you learned about Mr. Guglielmo is when you were going to the platform to retrieve kites and you bumped into Sergeant Snyder.

A. Yes.

[...]

Q. And at that time Sergeant Snyder asked you for an ice pack to give to Mr. Guglielmo; is that right?

A. Yes.

Q. Prior to that he didn't radio for you to come down to Mr. Guglielmo's cell, right?

A. No.

Q. So then you retrieved an ice pack, right?

A. Yes.

Q. Is this like a chemical pack you break or what –

A. Yeah, it was just a chemical pack one.

Q. Okay. And was it your intention to just give that ice pack to Sergeant Snyder and go back to work or –

A. Yes.

Q. Okay. So at that point, it wasn't even your understanding that you were supposed to do a medical check of Mr. Guglielmo?

A. Yes.

Q. So then when you returned and spoke with Sergeant Snyder and gave him the ice pack, I think you testified you don't remember how the decision was made for you to actually go check on Mr. Guglielmo; is that right?

A. Yes.

Q. All right. You didn't know there was a use of force; is that correct?

A. No.

Q.  Sergeant Snyder didn't tell you that he had struck Mr. Guglielmo, did he?

A.  No.

Q.  You didn't know he had been – he'd hit Mr. Guglielmo in the head; is that right?

A.  No.

Q.  That's right?

A.  I never – I never knew he did anything from Sergeant Snyder until things that I heard after the – after Mr. Guglielmo was out of the building.

Approximately 15 minutes after the incident, Sgt. Snyder returned to the cell with Nurse Mills, who assessed Guglielmo.  Nurse Mills asked for Guglielmo to be moved to the medical holding cells to keep an eye on him.  Nurse Mills testified, "There's a lot more traffic in that area with—and our medic and a lot of the corrections officers, more of them walking by there, so we usually put people that we would want to be seen more often out there."  Video footage from the Jail shows Guglielmo escorted away from Transport Staging at approximately 11:57 p.m.  Nurse Mills did not believe additional care was required at that time because he examined Guglielmo and "determined by talking to him […] that he was alert, oriented and I could visually see things---you know, that he had some injuries, but nothing at the time needed the (medical) bag."

Nurse Mills, Officer Zink, Officer Sears, and Sgt. Snyder escorted Guglielmo to Male Hold Cell 139 in the post-booking area.  Sgt. Snyder, Officer Cohn, and Officer Zink testified that they conducted periodic checks on Mr. Guglielmo while conducting their walk-through of that area of the Jail.

Sgt. Snyder testified regarding one of his periodic checks:

Q. Did you observe him at any time while he was [in] the male holding area?

A. After my initial—or during my initial walk-through, I noticed his feet were twitching.

Q. What do you mean by that?

A. You know, I could not tell if he was seizing or when you're falling asleep maybe you don't have it, but kind of like your feet—your feet twitch and wake you up, like the restless leg kind of thing, does that make sense? So his feet were—

Q. Moving?

A. –moving.

Q. Was he lying down?

A. Yes.

[...]

Q. And what did—how did you respond to that?

A. I asked for the first floor medic to step over and check him.

Q. Who was that?

A. Jack Saunders.

Q. What did he do?

A. He or we opened the door and he yelled out to him. He said hey or whatever, called to him. I don't think he knew his name.

Q. Did Mr. Guglielmo respond?

A. Yes, he did.

Q. What did he say?

A. Fuck you, leave me alone.

Q. What happened next?

A. We left him alone.

NaphCare Medic Jack Saunders similarly concluded that Guglielmo was not having a medical emergency. He testified, "Due to the notes, it says that he responded with cussing me out. [...] So usually people in a seizure aren't able to pull that off."

Within ten minutes of Medic Saunders' evaluation, at 12:18 p.m., Officers Zink and Cohn found Guglielmo unresponsive. Officer Cohn testified:

Officer Zink and I did a walk-through and we found—we were going to—he was like—he was propped in the corner. There was a half wall when looking inside the cell and his head was in the corner and we wouldn't observe him so we were going to try to move him in a better position. And when we went in, he wasn't— he wasn't responding. So I walked out of the cell. I could see the first floor medic's in his office and I walked over and told him to check him out because, you know, he wasn't responding to us. And then he went over and jail medical staff took over.

Medic Saunders returned to Guglielmo's cell after being notified that Guglielmo was unresponsive. Reviewing the notes from Guglielmo's medical file, Medic Saunders testified, "From this entry, it states I found him in the same position, on his left side, as stated earlier, and Mr. Guglielmo was bleeding from his left nostril but he was breathing on his own. He was unresponsive to verbal or painful stimuli." Medic Saunders radioed for additional medical staff, requesting the responses of Nurse Mills and Nurse Raymond Taylor.

Guglielmo was transported to Miami Valley Hospital. Upon arrival, he received an emergency craniotomy to relieve pressure inside his skull. Despite the surgery, Guglielmo remained comatose. Approximately a week later, surgeons opened up the left side of Guglielmo's face to repair his broken facial bones. They drilled 24 screws into his skull, attaching five titanium plates. The orbital floor of his eye was fractured so severely it could not be surgically repaired.

Guglielmo remained comatose in the hospital for three weeks. He was transferred to an intermediate care facility where he slowly regained consciousness and functional capacity. Even after physical and occupational therapy, Guglielmo is left with "a right facial droop, a dense left hemiplegia (paralysis on the left side of his body), an inability to ambulate, memory and concentration difficulties, and significant personality changes that according to family include being depressed, anxious and not in as good control of his temper and behavior as he had been prior to the beating at the jail." Guglielmo also suffers from Post Traumatic Amnesia and does not remember anything from when he was booked into the jail until he woke up in the intermediate

care facility. "Here I am in a wheelchair," he testified, "in a diaper, and I don't have any idea how I got here."

Guglielmo retained Dr. Paul Gabriel, Chairman of Emergency Medicine at Grant Medical Center in Columbus, Ohio, to testify as an expert in this case. (The Court denied Defendants' Motion in Limine to exclude Dr. Gabriel's testimony.) He opined that the amount of force required to cause Guglielmo's injuries is not consistent with Sgt. Snyder's recollection of the incident:

> The deposition by Mr. Snyder and the other corrections officers note four blows, one to the abdomen and one to the right side of the face, which was not the injured side, and two blows to the left side of the face and head that he stated were -- occurred within seconds, maybe ten seconds. Could that have caused the degree of injury with massive acute bleeding on the brain, mass effect, severe neurologic deficit, massive facial fractures? No, that's not possible.
>
> And, again, we got to understand how much damage there was. This is damage that you see when somebody face plants at 90 miles an hour. This is damage that you see getting repeatedly struck by a baseball bat, not once, multiple, multiple times. This is the degree that you see when -- I see the construction workers fall out of the third floor windows onto their face. This is massive. This is not subtle. This is a guy who almost died because of a massive acute bleed on his brain. So, no, could two blows do this? I don't see any way under the realm in heaven that could occur.

Guglielmo currently lives in a Florida nursing home. Dr. Patricia Brock, a certified life care planner, determined that it will cost $5,286,858 to move Mr. Guglielmo closer to his family and attend to his ongoing medical needs.

### G. Montgomery County Sheriff's Office Investigation

On January 26, 2015, Montgomery County Sheriff's Office Chief Deputy Rob Streck assigned this incident for investigation to the Inspectional Services Unit (Internal Affairs). Detective Bryan Cavender and Sergeant Dave Parin were tasked with determining whether Sgt. Snyder used proper force and whether all other actions complied with Montgomery County Sheriff's Office and Montgomery County Jail policy. They reviewed the incident report completed

by the individuals involved and video footage from inside the Jail. They also interviewed Sgt. Snyder, Sgt. Feehan, Nurse Mills, and Officers Sears, Cohn, and Ort.

Regarding Sgt. Snyder's use of force, Detective Cavender made the following findings:

> Sergeant Snyder initially responded to Cell 114 to try to calm Mr. Guglielmo and prevent him from harming himself. When Mr. Guglielmo grabbed Sergeant Snyder, he gave verbal commands to stop resisting and struck Mr. Guglielmo when he continued to pull Sergeant Snyder off balance. Sergeant Snyder delivered strikes until Mr. Guglielmo released his grasp of Sergeant Snyder. Sergeant Snyder's use of force was in direct response to Mr. Guglielmo's actions.

Detective Cavender concluded that Sgt. Snyder's application of force was consistent with the Montgomery County Sheriff's Office Policy 1.1.3 Use of Force, Section A (Force to Effect Lawful Objectives).

Detective Cavender and Sergeant Parin also investigated whether Sgt. Snyder complied with Montgomery County Sheriff's Office Policy 1.1.3 Use of Force, Section H Ensuring Medical Aid after Use of Weapons. They concluded:

> Sergeant Snyder contacted Nurse Mills and requested he examine Mr. Guglielmo immediately following the incident. Nurse Mills provided ice pack to Mr. Guglielmo to control visible swelling to his left eye. Nurse Mills suggested Mr. Guglielmo be moved to a male holding cell so he could be observed more easily.
>
> Sergeant Snyder's action of requesting Nurse Mills to provide an ice pack for the swelling of Mr. Guglielmo's eye immediately after the use of force and extra checks on Mr. Guglielmo were consistent with Sheriff's Office Policy and declared proper conduct.

Since the investigation concluded that the officers' conduct was proper, no discipline was issued.

## LEGAL STANDARD

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)). Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affirmations are more credible. 10A Wright & Miller, Federal Practice and Procedure, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id*. However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252.

"There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

In ruling on a motion for summary judgment, "[a] district court is not ... obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## ANALYSIS

Guglielmo concedes that Officers Cooper and Cohn should be dismissed from this case. Accordingly, the Court grants the Motion for Summary Judgment as to those two individual Defendants. The Court addresses each of Defendants' other arguments in turn below.

### A. Whether the Individual Defendants are entitled to Qualified Immunity

Defendants argue that Sgt. Snyder and Officers Sears, Zink, and Ort are entitled to qualified immunity on Guglielmo's claims. Qualified immunity shields public officials from civil liability under 42 U.S.C. § 1983 unless their actions violate clearly established rights "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). It is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), and protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). To defeat a defendant's motion on qualified-immunity grounds, a plaintiff must come forward with evidence from which a jury could find "(1) that the

official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (internal quotation marks omitted). "[I]t is well-settled that qualified immunity must be assessed in the context of each individual's specific conduct." *Stoudemire v. Mich. Dep't. of Corrs.*, 705 F.3d 560, 570 (6th Cir. 2013).

"To state a claim under 42 U.S.C. § 1983, a plaintiff must set forth facts that, when construed favorably, establish (1) the deprivation of a right secured by the Constitution or laws of the United States (2) caused by a person acting under the color of state law." *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006) (citing *West v. Atkins*, 487 U.S. 42, 48 (1988)). Guglielmo brings claims against the individual Defendants under § 1983 for excessive use of force in violation of the Fourteenth Amendment and for deliberate indifference to his serious medical needs, also under the Fourteenth Amendment.

### 1.    Qualified Immunity – Excessive Force

Guglielmo's excessive force claim is brought under the Fourteenth Amendment's Due Process Clause, which "protects a pretrial detainee from the use of excessive force that amounts to punishment." *Graham v. Connor*, 490 U.S. 386, 395 n. 10 (1989); *see also United States v. Budd*, 496 F.3d 517, 530 (6th Cir. 2007). The Sixth Circuit has stated:

> [W]hen assessing pretrial detainees' excessive force claims we must inquire into whether the plaintiff shows "that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, —— U.S. ——, 135 S.Ct. 2466, 2473, 192 L.Ed.2d 416 (2015). The inquiry is highly fact-dependent, and must take into account the "perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Id.* It should also account for "the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,'" *id.*, and defer when appropriate to "'policies and practices that in th[e] judgment' of jail officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Id.* (quoting *Bell v. Wolfish*, 441 U.S. 520, 540, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979)).

*Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 538 (6th Cir. 2015).

The following considerations are relevant to assessing whether a use of force is reasonable or unreasonable: "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kingsley*, 135 S.Ct. at 2473. This list is not exclusive. *Coley*, 799 F.3d at 538.

### i.      Snyder's use of force

The first inquiry in the qualified immunity analysis is whether Guglielmo can establish the violation of a constitutional right. Genuine issues of material fact exist regarding the amount of force used by Sgt. Snyder. If those issues are resolved in Guglielmo's favor, then a reasonable juror could find that Sgt. Snyder's use of force was excessive in light of the threat that he reasonably perceived from Guglielmo's actions.

Applying the *Kingsley* factors, factual issues become apparent. The first factor is the relationship between the need for the use of force and the amount of force used. Guglielmo was alone when Sgt. Snyder went to address the disturbance. Guglielmo had been through the booking process and was confined in a cell. It would be reasonable to infer that Guglielmo was unarmed and did not have access to anything he could use as a weapon. Guglielmo was 57 years old, 5'10", and weighed 155 pounds. Although Sgt. Snyder might not have known Guglielmo's age and weight, his booking photos indicate that he presented as a slim, older man. As Officer Sears testified, his physical appearance was not intimidating to a reasonable officer.

Five officers accompanied Sgt. Snyder to Guglielmo's cell. Officers Ort and Zink were inside the cell with Sgt. Snyder when he first struck Guglielmo. Sgt. Snyder was 41 years old,

5'10" and 215 pounds. Officer Ort was in his twenties, 5'9", and 175 pounds. Officer Zink was in his mid-thirties, 6'2", 260 pounds, and played linebacker in college. A reasonable officer in the company of Officers Ort and Zink would not have perceived Guglielmo as presenting a serious threat of bodily harm.

Guglielmo grasped Sgt. Snyder's forearms. It would be reasonable to believe that physical force was necessary for Sgt. Snyder to extricate himself from Guglielmo's grasp. Sgt. Snyder testified, and other officers corroborate his testimony, that he struck Guglielmo four times over a matter of four or five seconds after Guglielmo grasped him. Guglielmo presented expert testimony, however, that the injuries to his face were equivalent to what a physician would see "when somebody face plants at 90 miles an hour," is struck multiple times with a baseball bat, or falls off of a third-floor window onto his face. From this expert testimony, a reasonable juror could conclude that Sgt. Snyder and the other officers are not accurately reporting the amount of force used against Guglielmo. A juror might conclude, for example, that Sgt. Snyder struck Guglielmo four times—as he testified—but with an amount of force in each strike that was objectively unreasonable. Alternatively, a juror might conclude that Sgt. Snyder and the other officers have no credibility and that Sgt. Snyder severely beat Guglielmo—striking him more than four times— as punishment for creating a disturbance. The video footage is inconclusive on the amount of time force was used; as a result, the jury must assess whose testimony they find most credible in light of all of the evidence presented.

The first *Kingsley* factor touches on the second factor—the extent of the plaintiff's injury. In short, Guglielmo suffered devastating injuries. He required an emergency craniotomy. Surgeons drilled 24 screws into his skull and attached five titanium plates. The orbital floor of his eye was fractured so severely it could not be surgically repaired. Guglielmo remained comatose

for three weeks. After physical and occupational therapy, Guglielmo is left with a right facial droop, paralysis on the left side of his body, an inability to ambulate, memory and concentration difficulties, and significant personality changes that negatively impact his quality of life.

The third factor is any effort made by Sgt. Snyder "to temper or to limit the amount of force." Defendants argue that Sgt. Snyder took many steps to limit the amount of force used, including trying to establish a rapport with Guglielmo by talking to him. Guglielmo counters that Sgt. Snyder did not need to enter the cell and escalated the likelihood of violence by calling Guglielmo a homophobic slur. Guglielmo also refers to the testimony that Sgt. Snyder indicated his intent to beat Guglielmo before heading to Guglielmo's cell. Construing this evidence in Guglielmo's favor, a juror could reasonably find that Sgt. Snyder did not attempt to avoid a violent encounter, but both invited and took advantage of the encounter to punish Guglielmo for creating a disturbance.

The fourth factor is the severity of the security problem at issue. Defendants argue this factor weighs in Sgt. Snyder's favor because Guglielmo's banging made it difficult for the officers in the security control room to monitor security for the entire Jail. In addition, Defendants point to the grasping of Sgt. Snyder's forearms as a personal security issue that warranted a response. Guglielmo argues that banging on a cell door is typical behavior, not a security issue. Due to Guglielmo's proximity to the security control room, Guglielmo's contention that there was no security issue is not reasonable. The magnitude of the security issue, however, is a jury question. The mere existence of a security issue does not compel a finding that no constitutional violation occurred. The use of force still must be objectively reasonable.

The fifth *Kingsley* factor has also been discussed. A reasonable juror could find that there was no objective basis for an officer in Sgt. Snyder's position to reasonably perceive a threat of

serious bodily injury or death. The officers who witnessed the use of force testified that they did not feel the need to intervene because Sgt. Snyder had the situation under control and was not in danger.

The last factor under *Kingsley* is whether the plaintiff was actively resisting. The evidence is that Guglielmo stopped banging on the cell door when the officers arrived. Guglielmo did not comply, however, when told to let go of Sgt. Snyder's forearms. This physical resistance required the use of force—the amount of force required is a factual issue.

In sum, considering all of the *Kingsley* factors together, a reasonable juror could find that Sgt. Snyder's use of force was unreasonable under the totality of the circumstances.

The second inquiry in the qualified immunity analysis is whether the constitutional right was clearly established. Viewing the evidence in the light most favorable to Guglielmo, it was. If the jury determines Sgt. Snyder used force equivalent to striking Guglielmo multiple times with a baseball bat, then Sgt. Snyder is not entitled to qualified immunity. Defendants ask the Court to take into consideration that "running a prison is an inordinately difficult undertaking, and that safety and order at these institutions requires the expertise of correctional officials, who must have substantial discretion to devise reasonable solutions to the problems they face." *Kingsley*, 135 S.Ct. at 2474. Even acknowledging the discretion afforded correctional officials, a reasonable person still would have known that causing multiple fractures to an unarmed pretrial detainee's face, including splintering the suborbital bone beneath his left eye beyond repair, and ultimately rendering him comatose, is a violation of his constitutional rights.

In *Malley*, the Supreme Court stated that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley*, 475 U.S. at 341. Here, there is evidence from which the jury might infer that Sgt. Snyder knowingly violated the law. The jury

could determine, for example, that Sgt. Snyder was angry and intended to physically punish Guglielmo for creating the disturbance or incapacitate him so that he could not repeat the disturbance. Regardless of whether any punitive intent is inferred, which is not required to prove that excessive force was used against a pretrial detainee, a reasonable person would have known that such a severe beating violated Guglielmo's clearly established constitutional right not to be subjected to excessive force. *Harlow*, 457 U.S. at 818.

Defendants also argue that Sgt. Snyder's use of a homophobic slur does not establish a constitutional violation. The Court has not found that it could establish such a violation. Rather, the use of the homophobic slur is evidence that a juror may rely upon in evaluating the nature of the force used by Sgt. Snyder. The constitutional violation arises out of the use of force, not the language he may or may not have used to provoke it.

Defendants also argue that the events leading up to the use of force should not be considered when determining if it was objectively unreasonable. (Doc. 123 at 51, citing *Dickerson v. McClellan*, 101 F.3d 1151 (6th Cir. 1996).) In this case, consideration of the events leading up to Sgt. Snyder's use of force is not required to find that factual issues preclude the application of qualified immunity. A reasonable juror may find that Sgt. Snyder used objectively unreasonable force without consideration of, for example, his alleged statements to other officers about his intent to beat Guglielmo or his alleged use of a homophobic slur to provoke Guglielmo. The testimony of Guglielmo's medical expert alone is sufficient to sustain a finding that Sgt. Snyder used grossly disproportionate force given the circumstances.

Nevertheless, *Dickerson* is distinguishable from this case. In *Dickerson*, the defendant officers were accused of unlawfully entering a suspect's residence and, once inside, using excessive force when they shot the suspect multiple times. The Sixth Circuit determined that the

unlawful entry claim and excessive force claim were conceptually distinct and must be considered separately. The Sixth Circuit recognized it would be improper to hold police officers accountable for everything that occurs after a decision to intervene because it is their duty to intervene in uncertain situations to protect the public. It will always be the case that, if the officer did not intervene, no excessive force would have been used. Rather, the appropriate method of analysis is to "carve up the incident into segments and judge each on its own terms to see if the officer was reasonable at each stage." *Dickerson*, 101 F.3d at 1161 (quoting *Plakas v. Drinski*, 19 F.3d 1143, 1150 (7th Cir. 1994)). The Sixth Circuit therefore rejected the argument that, if the defendants had investigated further before entering the residence, no shooting would have occurred. Instead, it considered only the moments immediately before the shooting to determine whether the use of force was reasonable, judging from the perspective of a reasonable officer on the scene.

Here, *Dickerson* may support an argument that consideration of whether Sgt. Snyder used excessive force cannot be premised on his decision to enter Guglielmo's cell. In other words, it would not be permissible for a juror to infer that Sgt. Snyder used excessive force only because he could have avoided any use of force whatsoever had he stayed outside of Guglielmo's cell. It is permissible and consistent with *Dickerson*, however, for a juror to consider events leading up to the use of force to the extent that they shed light on what happened in that moment. For example, it would be permissible for a juror to consider Sgt. Snyder's alleged statement that he intended to beat Guglielmo's "ass" because it may be used to assess Sgt. Snyder's credibility regarding his reasons for using force and the amount of force that he actually used.

Guglielmo argues that this case is on-point with *Morabito v. Holmes*, 628 F. App'x 353 (6th Cir. 2015), which the Sixth Circuit decided nineteen years after *Dickerson*. In *Morabito*, the plaintiff alleged the defendants "entered [his] cell without a legitimate purpose—they simply were

frustrated with [his] outbursts and demands for medical treatment—and stood over him, taunting him." *Id.* at 354. Plaintiff further alleged he was "not attempting to hurt himself, and posing no threat to anyone else." *Id.* The defendants allegedly "knocked [plaintiff's] head aside, pinned him to the ground, punched him, and then used a Taser against his neck for five seconds." *Id.* The defendants contended that the officer involved "was trying to calm [plaintiff] and prevent him from hurting himself" and that the "reasonable use of force began in response to [plaintiff's] attempt to spit on [the officer] and escalated when [plaintiff] balled his fists and tried to tackle [the officer]." *Id.* at 357–58. The video footage, despite three camera angles, was unclear.

Accepting the plaintiff's version of the facts, as required on summary judgment, the Sixth Circuit held that "provoking an altercation with [plaintiff] out of frustration with his repeated verbal outbursts and demands for medical treatment, ultimately slapping, tasing, and punching [plaintiff] while he was pinned under two officers, does not constitute an objectively reasonable use of force." *Id.* at 358. In addition, "the constitutional right to be free from such treatment was clearly established long ago." *Id.* As a result, the Sixth Circuit affirmed the district court's determination that material issues of fact precluded summary judgment for defendants.

Similar to the allegations in *Morabito*, Guglielmo alleges Defendants were frustrated with him for banging on his cell door, went to his cell with the intention of provoking an altercation, provoked an altercation, and then subjected him to excessive force. Accepting Guglielmo's version of the facts, he has established the violation of a constitutional right that was "clearly established long ago." *Id.* Material issues of fact therefore preclude a determination that Sgt. Snyder is entitled to qualified immunity on the excessive force claim.

### ii.    Officers Zink, Sears, and Ort's Failure to Intervene

Guglielmo contends that Officers Zink, Sears, and Ort are liable under § 1983 for failure to intervene to protect Guglielmo from the use of excessive force.  As discussed, the first inquiry in the qualified immunity analysis is to determine whether Guglielmo can establish the violation of a constitutional right.  "Generally speaking, a police officer who fails to act to prevent the use of excessive force may be held liable when (1) the officer observed or had reason to know that excessive force would be or was being used, and (2) the officer had both the opportunity and the means to prevent the harm from occurring."  *Turner v. Scott*, 119 F.3d 425, 429 (6th Cir. 1997).

Defendants contend that Officers Zink, Sears, and Ort did not have any opportunity to intervene because the incident happened so quickly.  According to Defendants, the use of force lasted only four or five seconds.  On summary judgment, however, the Court must construe the facts in Guglielmo's favor.  Guglielmo estimates that the use of force lasted up to forty-nine seconds based on his analysis of videotape evidence and his experts' opinions regarding the amount of force used.  This is not an unreasonable inference.

In *Goodwin v. City of Painesville*, 781 F.3d 314 (6th Cir. 2015), the Sixth Circuit found that two officers who witnessed a 21-second tasering, which was quickly followed by a five-second tasering, had sufficient time to intervene and stop the use of force.  The plaintiffs had already shown that the tasering was excessive.  One of the officers was present for the duration of the tasering and the other officer was present for only a portion of the time the taser was used.  Both officers were attempting to handcuff the suspect when the taser was applied.  Although the record was not clear when the second officer arrived, he was present at least prior to the application of the subsequent five-second tasering.  Witnesses indicated that the suspect was "convulsing uncontrollably and foaming at the mouth."  *Id.* at 328.  The Sixth Circuit found there was sufficient

evidence about the suspect's condition "to make it a jury question whether a reasonable officer in [the witnessing officers'] position[s] would have seen that the force being applied [. . .] was excessive and taken action to get [the tasering officer] to stop applying it." *Id.*

If a juror were to find Guglielmo was beaten as severely as his medical expert opines, then they could also find Officers Zink, Sears, and Ort knew that they were observing an excessive use of force. Based on the Sixth Circuit's holding in *Goodwin*, forty-nine seconds is sufficient time for the officers to have recognized the use of excessive force and taken steps to stop it. In addition, due to their proximity to Sgt. Snyder, they could have physically intervened or verbally commanded him to leave Guglielmo alone. There is no evidence that any such actions were taken. Guglielmo has therefore presented sufficient evidence from which a reasonable juror could find that Officers Zink, Sears, and Ort violated a constitutional right by failing to act to prevent the use of excessive force.

The second inquiry is whether the constitutional right was clearly established. Although Defendants do not expressly direct any of their arguments to this inquiry, they suggest that the officers could not have known the use of force was excessive because Guglielmo was not restrained at the time it was applied. Guglielmo refers to several cases where officers were held liable for failing to intervene when a restrained individual was subjected to excessive force. (Doc. 142 at 9, citing *Morabito v. Holmes*, 628 F. App'x 353 (6th Cir. 2015); *Sallenger v. Oakes*, 473 F.3d 731 (7th Cir. 2007); *Coley v. Lucas Cnty*, 799 F. 3d 530 (6th Cir. 2015); *Sanchez v. Hialeah Police Dep't.*, 357 F. App'x 229 (11th Cir. 2009).) Because Guglielmo was not restrained, Defendants contend it was not clearly established that Sgt. Snyder's use of force was excessive. The Court disagrees. Even though not restrained, Guglielmo was unarmed and confined within a cell. A reasonable juror could find that he presented a minor, if any, threat to Sgt. Snyder's safety.

In addition, there is evidence to support a finding that an extraordinarily disproportionate amount of force was applied. It was clearly established that using that amount force would be unconstitutional in similar circumstances, regardless of whether the inmate was restrained.

For the above reasons, material issues of fact preclude a determination that Officers Zink, Sears, and Ort are entitled to qualified immunity on the claim that they failed to intervene to protect Guglielmo from an excessive use of force.

## 2. Qualified Immunity – Deliberate Indifference to Serious Medical Needs

"The Eighth Amendment's prohibition on cruel and unusual punishment generally provides the basis to assert a § 1983 claim of deliberate indifference to serious medical needs, but where that claim is asserted on behalf of a pre-trial detainee, the Due Process Clause of the Fourteenth Amendment is the proper starting point." *Phillips v. Roane Cnty., Tenn.*, 534 F.3d 531, 539–40 (6th Cir. 2008) (citing *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983) ("[T]he due process rights of a [pre-trial detainee] are at least as great as the Eighth Amendment protections available to a convicted prisoner.")). Jail officials' deliberate indifference violates a pre-trial detainee's rights "[w]hen the indifference is manifested by . . . prison guards in intentionally denying or delaying access to medical care" for a serious medical need. *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976).

A claim for deliberate indifference to serious medical needs requires a showing of objective and subjective components. The objective component requires a plaintiff to show the existence of a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994). The Sixth Circuit directs that "where a plaintiff's claims arise from an injury 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention,' . . . it is sufficient to show that he actually experienced the need for medical treatment, and that the need was not addressed

within a reasonable time frame." *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899–900 (6th Cir. 2004) (citation omitted).  In contrast, the subjective component requires a plaintiff to "allege facts which, if true, would show that the official being sued subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837).  Although the latter, subjective standard "is meant to prevent the constitutionalization of medical malpractice claims," a plaintiff need not show that the officer acted with the specific intent to cause harm.  *Id.*  Accordingly, the Sixth Circuit has held that "'deliberate indifference to a substantial risk of serious harm to a prisoner is the equivalent of recklessly disregarding that risk.'"  *Id.* (quoting *Farmer*, 511 U.S. at 836).  Because government officials generally do not concede this subjective component, "it [is] permissible for reviewing courts to infer from circumstantial evidence that a prison official had the requisite knowledge." *Id.*

Correctional officers may "not escape liability if the evidence showed that [they] merely refused to verify underlying facts that [they] strongly suspected to be true, or declined to confirm inferences of risk that [they] strongly suspected to exist." *Farmer*, 511 U.S. at 843 n. 8.  *See also Estate of Carter v. City of Detroit*, 408 F.3d 305, 313 (6th Cir. 2005) ("In most cases in which the defendant is alleged to have failed to provide treatment, there is no testimony about what inferences the defendant in fact drew.  Nonetheless, in those cases, a genuine issue of material fact as to deliberate indifference can be based on a strong showing on the objective component.").

The same two-step analysis applies to the assertion of qualified immunity as to this claim. Under the first step, Defendants argue that Guglielmo cannot establish the violation of a constitutional right because "[t]he record makes clear that the Defendants, as a group, attempted

to provide the Plaintiff with medical care and alerted medical staff on three separate occasions within a one-hour span of Mr. Guglielmo's need for medical attention." (Doc. 123 at 47.) Contrary to this assertion, however, the record contains evidence from which a reasonable juror could find in Guglielmo's favor.

In his Memorandum in Opposition, Guglielmo argues that only Sgt. Snyder was deliberately indifferent to his serious medical needs, not any of the other individual Defendants. This is important because in a § 1983 action "[e]ach defendant's liability must be assessed individually based on his own actions." *Pollard v. City of Columbus, Ohio*, 780 F.3d 395, 402 (6th Cir. 2015) (internal quotes omitted) (quoting *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010)). To the extent that Guglielmo originally sought to bring a deliberate indifference claim against anyone other than Sgt. Snyder, those claims are dismissed.

As to the objective component of the claim against Sgt. Snyder, Defendants cannot reasonably dispute that Guglielmo had a "sufficiently serious" medical need. As to the claim's subjective component, a reasonable juror could find that Sgt. Snyder (1) perceived facts supporting an inference of the existence of a substantial risk to Guglielmo, (2) did in fact draw that inference, and (3) disregarded that substantial risk.

Guglielmo's medical expert testified that Sgt. Snyder is the one who caused the multiple fractures to Guglielmo's face. Again, if the jury finds that the use of force was tantamount to being beaten with a baseball bat, then Sgt. Snyder caused (and therefore perceived) injuries posing a substantial risk to Guglielmo's life. There is also evidence that Sgt. Snyder disregarded that risk. Sgt. Snyder's alleged failure to notify medical personnel of the severity of the force used against Guglielmo—supported, for example, by Nurse Mills' testimony—supports a finding that, at the very least, he delayed the provision of immediate emergency medical treatment to Guglielmo.

*See Border v. Trumbull Cnty. Bd. of Comm'rs*, 414 F. App'x 831, 838-39 (6th Cir. 2011) (officer not relieved of liability on deliberate indifference claim where he was aware of plaintiff's serious medical need, but only requested that a medical staff member treat him for a minor cut on his head); *Blackmore*, 390 F.3d at 899 ("When prison officials are aware of a prisoner's obvious and serious need for medical treatment and delay medical treatment of that condition for non-medical reasons, their conduct in causing the delay creates the constitutional infirmity.")

Defendants also argue Sgt. Snyder is entitled to qualified immunity because the contours of the violated right were not sufficiently clear that a reasonable officer would have understood that what he was doing violated that right. This inquiry also turns on the severity of the alleged use of force. If the jury were to find that Guglielmo was beaten as severely as his experts opine, then Sgt. Snyder was on notice that Guglielmo sustained serious injuries and required immediate medical care—not just the ice pack that Sgt. Snyder requested for Guglielmo. Under those circumstances, the contours of the right to medical treatment were clearly established. The jury may not ultimately find in Guglielmo's favor on the severity of the force used, but at this time material issues of fact preclude a determination that Sgt. Snyder is entitled to qualified immunity on this claim.

**B.      Sufficiency of Claims for Excessive Force and Deliberate Indifference to Serious Medical Needs**

Defendants separately argue that Guglielmo cannot establish his claims for excessive use of force and deliberate indifference to his serious medical needs as a matter of law. As discussed above with respect to qualified immunity, Guglielmo has come forward with sufficient evidence to support both of these claims.

**C.     Guglielmo's Claims Against Individual Defendants in their Official Capacities**

Defendants argue that the claims against the individual Defendants in their official capacities should be dismissed because they are, in all respects other than name, claims against Montgomery County.  (Doc. 123 at 50, citing *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).)  Since Montgomery County is a Defendant, they argue, the claims against Sheriff Plummer in his official capacity and all of the other officers who are Defendants are duplicative.

Guglielmo does not oppose the dismissal of his claims against the individual Defendants in their official capacities.  Accordingly, they are dismissed.

**D.     Guglielmo's Claim Against Sheriff Plummer in his Individual Capacity**

Defendants argue that the claim against Sheriff Plummer in his individual capacity should be dismissed because he was not involved in any manner with the force used against Guglielmo.  As the Sixth Circuit explained:

> "[S]imple negligence is insufficient to support liability of [supervisory officials] for inadequate training, supervision, and control of individual officers."  A supervisory official may not be held liable under § 1983 for the misconduct of those the official supervises unless the plaintiff demonstrates that the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.  At a minimum plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers.  Supervisory liability under § 1983 cannot be based upon a mere failure to act but must be based upon active unconstitutional behavior.

*Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002) (internal citations omitted).

Guglielmo's Memorandum in Opposition does not address the claim against Sheriff Plummer in his individual capacity.  As a result, he has waived that claim and it is dismissed.  *See Notredan, LLC v. Old Republic Exch. Facilitator Co.*, 531 F. App'x 567, 569 (6th Cir. 2013) (failure to respond to argument raised in motion constitutes a waiver of that claim).

### E. Guglielmo's Claim Against Montgomery County

Municipalities cannot be held liable in a § 1983 action under a theory of *respondeat superior*. They may be held responsible "only for injuries caused by those acts that may fairly be said to represent official policy or by their policies or customs." *North v. Cuyahoga Cnty.*, 754 F. App'x 380, 386 (6th Cir. 2018) (citing *Ford v. Cnty. of Grand Traverse*, 535 F.3d 483, 495 (6th Cir. 2008)). In addition to demonstrating an underlying constitutional violation, "[a] plaintiff bringing a § 1983 claim against a municipality must ... identify the policy or custom that caused her injury." *Ford*, 535 F.3d at 495. In the absence of a formally approved policy, a "custom" can give rise to municipal liability when the "practice is so widespread as to have the force of law." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997).

In addition to identifying "conduct properly attributable to the municipality," *id.*, a plaintiff must show that the municipality was a "moving force" behind the alleged violation, *Monell v. Dep't of Social Services*, 436 U.S. 658, 694 (1978). In other words, "a plaintiff must identify the policy, connect the policy to the [municipality] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and internal quotation marks omitted); *see also Alkire v. Irving*, 330 F.3d 802, 815 (6th Cir. 2003).

Municipal liability also may be premised on the municipality's failure to adequately train or supervise its employees. Such a failure can give rise to liability when the training and supervision "were inadequate for the tasks the [employees] were required to perform, the inadequacy resulted from [the municipality's] deliberate indifference, and the inadequacy actually caused, or is closely related to, [the plaintiff's] injury." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738 (6th Cir. 2015).

Defendants initially argued that Guglielmo cannot establish municipal liability based upon the theory that Montgomery County failed to adequately train or supervise its employees. In response, however, Guglielmo asserted that Montgomery County is liable because it "has an unconstitutional policy of allowing its corrections officers to use excessive force as seen by its pattern and practice of failing to meaningfully investigate uses of force and ratifying all (but one) uses of force by Montgomery County jail officers." (Doc. 134 at 47.) In reply, Defendants argue they are nevertheless entitled to summary judgment on Guglielmo's claim under both the theory that Montgomery County ratified the use of excessive force and that it has an unconstitutional custom or policy of permitting excessive force.

**1.    Guglielmo's Ratification Theory of Liability**

Guglielmo relies on *Wright v. City of Canton*, 138 F. Supp. 2d 955 (N.D. Ohio 2001) for the proposition that a municipality may be held liable under § 1983 when its final decision maker reviews and approves an officer's use of force or when a policymaker fails to meaningfully investigate the alleged unconstitutional conduct. Defendants refer to another case, however, holding that *Wright* was wrongly decided to the extent it premised liability exclusively on ratification without any showing that the ratification was also a "moving force" behind the use of force. *See Greenlee v. Miami Twp., Ohio*, No. 3:14-CV-173, 2015 U.S. Dist. LEXIS 18145, at *21-23 (S.D. Ohio Feb. 12, 2015), *aff'd* 2015 U.S. App. LEXIS 23432 (6th Cir. Sept. 23, 2015).

Although *Greenlee* is not binding precedent, its analysis is persuasive. In that case, the plaintiffs brought a § 1983 action seeking to hold a township liable for the misconduct of one of its police officers. The plaintiffs alleged the township's board of trustees "impliedly approved of the wrongdoing by failing to conduct a meaningful investigation" and failed to take any action to remedy the wrongdoing. *Greenlee*, 2015 U.S. Dist. LEXIS 18145, at *20. "Standing alone,"

however, those allegations were not sufficient to establish municipal liability. *Id.* The court explained that, even if ratification was evidence of a policy of permitting the wrongdoing, plaintiffs also must show that the policy caused the wrongdoing. And, "[i]n most cases, once an individual's rights have been violated, a subsequent failure to conduct a meaningful investigation cannot logically be the 'moving force' behind the alleged constitutional deprivation." *Id.* (internal quotes omitted) (quoting *Daniels v. City of Columbus*, No. C2–00–562, 2002 WL 484622, at *5 (S.D. Ohio Feb. 20, 2002)).

The *Greenlee* court acknowledged one "exception," which nonetheless still satisfied *Monell*'s causation requirement:

> In *Marchese v. Lucas*, 758 F.2d 181, 188 (6th Cir. 1985), and *Leach v. Shelby County Sheriff*, 891 F.2d 1241, 1248 (6th Cir. 1989), the Sixth Circuit found that a failure to investigate incidents of alleged police abuse, and to discipline the officers involved, demonstrated deliberate indifference to the constitutional rights of the victims, and subjected the municipality to liability. In each case, however, there was a documented pattern of abuse prior to the incident giving rise to the lawsuit. When such documentation exists, failure to investigate a complaint or to discipline the wrongdoer may constitute evidence that the municipality has a policy or custom of tolerating unconstitutional behavior. *See Alexander v. Beale St. Blues Co., Inc.*, 108 F. Supp. 2d 934, 949 (W.D.Tenn. 1999) (holding that "[a]lthough ratification might tend to establish the existence of a policy of acquiescence that in itself was a 'moving force,' mere ratification of the conduct at issue by itself cannot legally suffice as a 'moving force'").

> However, a "single, isolated incident" of a failure to conduct a meaningful investigation or to discipline the officers involved cannot give rise to municipal liability. *See Maynard v. Jackson Cnty.*, 706 F. Supp. 2d 817, 827–28 (S.D. Ohio 2010) (holding that sheriff's failure to discipline an officer "on this single occasion" could not be deemed the "moving force" behind the constitutional violation). *See also Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 n. 5 (6th Cir. 2006) ("We have not found any legal support for the proposition that, in the absence of deliberate indifference before a constitutional violation, a municipality may be liable for simply failing to investigate or punish a wrongdoer *after* the violation.") (emphasis added).

*Greenlee*, 2015 U.S. Dist. LEXIS 18145, at *21-22. The court further held that to the extent that *Wright v. City of Canton* failed to recognize that a documented pattern of abuse prior to the incident

was required to impose liability in both *Marchese* and *Leach*, it was wrongly decided. *Id.* at *21 n.5.

Guglielmo cites a variety of evidence in support of his argument that Montgomery County failed to conduct a meaningful investigation into Sgt. Snyder's use of force. Guglielmo does not, however, cite evidence showing a causal link between that failure and the use of force against him. He has not summoned sufficient evidence to support a claim based solely on Montgomery County's alleged ratification of Sgt. Snyder's conduct.

### 2. Evidence of a Custom or Policy Permitting Excessive Force

Guglielmo also seeks to hold Montgomery County liable by showing that it has a custom or unwritten policy of permitting correctional officers to use excessive force at the Jail. To prevail on such a theory, a plaintiff must show:

(1) the existence of a clear and persistent pattern of illegal activity;

(2) notice or constructive notice on the part of the defendant;

(3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and

(4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (internal quotes and brackets removed) (quoting *Doe v. Claiborne Cnty., Tenn.*, 103 F.3d 495, 507 (6th Cir. 1996)).

### i. Existence of Clear and Persistent Pattern

Guglielmo relies on the testimony of Michael Berg, a corrections expert, to show that there is a clear and persistent pattern of excessive force at the Jail. Berg reviewed 120 uses of force by the named Defendants to determine, in each case, whether the force used was excessive. His process involved reviewing the officer's description of a particular event – including the inmates'

actions and the officer's response. Generally, Berg found that incidents involved an excessive use of force where "the individual was under control" but the officer continued to use "fist strikes, knee strikes, tasings, OC spray, restraint devices such as a restraint chair, and flashlight used as an attack weapon."

Berg opined that the overall number of use-of-force incidents by the defendant officers was "extremely high" and inconsistent with the principle that the use of force should be a "last resort." He determined that 71 of the 120 incidents he reviewed involved excessive force. In one-and-a-half years at the Jail, Sgt. Snyder used force thirty-one times. Of those incidents, Berg determined the use of force was excessive in 29 cases, or 93.5% of the incidents. No officer was disciplined as a consequence of any of the 120 use-of-force incidents that Berg reviewed.

Defendants' sole counter-argument is that Berg's testimony is inadmissible under Fed. R. Evid. 702. In a prior Order, the Court denied Defendants' Motion in Limine to exclude Berg's testimony on the same ground. Based on Berg's testimony, Guglielmo has presented evidence from which a reasonable juror could find a clear and persistent pattern of using excessive force at the Jail.

### ii.    Notice or Constructive Notice

As to this element, Guglielmo asserts that each of the 71 incidents allegedly involving excessive force was reported to the Chief Deputy, Jail Commander, and the Training Center. In addition, Sheriff Plummer testified that he shares his responsibility to make sure the use-of-force policies are being followed in the jail with a major (Jail Commander) and the chief deputy. Guglielmo argues that this evidence is sufficient to show that Montgomery County was on notice of the alleged pattern of excessive force. The Court agrees and, in any event, Defendants do not dispute this element.

### iii.     Tacit Approval of Unconstitutional Conduct

Guglielmo argues that a reasonable juror may infer Montgomery County's tacit approval of the use of excessive force from the fact that, in Sheriff Plummer's ten years of service, only one officer was disciplined for using excessive force.  Moreover, Guglielmo argues the one incident where an officer was disciplined is irrelevant because it occurred after the incident involving Guglielmo.  Defendants do not specifically challenge the sufficiency of the evidence to establish this element.  The Court notes that the parties dispute the adequacy of the investigations into uses of force at the Jail, which could be construed as relevant to whether Montgomery County tacitly approved the use of excessive force.  The parties' arguments as to this issue, however, were directed toward Guglielmo's ratification theory of liability.  Regardless, there are material factual issues concerning the adequacy of the investigations that must be resolved by the trier of fact.

### iv.     Moving Force or Direct Causal Link

Guglielmo claims that he was subjected to excessive force because Montgomery County failed to discipline Sgt. Snyder for using excessive force on other inmates in four nearly identical situations that occurred in the fourteen months before Guglielmo was booked into the Jail.  In each of the four incidents, Sgt. Snyder ordered the inmate to stop banging on the cell door, entered the cell, and ultimately pepper sprayed the inmate.  (Docs. 134-21, 134-22, 134-23, 134-24.)  Guglielmo contends that, in each instance, the use of force was unnecessary because the inmate was compliant—just as Guglielmo complied with the order to stop banging on the door before he was struck.  In the incident reports, Sgt. Snyder states the use of force was required because the inmates were not complying with commands and/or posed a safety risk.  Sgt. Snyder also testified that it was his "standard operating procedure" to enter a cell "to control inmates in the jail that

might hurt themselves or the property." Each incident was reported and approved by the Sheriff's office as within policy.

These incidents are similar enough for Guglielmo to argue, based on Berg's testimony, that Sgt. Snyder had an established pattern of entering inmates' cells for creating too much noise and then using excessive force against them. If the jury agrees, then it could also find that Guglielmo would not have been subjected to excessive force if Sheriff Plummer had disciplined Sgt. Snyder for the use of excessive force in these prior incidents. *Cf. Claiborne Cnty., Tenn.*, 103 F.3d at 508 (plaintiff could not establish policy, custom or practice where there was no evidence that the defendants school board failed to act regarding other teachers in similar circumstances). By establishing this causal link, Guglielmo has shown that he can meet his burden on this element at trial. *See Mann v. Helmig*, 289 F. App'x 845, 850 (6th Cir. 2008) ("[P]roof merely that such a policy or custom was 'likely' to cause a particular violation is not sufficient; there must be proven at least an 'affirmative link' between policy or custom and violation; in tort principle terms, the causal connection must be 'proximate,' not merely 'but-for' causation-in-fact.").

Guglielmo has come forward with evidence from which a reasonable juror could find in his favor on his § 1983 claim against Montgomery County based on a custom or policy of permitting the use of excessive force. The motion for summary judgment as to this claim is therefore denied.

## CONCLUSION

For the reasons above, Defendants' Motion for Summary Judgment (Doc. 123) is **GRANTED IN PART** and **DENIED IN PART**. Specifically, the Court orders as follows:

> 1. All claims against Officers Cooper and Cohn are **DISMISSED**;

2. Sgt. Snyder and Officers Zink, Sears and Ort are **DENIED** summary judgment on the basis of qualified immunity due to the existence of genuine issues of material fact;

3. Except with respect to such a claim against Sgt. Snyder, 42 U.S.C. § 1983 claims of deliberate indifference to serious medical needs brought against the individual defendants are **DISMISSED**;

4. The claims against Sheriff Plummer, Sgt. Snyder, and Officers Zink, Sears, and Ort in their official capacities are **DISMISSED**;

5. The claims against Sheriff Plummer in his individual capacity are **DISMISSED**;

6. The claim against Montgomery County based exclusively on its alleged ratification of the use of force against Guglielmo is **DISMISSED**; and

7. All other claims shall proceed to trial.

**DONE** and **ORDERED** in Dayton, Ohio, this Tuesday, May 28, 2019.

s/Thomas M. Rose

_____
THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE